

14 CV 9447

LAW OFFICES OF GEORGE N. PROIOS, PLLC
Attorneys for Plaintiff
55 Broadway, Suite 1501
New York, NY 10006
Phone: 212-279-8880

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————

Aegean Bunkering (USA) LLC

Plaintiff,

v.

M/T AMAZON (IMO 9476654), its
engines, tackle and apparel,

Certain Bunkers FO 500 CST aboard
or loaded aboard the M/T AMAZON,

Defendants *in rem*,

Bergen Bunkers, AS

Jasper Exporting Ltd..

Defendants *quasi in rem*,

and

The Master of the M/T AMAZON,

Garnishee

——————————————————

14 CV
**ECF Case**

**VERIFIED COMPLAINT**

Aegean Bunkering (USA) LLC ("Agean") hereby pursuant to Supplemental Admiralty

and Maritime Rule C sues the AMAZON (IMO 9476654), its engines, tackle and apparel (herein

collectively the "Vessel"), *in rem*, pursuant to Supplemental Admiralty and Maritime Rule D,

Certain Bunkers FO 500 CST aboard or loaded aboard the M/T AMAZON ("Bunkers"), and

pursuant to   pursuant to Supplemental Admiralty and Maritime Rule B, Jasper Exporting Ltd., *quasi in rem*, as follows:

## Jurisdiction and Venue

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 and the Commercial Instruments and Maritime Lien Act, 46 U.S.C. §§ 31301-31343. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), through the stipulation of the parties, including for security as set out in the accompanying letter of undertaking, Exhibit A hereto. On or about November 19, 2014, in exercise of its rights against the Vessel, Jasper, Bergen, and the Bunkers which Aegean provided to the Vessel, as more fully set out herein Aegean brought action as the Vessel was located at Nassau, Bahamas, arresting the Vessel. In exchange for release of the Vessel, Aegean received the undertaking which is Exhibit A hereto.

2.      This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiff invokes the maritime procedures and special relief provided in Rules B, C and D of the Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure (the "Supplemental Admiralty Rules")

3.      Jurisdiction is founded on the undertaking which is Exhibit A hereto, as well as the maritime contract on which this action is based stating agreement, to proceed in this District, on the security which is the subject of the undertaking.

## Parties

4.      The Vessel is an ocean-going vessel owned by Jasper, a Liberian corporation.

Plaintiff is a Delaware corporation registered in New York with its principal place of business in this District. Bergen Bunkers is a Norwegian corporation. Neither Jasper nor Bergen Bunkers are present in this District within the meaning of Supplemental Rule B.

### Facts

5.      Aegean brings this action in order to recover money indisputably due and owing to it under a maritime contract for the supply of bunkers to the Vessel (hereinafter the "Bunker Contract"). Exhibit B hereto includes the documents pertinent to the Bunker Contract, namely, the invoice for payment, delivery receipt and the incorporated "General Terms and Conditions for Bunkers" of Hess Oil ("Bunkers GTCs").

6.      The Bunker Contract is between Aegean and Jasper. Bergen Bunkers was acting as apparent or actual agent for the Vessel and Jasper, jointly and severally, for entry of the Bunker Contract with Aegean. Bergen Bunkers on October 22, 2014 on behalf of Jasper and the Vessel, placed an order with Aegean, pursuant to the Bunker Contract, for provision of the Bunkers to the Vessel. Consequently, in fulfillment of the Bunker Contract, Aegean on October 31, 2014 provided the Bunkers to the Vessel at Philadelphia, issuing the invoice which is part of Exhibit B.

7.      The Bunkers GTCs (in Exhibit B hereto) provide in pertinent part as follows:

D. Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York, U.S.A. (without reference to its conflict of law rules).
. . .

E. Jurisdiction.

Each Party expressly submits to the exclusive jurisdiction of any New York State court or federal District Court of the United States of America sitting in the

Borough of Manhattan in New York City and any appellate court thereof, in any action or proceeding arising from, arising out of or relating to this Agreement, or for recognition of any judgment, without recourse to arbitration, and each Party consents to service of process by certified mail. . . .

\*   \*   \*

P. Liens.

Deliveries of Bunkers hereunder are made not only on the credit of Buyer, but also on the faith and credit of Buyer's vessel that uses the Bunkers. Seller and Supplier will have and may assert a lien for the said amount of the delivered price against any such Vessel, should the laws applicable at (i) the place of Seller's address which is set forth in the relevant Contract, (ii) the place of delivery of Bunkers, and/or (iii) the place of seizure of such Vessel; grant or recognize a lien for Bunkers delivered to a Vessel.   All costs associated with the seizure of any Vessel shall be for Buyer's account. The taking of any additional security measures by Seller or Supplier shall not operate as a waiver of this provision. If at any time, a Price provided under these [Bunkers GTCs] or any Contract shall not conform to the applicable laws, regulations or orders of any government or other competent authority having jurisdiction over Buyer, Seller, or Supplier, Seller shall make appropriate adjustments to such Price. The Buyer shall not be entitled to cancel the effect of this lien by wording on the delivery ticket or otherwise.

\*   \*   \*

V. Definitions.

In addition to the terms previously defined in this Agreement, the following terms shall apply:

\*   \*   \*

"Buyer" has the meaning as set forth in any Contract.

"Contract" means any purchase or sales contract incorporating these [Bunkers GTCs].

8.      On October 31, 2014, upon Aegean's physical provision of the Bunkers to the Vessel, the Chief Engineer of the Vessel, employed by Jasper, further, signed the Bunkers bunker delivery receipt ("BDR") for the Vessel and Jasper (in Exhibit B hereto), which states in

pertinent part as follows:

> The Bunkers described herein is delivered in accordance with the applicable terms and conditions of sale (a copy of which as been provided to Buyer prior to delivery) and on credit of the vessel. Any disclaimers a o creation of a maritime lien in the amount of the purchase price and delivery charges and/or restrictions as to the authority of the ships officer signing the Receipt to find the vessel and her owner to the above are null and void, unless an authorized representative of Aegean Bunkering (USA) LLC shall have otherwise agreed in writing at the time Buyer initially orders the Bunkers. Failing such agreement delivery, shall under no circumstances, constitute a waiver by Aegean Bunkering (USA) LLC.

9.      By signing the BDR, the Vessel's Chief Engineer acted on behalf of the Vessel and her Owner and/or Operator to procure Bunkers, and thereby accepted the bunkers on behalf of, *inter alia*, the Vessel in compliance with the Commercial Instruments and Maritime Lien Act, 46 U.S.C. §§ 31301-31343.

10.      The Bunkers delivered to the Vessel were necessary to the accomplishment of the Vessel's which is worldwide trade as a commercial ship. The Vessel's Chief Engineer at the time of the bunker provision by Aegean to the Vessel was authorized to order and receive necessaries for the account and on the credit of the Vessel and its owner, Jasper.

11.      The Vessel and Jasper have received the benefit of the aforementioned Bunkers deliveries and are indebted to Aegean and obligated to pay for the Bunkers. Aegean performed all conditions precedent to warrant full and complete payment for the Bunkers,

12.      As a result of the foregoing, Aegean possesses a maritime lien *in rem* against the Vessel for the provision of necessaries, bunker fuel, enforceable in this admiralty action in accordance with the provisions of Supplemental Admiralty and Maritime Rule C.

13.      By information and belief, Bergen Bunkers had an agreement with Jasper and/or Jasper's agents, for payment to Bergen Bunkers for the Bunkers which Aegean provided to the

Vessel. By information and belief, that agreement incorporated Bergen Bunkers terms and

conditions of sale (Exhibit C hereto) which state in pertinent part as follows:

H. TITLE

H.1 Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery. The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of nonpayment.

H.2 Until full payment of the full amount due to the Seller has been made and subject to Article G.14 hereof, the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller, and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel, nor mix, blend, sell, encumber, pledge, alienate, or surrender the Bunkers to any third party or other Vessel.

H.3 In case of non or short payment for the Bunkers by the Buyer, the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention, without prejudice to all other rights or remedies available to the Seller.

*   *   *

P. LAW AND JURISDICTION

P.1 This Agreement shall be governed and construed in accordance with English law.

The Bunkers has not been paid for, by information and belief, including to Bergen Bunkers, and

title to the fuel remained with Bergen Bunkers.   Aegean is a beneficiary of the provisions of the

Bergen Bunkers terms and conditions of sale.

14.     Bergen Bunkers, by information and belief, has been insolvent for more than 30

days prior to this complaint.   Aegean demanded adequate security from Bergen Bunkers, which

failed to provide that security.   With Bergen Bunkers' failure to provide adequate security,

Aegean has terminated the Bunker Contract (except the obligation to pay for the Bunkers) and

accelerated the requirement of payment.   As a part of the termination of the Bunker Contract

including by notice to Bergen Bunkers, Aegean contends that it also has resumed title to the Bunkers provided to the Vessel.   Consequently, Aegean contends that the title to the Bunkers, if it is not held presently by Bergen Bunkers, is held by Aegean.

15.     As of the date of filing this Verified Original Complaint, Aegean has not received any payment for the Bunkers which it provided to the Vessel.

**Count I - Maritime Lien In Rem Against the Vessel**

16.     Aegean repeats and incorporates the foregoing paragraphs.

17.     The Vessel holds, has consumed and not paid for, the Bunkers. Consequently, the Vessel has been unjustly enriched.   Further, although not holding title to the Bunkers, the Vessel has consumed certain amounts of the Bunkers, and therefore converted the Bunkers.

17.     As a result of the Vessel's failure to pay Aegean for the Bunkers, under the terms of the Bunker Contract, Aegean's claim for the amount of $ 981,708.20, plus interest and costs, attaches as maritime lien on the Vessel in favor of Aegean and is enforceable by suit *in rem*.

18.     Aegean further holds a maritime lien *in rem* against the Vessel for the tort of conversion, for the amount of the Bunkers consumed by the Vessel, without the Vessel, or Jasper, holding title to the Bunkers.

19.     For the bunkers remaining on the Vessel; to which neither the Vessel nor Jasper hold title, Aegean further holds a maritime lien in rem against the Vessel for the tort of trespass to the title of Aegean to the Bunkers.

20.     Accordingly, Aegean seeks to enforce its maritime liens against the Vessel *in rem*, as demanded below.

### Count II - Possessory Action - Bunkers, *In Rem*

21.     Aegean repeats and incorporates the foregoing paragraphs.

22.     Pursuant to Supplemental Rule D, on the undertaking provided, Aegean arrests the Bunkers to try title to them and for a declaration that Aegean is the owner of the Bunkers and entitled to be paid for their value.

23.     Accordingly, Aegean proceeds pursuant to Supplemental Rule D against the Bunkers, *in rem*, as demanded below.

### Count III - Against Bergen Bunkers, AS, *Quasi in Rem* - Supplemental Rule B

24.     Aegean repeats and incorporates the foregoing paragraphs.

25.     Bergen Bunkers held and may hold title to the Bunkers.   To the extent that Bergen Bunkers (rather than Aegean) holds title to the Bunkers, Aegean proceeds pursuant to Supplemental Rule B in attachment of the Bunkers, for the full amount owed to Aegean for the Bunkers.

26.     Accordingly, Aegean proceeds pursuant to Supplemental Rule B against Bergen, attaching the Bunkers as property of Bergen, as demanded below.

### Count IV - Against Jasper *Quasi in Rem* - Supplemental Rule B

27.     Aegean repeats and incorporates the foregoing paragraphs.

28.     Jasper received, holds and caused the Vessel to consume the Bunkers, pursuant to the Bunker Contract.   If for some reason Jasper is not a party to the Bunker Contract, Jasper has been unjustly enriched by the Bunkers, and also by permitting the Bunkers to be consumed, has caused the conversion of the Bunkers consumed. Jasper may also contend that the Bunkers are its

property. Aegean accordingly proceeds pursuant to Supplemental Rule B in attachment of the Vessel as property of Jasper, as well as, to the extent Jasper contends that the Bunkers are its property, the Bunkers, for the full amount owed to Aegean for the Bunkers.

29.     Accordingly, Aegean proceeds pursuant to Supplemental Rule B against Jasper, attaching the Vessel and (if claimed as property of Jasper), the Bunkers, as demanded below.

### Count V - Against the Master of the Vessel, As Garnishee, Supplemental Rule B

30.     Aegean repeats and incorporates the foregoing paragraphs.

31.     The Master of the Vessel had at the time of the arrest of the Vessel in Bahamas, custody of the Vessel and Bunkers, and continues to have custody of the Vessel and Bunkers.

32.     Pursuant to Counts III and IV, Aegean therefore proceeds against the Master as Garnishee, requesting that on the undertaking provided, the Vessel and Bunkers be considered garnished and attached, pursuant to Supplemental Rule B.

33.     Accordingly, Aegean proceeds pursuant to Supplemental Rule B against the Master of the Vessel as Garnishee, as demanded below.

WHEREFORE, Aegean demands as follows:

A.      That on the undertaking provided, pursuant to Supplemental Rule C, this action proceed against the Vessel *in rem*, for Aegean's claim for the amount of $ 981,708.20, plus interest and costs (herein the "Claim Amount"), and that this Court enter judgment in favor of Aegean and against the Vessel, for the Claim Amount; and

B.      That on the undertaking provided, pursuant to Supplemental Rule D, this action proceed against the Bunkers *in rem*, that this Court declare that the Bunkers were and are Aegean's property, and that the Court enter judgment in favor of Aegean and against the Bunkers, Jasper and Bergen and on the undertaking, for the Claim Amount; and

-9-

C.   That on the undertaking provided, pursuant to Supplemental Rule B, this action proceed against Bergen, and Jasper, as set out in Counts III and IV herein, respectively, considering the attachment of the Bunkers and the Vessel as set out in those Counts, and that the Court enter judgment in favor of Aegean and against Bergen (Count III) and/or Jasper (Count IV) on the undertaking, for the Claim Amount; and

D.   That on the undertaking provided, the Court consider that Supplemental Rule B process of maritime attachment and garnishment has issued to the Master of the Vessel, with security provided as set out in the undertaking; and

E.   That in response to all Counts, this Court extend to Aegean all further and other proper relief.

Dated: November 26, 2014.
New York, New York

Respectfully Submitted,

LAW OFFICES OF GEORGE N. PROIOS, PLLC

George N. Proios
55 Broadway, Suite 1501
New York, NY 10006
Phone: 212-279-8880

Attorneys for Aegean

OF COUNSEL:
J. Stephen Simms
John T. Ward
Marios J. Monopolis
Simms Showers LLP
201 International Circle, Suite 250
Baltimore, Maryland 21030
Telephone: 410-783-5795

VERIFICATION

STATE OF NEW YORK        )
                         :        ss.:
COUNTY OF NEW YORK       )

George N. Proios being duly sworn, deposes and says:

1.      I am a member of the bar of this Honorable Court and am counsel to Plaintiff.

2.      I have read the foregoing Complaint and I believe the contents thereof are true.

3.      The reason this Verification is made by deponent and not by Plaintiff in that Plaintiff is
foreign corporation, no officers or directors of which are within this jurisdiction.

4.      The sources of my information and belief are documents provided to me and statements
made to me by representatives of Plaintiff.

5.      Pursuant to Supplemental Rule B, I caused the following efforts to be made to confirm
that neither defendants Bergen Bunkers nor Jasper are found within the District, or any adjacent
District, within the meaning of Supplemental Rule B:

      A.      Caused a check of the respective state corporate information directories of
             New York, New Jersey, Connecticut, Vermont, Massachusetts and
             Pennsylvania, finding no listing for either defendant Bergen Bunkers or
             Jasper; and

      B.      Caused to be conducted a search using Google, finding no listing in the
             United States for either defendant Bergen Bunkers or Jasper.


                      _____
                      George N. Proios

                      Sworn to before me this
                      26th day of November, 2014


                      _____
                      Notary Public

                            ELIN MARIE FREY
                    NOTARY PUBLIC, STATE OF NEW YORK
                        Registration No. 02FR6278361
-11-                        Qualified in Queens County
                      Commission Expires March 25, 2017

Exhibit A

# NORTH 

Aegean Bunkering (USA) LLC
c/o Simms Showers LLP
201 International Circle
Baltimore
Maryland 21030

**BY FACSIMILE TO 410-365-6131**
**AND EMAIL TO** jssimms@simmsshowers.com

Our Ref:    14/FDD/A/DHL/BJR/CK/NL301291CK
Date:       24 November 2014

Dear Sirs

**"M/V AMAZON" (IMO 9476654, "Vessel") ALLEGED NON-PAYMENT BUNKER FUEL RECEIVED AT PHIILADELPHIA, USA 30th OCTOBER 2014 – CLAIM US$981,708.20 against the Vessel, Owners of the Vessel and/or managers of the Vessel (collectively and individually, "Claim")**

In consideration of your consenting to promptly release from arrest and/or to refrain from taking any action resulting in the arrest or detention of the Vessel, or any other vessel or property in the ownership, associated ownership, management, possession or control of the Owners of the Vessel and/or managers of the Vessel for the purpose of founding jurisdiction and/or obtaining security in respect of the above mentioned Claim, we, NEPIA, and as agent for the Vessel's Owners for purposes of this undertaking, hereby undertake to pay to you within 14 days of your written demand, such sums as may be settled upon between the parties or adjudged by the U.S. District Court for the Southern District of New York, by final judgment, not subject to appeal, or other competent tribunal as may be agreed, to be recoverable against the Vessel, Owners of the Vessel and/or managers of the Vessel in respect of the Claim, provided that the total of our liability hereunder shall not exceed the sum of US$1,150,000 (One Million, One Hundred and Fifty Thousand United States Dollars) inclusive of interest and costs.

We further undertake to file or cause to be filed an appearance and Claim of Owner on behalf of the Vessel in an action asserting the Claim filed or to be filed by you in the U.S. District Court for the Southern District of New York which Court shall have exclusive jurisdiction and venue over the Claim, and such appearance shall be made whether the Vessel is lost or not lost and irrespective of the presence or absence of the Vessel within the jurisdiction of the Court. This LOU will stand as substitute security for your Claim against the Vessel and/or the Owners of the Vessel and/or managers of the Vessel.

---

THE NORTH OF ENGLAND P&I ASSOCIATION LIMITED  The Quayside, Newcastle upon Tyne, NE1 3DU UK
Telephone: +44 (0) 191 2325221  Fax: +44 (0) 191 2610540  www.nepia.com

The North of England Protecting and Indemnity Association Limited. Registered in England No. 505456. Registered Office above.
Hong Kong: Room 3007-08, COSCO Tower, 183 Queen's Road Central, Hong Kong  Telephone: +852 25446813  Fax: +852 25424424.
Greece: 5-7 Aghiou Nikolaou, GR 185 37, Piraeus, Greece  Telephone: +30 210 4283036  Fax: +30 210 4280920.
Singapore: 80 Anson Road, #26-03 Fuji Xerox Towers, Singapore 079907  Telephone: +65 64110160  Fax: +65 62240160.
Tokyo: Shinkyobashi Building, 6th Floor, 2-8-8 Kyobashi, Chuo-ku, Tokyo, Japan, 104 - 0031  Tel: +81 (3) 5159 5373  Fax: +81 (3) 5250 0003.
The North of England P&I Association Limited is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority in the UK.

Owners shall within 14 days of your written demand or at Owners' option provide replacement security for the said Claim, in substitution for this undertaking, in the form of cash paid into the registry of the U.S. District Court for the Southern District of New York or bond issued by a surety agreeable by you, in a form agreeable by you, and upon the provision of such replacement security and confirmation in writing from you of its acceptability as replacement security, which will not be unreasonably withheld or delayed, or in the absence of your agreement, approval of the replacement security by a court of competent jurisdiction, this Undertaking shall be rendered null and void and shall be returned to us at the above address. Except as provided for herein, this Undertaking and any replacement security is provided without prejudice to and with a full reservation of all rights and defences available to the Vessel, her Owners, and/or her managers in connection with the said Claim, including but not limited to any rights and defence(s) that may be available under U.S. or other law, none of which is to be regarded as waived by virtue of the posting of this Undertaking, with the exception that no defence shall be raised that you failed to commence subsequent substantive legal proceedings on the merits of the Claim in the U.S.

This Undertaking shall be governed by and construed in accordance with U.S. maritime law and subject to the jurisdiction of the Southern District of New York.

In consideration of this undertaking, and Owners' payment of the Claims, you agree to provide all reasonable assistance and documents that Owners may reasonably request for the purpose of defending any claim, in direct connection with the Claim, that is brought against them by OW Bunker [Malta Ltd.] or its assignees.

This undertaking is being transmitted to you by facsimile and email.  No original of this undertaking shall be required to enforce the terms of this undertaking, and no copy of this undertaking shall be required to be returned upon settlement, judgment or cancelation of this undertaking.

Yours faithfully

*B Roberts*

B Roberts.
Group Director (FD&D)
The North of England P&I Association Limited

Exhibit B



# AEGEAN BUNKERING (USA) LLC
299 Park Avenue, 2nd Floor, New York, NY 10171 USA

## ORIGINAL INVOICE

| BILL TO:        ACCOUNT NO: |
|---|
| BERGEN BUNKERS AS |
| TORGALLMENNINGEN 9 |
| BERGEN, BE 5807 |

| INVOICE DATE: | INVOICE NUMBER: |
|---|---|
| 10/31/2014 | P0001239SF |

**SHIP TO:**
BERGEN BUNKERS AS

**LOAD:** PENNSAUKEN

**DLVD:** PHILADELPHIA

**SHIP VIA:** DS34

**PO:** 182158788

**WIRE TRANSFER TO:**
**BANK NAME:** WELLS FARGO
ADDRESS (CITY STATE): SAN FRANCISCO, CA
ABA #: 121000248 SWIFT: WFBIUS6S
ACCOUNT NAME: ABN AMRO CAPITAL USA LLC
ACCOUNT NUMBER: 4122099799
FURTHER CREDIT:HOUSE ACCOUNT A/C: 45000906
REFERENCE: AEGEAN BUNKERING (USA) LLC

**TERMS:** NET  30 DAYS FROM SHIP DATE

| ITEM DESCRIPTION | SHIP DATE | QUANTITY | UNIT | UNIT PRICE | ITEM AMOUNT |
|---|---|---|---|---|---|
| CPHY_15311     BUNKER FO 500 CST | 10/31/2014 | 2100.87 | MT | 460.00 | 966,400.20 |
| FUEL SURCHARGE | | | | | 3,283.00 |
| BOOMING CHARGE | | | | | 300.00 |
| BARGING | | | | | 11,725.00 |
| | | | | USD | 981,708.20 |

VESSEL: AMAZON

TOTAL AMOUNT DUE BY: 12/01/2014

Seller represents that with respect to the production of the articles and/or the performance of the services covered by this invoice, it has fully complied with the provisions of the Fair Labor Standards Act of 1938, as amended, and with regulation and orders of the U.S. Dept. of Labor issued under Section 14 thereof.
AHC 3403A

**THANK YOU FOR CHOOSING AEGEAN BUNKERING (USA) LLC AS YOUR ENERGY SUPPLIER!**

**AEGEAN**

299 Park Avenue, 2nd Floor
New York, NY 10171 USA

| Marine Fuel Bunker Delivery Note | | Bunker Order No. CPHY_15311 | |
|---|---|---|---|
| Vessel Name: M/V AMAZON | Barge Name: DS34 | Date of Delivery: 10/30/14 | |
| Vessel IMO Number: 9476654 | Loading Point: BuckEye Terminals LLC Del | Delivery Point: Marcus Hook Anchorage (M: | |

| PRODUCT ANALYSIS: | | PRODUCT INFORMATION | | | | |
|---|---|---|---|---|---|---|
| Density @15C: | 1.0065 | Grade Supplied | | Gross Barrels | Net Barrels | Metric Tons |
| Viscosity CST @50C: | 222 | RMK-500 | | 13,411.86 | 13,147.72 | 2,100.870 |
| Sulfur % m / m: | 1.65 | | | | | |
| Temp F: | 112 | | | | | |

| Fuel Grades | Sample(1) - (Vessel) | Sample(2) - (Aegean) | Sample(3) - (Aegean) | Annex |
|---|---|---|---|---|
| RMK-500 | 36540035 | 36541119 | 36541116 | 36541158 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| DELIVERY INFORMATION | MONTH/DAY/YEAR | TIME | GAUGES WITNESSED BY SHIPS REPRESENTATIVE | | |
|---|---|---|---|---|---|
| Barge Alongside | 10/30/14 | 17:20 | ☑ Before | ☐ After | ☐ Declined |
| Hose Connected | 10/30/14 | 18:50 | SAMPLES GIVEN TO CUSTOMER | | |
| Started Pumping | 10/30/14 | 19:30 | ☑ Yes | ☐ No | If no why? |

| Finished Pumping | 10/31/14 | 00:42 | Aegean Representative (Delivery Company) | |
|---|---|---|---|---|
| Hose Disconnected | 10/31/14 | 00:50 | By: chris cunningham | |
| Barge Away | | | Date: 10/31/14 | Time: |

The fuel supplied in this delivery is in conformity with Regulation 14 (1) or 14 (4)(a) and Regulation 18 of Annex VI of Marpol 73/78 effective 19th of May 2005.

Signed _(signature)_                                  Print _David Pruitt_

The marine fuel described herein is delivered in accordance with the applicable terms and conditions of sale (a copy of which has been provided to Buyer prior to delivery) and on credit of the vessel. Any disclaimers as to creation of a maritime lien in the amount of the purchase price and delivery charges and / or restrictions as to the authority of the ships officer signing the Receipt to bind the vessel and her owner to the above are null and void, unless an authorized representative of Aegean Bunkering (USA) LLC shall have otherwise agreed in writing at the time Buyer initially orders the marine fuel. Failing such agreement delivery, shall under no circumstances, constitute a waiver by Aegean Bunkering (USA) LLC.

The vessel is responsible for all hose connecting and disconnecting. Barge will lift hose to vessel's rail only. If vessel is unable to take delivery of the full quantity ordered, all expenses in connection with returning the oil to the installation shall be for buyer's account. The vessel's management is invited to appoint a representative to check and witness the opening and closing meter readings or tank dips. Supplier's measurements are final and binding. The vessel's staff in charge of bunkering operations must NOT close valves on board without first giving ample warning to the attendant of the delivering facility. Any instructions from the vessel's staff, such as "ease down" or "stop" will be carried out immediately to avoid excessive pressure on the pipeline, which may cause hose to burst. Prior to bunkering operations, every precaution must be taken to avoid contamination by oil spillage, such as the placing drop pans, the closing of scuppers, etc. Any oil spillage will automatically be the sole responsibility of the receiving vessel if this warning is ignored. Any indication of contamination MUST be immediately reported to the relevant authorities by the staff of the delivering facility.

## REMARKS:

DECLARATION OF THE MASTER/CHIEF ENGINEER: I declare that the information given above is true and correct to the best of my knowledge and belief; that I have no knowledge of the facts set forth herein; that the articles described in this notice of lading were received in the quantities stated, from the person and on the date indicated above; that said articles were laden on the vessel named above for use on said vessel as supplies, except as noted, received for the use bunkers, together with representative, sample given quantities show above. Exact quantities shown are subject to correction in case of error.

_(signature)_

**MASTER/CHIEF ENGINEER**          **DATE:** _31/OCT/2014_          **SHIP STAMP**



# HESS CORPORATION

## GENERAL TERMS AND CONDITIONS FOR MARINE FUELS

Buyer and Seller (each, a "Party" and collectively, the "Parties") have entered and/or anticipate entering into one or more Contracts governed by these General Terms and Conditions for Marine Fuels ("Marine Fuels GTCs") in reliance on the fact that the Marine Fuels GTCs and all such Contracts form a single agreement between the Parties (collectively, "Agreement"), and would not otherwise enter into any Contracts.

**A.  Payment Terms.**
Payment shall be made in U.S. Dollars without discount, deduction or setoff within thirty (30) days from date of delivery (the "Due Date").  Payment of all sums due in respect of Marine Fuels delivered hereunder shall be made in full to Seller by means of electronic wire transfer to the bank account stated on the invoice or otherwise provided, such that funds are received into such account by the Due Date.  If the Due Date falls on a Saturday, Sunday or public holiday, payment shall be made so as to reach Seller's designated bank account not later than the last banking day prior to the Due Date.  Delivery documents may be provided to the Buyer if so requested, but payment shall not be conditional upon the Buyer's receipt of such documents.

In the event that Buyer fails to make any payment when due, Seller shall have the right to charge interest on the outstanding amount at two percent (2%) above the Interest Rate published by the Wall Street Journal, or the maximum amount allowed by law (whichever is less), on the Due Date, and calculated on a three hundred sixty (360) day-per-year basis from the Due Date (the "Interest Rate") until the date such payment is received by Seller.  If the Wall Street Journal is not published on the Due Date, the Seller shall use the prime rate published by an internationally-recognized financial publication.

In the event of any dispute with respect to payment amounts hereunder, Buyer shall pay Seller the undisputed amount on the Due Date.

**B.  Credit.**
If Seller supplies Marine Fuels to Buyer on credit and the financial condition of Buyer becomes, in the sole opinion of Seller, impaired or unsatisfactory, Seller may demand that Buyer make payment for Marine Fuels at any time before the Due Date or provide security.

To the extent Buyer has (i) exceeded any credit limit set by Seller without providing the security demanded by Seller, or (ii) failed to make any payment hereunder, Seller shall, in addition to any other remedy allowed hereunder or at law or in equity, (x) have the right to suspend or terminate any delivery of Product under this Agreement, and/or (y) aggregate all amounts payable by each Party to the other under all agreements between them and net the same, such that a single payment shall be payable by one Party to the other, which amount shall be immediately due and payable.  In the event of any such delivery termination or suspension, Buyer shall have no recourse against Seller.

**C.  Minimum Insurance Amount and Indemnity.**
Any Vessels nominated by Buyer hereunder shall have secured and will maintain while in or about the Delivery Port, oil pollution insurance coverage in at least the maximum amount prescribed by such Vessel's protection and indemnity (P&I) club or mutual insurance association.  Should any additional oil pollution insurance coverage become available over and above the current maximum P&I club limit currently available, each Vessel nominated by Buyer shall secure the same.

**D.  Governing Law.**
This Agreement shall be governed by and construed in accordance with the laws of the State of New York, U.S.A. (without reference to its conflict of law rules).  To the extent not inconsistent herewith, Incoterms 2010, ICC publication No. 715, effective January 1, 2011, shall apply hereto.

**E.  Jurisdiction.**
Each Party expressly submits to the exclusive jurisdiction of any New York State court or federal District Court of the United States of America sitting in the Borough of Manhattan in New York City and any appellate court thereof, in any action or proceeding arising from, arising out of or relating to this Agreement, or for recognition of any judgment, without recourse to arbitration, and each Party consents to service of process by certified mail.

Each Party further agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in

Effective as of October 29, 2010, as revised July 9, 2013

any other manner provided by law. Each Party waives any objections which it may now or hereafter have based on venue and/or forum non conveniens for any such suit, action or proceeding filed in any New York State court or federal District Court of the United States of America sitting in the Borough of Manhattan in New York City.

The Parties hereto specifically and intentionally exclude the applicability to this Agreement, if any, as the United Nations Convention on Contracts for the International Sale of Goods.

## F.  WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENTS.  EACH PARTY HERETO: (A) CERTIFIES THAT NO REPRESENTATIVE AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION F.

## G.  Assignment.

Seller may assign all or any of its rights and obligations without notice to Buyer.  Buyer consents, irrespective of notice, to be bound to the assignee.  Delivery of the Marine Fuels by the assignee shall constitute its consent to be bound to Buyer under the terms set out herein.  Any assignment by Buyer without Seller's written consent shall be void**.**

## H.  General Quality Terms.

Buyer shall have sole responsibility for selection and acceptance of Marine Fuels, including determination of compatibility with any Marine Fuels already on board any Vessel, for use in such Vessel receiving Marine Fuels. Quality testing shall be by an independent laboratory chosen by Seller ("Independent Lab") from composite samples taken at time of delivery from the shore tank or Vessel from which delivery was made.   The tests taken by this Independent Lab shall be conclusive for purposes of determining the quality of Marine Fuels. Unless otherwise indicated to Buyer in writing by Seller or Supplier, any information provided to Buyer regarding the characteristics of Marine Fuels at any delivery location shall not be construed as specifications of Marine Fuels to be delivered hereunder, but only as indications of the characteristics of Marine Fuels available at that location from time to time. Neither Seller nor Supplier offers any guarantees or warranties, express or implied, as to the satisfactory quality,

merchantability, fitness, or suitability of Marine Fuels for any particular purpose or otherwise, which extend beyond the description in this Section G.

## I.  Other Charges and Taxes.

Buyer shall be liable for all costs, expenses, and/or charges incurred by Seller or Supplier on account of Buyer's failure, breach, and/or non-compliance with its obligations under any agreed nomination as set forth in Section J below. Buyer shall also pay all applicable duties, taxes, fees, and other costs including, without limitation, those imposed by any government, and barging and other delivery charges, all of which shall be included in Seller's invoices to Buyer. Where Marine Fuels are intended for export use or are imported under bond, or Marine Fuels manufactured from imported crude oil and entitled to a duty drawback is delivered for Buyer's account without payment by Buyer of the applicable customs duty, tariff, fee or other charge thereon, Buyer shall be liable to reimburse Seller for any such tax or charge assessed, including interest and penalties thereon, or for any drawback denied after Supplier's delivery by reason of failure by Buyer or the applicable Vessel to qualify therefore or to furnish the necessary proof within the requisite time period specified by applicable law or regulation.

The price set forth in any Contract excludes all taxes (including, but not limited to, federal, state and local excise (sales and use) taxes).  Buyer has stated that Marine Fuels purchased hereunder are to be used or consumed solely by a Vessel or Vessels engaged in foreign commerce and sailing under a foreign flag.  Seller has concluded, in reliance on such statement from Buyer, that each sale hereunder is exempt from the applicable state sales and use taxes.  If requested by tax auditors from any such applicable state, Buyer shall provide Seller with a completed tax exemption certificate.

Buyer expressly agrees to pay or reimburse Seller for any taxes (including penalties and interest) resulting from the sale of Marine Fuels that Seller is required to collect or pay, that result from any untrue statement made by Buyer and relied upon by Seller, or that are assessed for any other reason.

## J.  Nominations.

Buyer or Buyer's agent shall give Seller at least five (5) calendar days prior written notice of deliveries required, specifying the (i) name of the Vessel, (ii) Delivery Port, (iii) Vessel's agents, (iv) approximate date of delivery, and (v) grade and quantity of Marine Fuel. Buyer or Vessel's local agent shall confirm in writing the details above to Seller or Supplier at least forty-eight (48) hours (excluding non-business days) prior to delivery. Buyer agrees to reimburse Seller or Supplier for overtime and/or other additional expenses incurred due to the failure of Buyer, its servants, or Vessel's local agents to provide Seller or Supplier with written amendments of delivery time, quantity changes, or

cancellations at least forty-eight (48) hours prior to scheduled delivery. A notice as given above shall be invalid if a Vessel's estimated arrival date given therein is later than three (3) calendar days beyond the delivery date and shall be deemed cancelled and subject to cancellation pursuant to Section L below if Vessel has not arrived within three (3) calendar days after Vessel's said estimated arrival date.

**K. Deliveries, Demurrage, Title and Risk of Loss.**
Deliveries shall be made at Seller's option into (i) Buyer's Vessel(s) at a terminal as agreed between the parties, (ii) Buyer's Vessel via Seller's Vessel where barging facilities satisfactory to Seller are available to Seller, or (iii) Buyer's Vessel via Supplier's Vessel.

Delivery shall be made during ordinary business hours at the place of delivery unless otherwise agreed by Seller and permitted by the Delivery Port regulations, in which event Buyer shall pay any extra expense incurred. Buyer shall make all connections and disconnections of delivery hose to Buyer's Vessel.

For deliveries into Buyer's Vessel via Seller's or Supplier's Vessel, deliveries need not be made whenever, in Seller's sole opinion, a clear and safe berth for Seller's or Supplier's Vessel is not available. Delivery shall be complete and title and risk of loss shall pass to Buyer at the point at which Marine Fuels pass the flange connecting the Vessel loading arm or hose with the permanent loading connection of Buyer's Vessel. Seller or Supplier shall not be liable to Buyer for any loss or demurrage due directly or indirectly to congestion of the Delivery Port, prior commitments of available Vessels, weather (whether or not unusual), or any other Force Majeure as set forth in Section Q below. Buyer shall pay any demurrage or detention charges at such rate as may be invoiced by Seller or Supplier.

For deliveries into Buyer's Vessel at a terminal, deliveries need not be made whenever, in Seller's opinion, a clear and safe berth for a Vessel is not available. Delivery shall be complete and title and risk of loss shall pass to Buyer at the point at which the Marine Fuels pass the flange connecting the shore loading arm with the permanent loading connection of Buyer's Vessel. Deliveries shall be made on a "first come, first served" basis. Seller shall not be liable to Buyer for any loss or demurrage due directly or indirectly to congestion of the Delivery Port, weather (whether or not unusual), or any other force majeure set forth in Section Q below. Buyer shall receive Marine Fuels into Buyer's Vessel and then withdraw such Vessel from the terminal berth. Buyer shall pay any demurrage or detention charges incurred by Seller resulting from any delay by Buyer in its use of the delivery facilities, including any delay by Buyer vacating its berth at the relevant terminal.

With respect to all forms of delivery listed above, Buyer shall make all connections and disconnections between the delivery hose and the Vessel's intake pipe, and shall render all other necessary assistance and provide sufficient tankage and equipment to receive promptly all deliveries hereunder. In no case shall Seller or Supplier be liable for any damage or delay resulting from causes beyond its control or avoidable by due care on the part of Buyer or its Vessel.

Seller may elect to discontinue operations at any delivery location for any reason without obligation to Buyer.

**L. Cancellation.**
If Buyer cancels any Contract in whole or in part for any reason whatsoever, Seller, without prejudice to any other rights it may have hereunder, at law or in equity, shall be entitled to a cover remedy such that Buyer shall owe Seller the difference between the price set forth in Contract and the amount Seller has obtained from a replacement buyer at the current market price as determined by Seller in a commercially reasonable manner. To the extent Seller is unable to resell the Marine Fuels in a commercially reasonable manner, Buyer shall pay the entire remaining price under such Contract and may elect to take delivery of such Marine Fuels.

**M. Termination.**
Either Party may terminate this Agreement ("Liquidating Party") if the other Party ("Defaulting Party"): (i) becomes Bankrupt; (ii) fails to make any payment or perform when due any obligations under this Agreement or any other agreement with the Liquidating Party; (iii) fails to provide a prepayment, payment at delivery, or security as may be required pursuant to Section B hereof; or (iv) fails to provide adequate assurance of its ability to perform all of its outstanding obligations hereunder or any other contract with the Liquidating Party or any of Liquidating Party's Affiliates within forty-eight (48) hours of Liquidating Party's written demand therefor when Liquidating Party has reasonable grounds for insecurity. For the purpose of this Section M, "Bankrupt" shall mean, with the respect to any person or entity, such person or entity (i) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under the Bankruptcy Code or any other bankruptcy, insolvency, reorganization or similar law, or has any such petition filed or commenced against it; (ii) makes an assignment or any general arrangement for the benefit of creditors; (iii) otherwise becomes bankrupt or insolvent (however evidenced); (iv) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets; or (v) is generally unable to, or admits in writing its inability to, pay its debts as they fall due.

Upon the occurrence of any of the events specified above, Liquidating Party shall have the right, exercisable in its sole discretion and at any time upon prior notice to Defaulting Party (except with respect to any of the defaults specified in clause (i) of this Section M, in which case no notice is required), to liquidate this Agreement and all other contracts

then outstanding between the parties (however Liquidating Party may be designated thereunder) by declaring all such contracts terminated, whereupon such contracts shall automatically be terminated ("Terminated Contracts") except for the payment obligation below (an "Early Termination"), and by calculating the difference (whether positive or negative), if any, between the price specified in each Terminated Contract and the market price for such Terminated Contract (as determined by Liquidating Party in a commercially reasonable manner at a time or times reasonably determined by Liquidating Party), adding any costs incurred in terminating the Terminated Contracts (including broker fees, resale costs, hedge replacement costs, and collection and enforcement fees), and aggregating or netting such calculated differences and costs to a single liquidated settlement amount ("Settlement Amount"). If such Settlement Amount is a positive number, it shall be payable by Defaulting Party to Liquidating Party, and if such Settlement Amount is a negative number, then the absolute value thereof shall be payable by Liquidating Party to Defaulting Party. The Settlement Amount will be due and payable on demand therefor, and interest shall accrue on any unpaid portion of Settlement Amount at the Interest Rate until paid in full by the Defaulting Party. At the discretion of Liquidating Party and without prior notice to Defaulting Party, the Settlement Amount may be adjusted by set-off against any amounts payable (whether or not arising under this Agreement, matured or contingent, and irrespective of the currency, place of payment, or place of booking of the obligation) between Liquidating Party and Defaulting Party and/or any of their respective Affiliates.

## N.  Claims.
Buyer waives any claim against Seller with respect to the quantity or quality of the Marine Fuels supplied unless Buyer's claim is submitted to Seller in writing within twenty (20) days after the date of delivery of the Marine Fuels.

It is the duty of Buyer to take all reasonable actions, including retention and burning of fuel, to eliminate or minimize any damages or costs associated with any off-specification or suspected off-specification supply. Claims as to quality must be based on quality reports made by an Independent Lab in regards to the composite samples taken at the time of the delivery from the shore tank or Vessel from which delivery was made. Buyer shall cooperate with Seller or Supplier in achieving the most cost-effective solution, and in any event, Seller or Supplier's obligation hereunder shall not exceed the price of that portion of the Marine Fuels sold hereunder on which liability is asserted. Seller or Supplier may also elect to deliver the same quantity of on-specification Marine Fuels to Buyer in settlement of any claim hereunder.
Should any timely claim submitted by Buyer not be settled to Buyer's satisfaction, any legal action brought by it thereon shall be time-barred unless commenced within six (6) months after delivery of Marine Fuels or other event,

action, inaction or omission from which such claim arises. This provision shall survive termination of any Contract or this Agreement arising between Seller or Supplier and Buyer.

## O.  Indemnities.
Buyer shall defend, indemnify, and hold Seller and Supplier harmless with respect to any and all liability, loss, claims, expenses or damage Seller or Supplier may suffer or incur by reason of, or in any way concerned with, the fault or default of Buyer or its agents in the purchase, receipt, use, storage, handling or transportation of Marine Fuels hereunder.

Seller warrants that at the time title in the Product delivered under this Agreement passes to Buyer, Seller has the right to sell the said Product to Buyer and Seller has unencumbered title to the Product. Seller shall indemnify and hold Buyer harmless from and against any and all claims, damages, costs, and expenses (including reasonable attorney fees), which Buyer may suffer by reason of any of the shipping documents relating to Product remaining outstanding or for breach of said warranty of title given above. Such indemnification shall include, but not be limited to, claims made by the carrier, Vessel owner, consignor, consignee or any holder or transferee of the shipping documents or by any other party claiming an interest in or lien on the Product or proceeds thereof.

## P.  Liens.
Deliveries of Marine Fuels hereunder are made not only on the credit of Buyer, but also on the faith and credit of Buyer's Vessel that uses the Marine Fuel. Seller and Supplier will have and may assert a lien for the said amount of the delivered Price against any such Vessel, should the laws applicable at (i) the place of Seller's address which is set forth in the relevant Contract, (ii) the place of delivery of Marine Fuels, and/or (iii) the place of seizure of such Vessel; grant or recognize a lien for Marine Fuels delivered to a Vessel. All costs associated with the seizure of any Vessel shall be for Buyer's account. The taking of any additional security measures by Seller or Supplier shall not operate as a waiver of this provision. If at any time, a Price provided under these Marine Fuels GTCs or any Contract shall not conform to the applicable laws, regulations or orders of any government or other competent authority having jurisdiction over Buyer, Seller, or Supplier, Seller shall make appropriate adjustments to such Price. The Buyer shall not be entitled to cancel the effect of this lien by wording on the delivery ticket or otherwise.

## Q.  Force Majeure.
In addition to any other excuses (arising out of the same or other causes) provided by law, no failure or omission by either Party to carry out or observe any of the provisions or conditions of this Agreement shall be deemed to be a breach of contract if the same shall arise out of causes not reasonably within the control of that Party, whether or not

foreseen, including (without limitation) such causes as labor disputes, strikes, governmental intervention, or Seller's response to the insistence or request of any governmental instrumentality or person purporting to act therefor, wars, civil commotion, fire, flood, accident, storm or any act of nature. The term "Party" when used with reference to Seller shall also include Supplier and any subsidiary or Affiliate of Seller or Supplier. Under no circumstances, however, shall Buyer be excused from its obligation to pay all amounts due hereunder for undisputed Marine Fuels actually delivered. A Party affected by events described in this Section shall give prompt written notice to the other Party describing in sufficient detail the events and the estimated scope of such disability.

Either Party may terminate this Agreement forthwith if a force majeure event described above continues for a period of at least thirty (30) consecutive days (or if both parties agree that the event will continue for at least thirty (30) consecutive days), by giving to the other Party written notice to that effect.

**R**.  **Shortage of Marine Fuel.**
If, as a result of any of the events, matters or things referred to in Section Q above, or any other foreseeable or non-foreseeable event, including:  (i) contractual changes relating to the supply of crude oil, feedstock, and/or petroleum products from which Marine Fuels of the type to be sold hereunder is derived, or (ii) supplies of Marine Fuel are curtailed, or are available to Seller or Supplier only under conditions which, in Seller's or Supplier's sole judgment, are deemed unacceptable, Seller may allocate, on any fair and reasonable basis according to its own discretion, its available supplies of Marine Fuels to meet its own requirements and those of its subsidiaries and Affiliates, and other customers, (including Buyer), and Seller and Supplier shall not be required to increase supplies of Marine Fuels from some other source of supply or to purchase Marine Fuels to replace the supplies so curtailed.

No Party affected by Section Q or this Section R shall be required to remove such cause(s) if doing so would cause any additional expense.  Neither Seller nor Supplier shall be obligated to purchase additional supplies of Marine Fuels to make up deliveries omitted during any period of disruption, nor will the term of any Contract, if applicable, be extended due to the causes set forth in Section Q and this Section R.

**S**.  **Environmental Protection.**
If any spill occurs while Marine Fuels are being delivered, Buyer shall promptly take such action as is reasonably necessary to remove the spilled Marine Fuels and mitigate the effects of such spills.  Seller or Supplier, regardless of cause, are authorized, at its option and at Buyer's expense (unless Seller or Supplier is the cause of such spill, in which case, at Seller's expense), to take such measures and incur such expenses (whether by employing its own resources or by contracting with third parties) as are reasonably

necessary in the judgment of Seller to remove spilled Marine Fuels and mitigate the effects of any such spills. All expense, claims, loss, damage, liability and penalties arising from any spill shall be borne by the Party who caused such spill.  If both parties are at fault, all expense, claims, loss, damage, liability and penalties shall be divided between the parties in accordance with their respective degrees of fault.  Buyer or Seller shall provide to the other Party, as soon as possible, all documents and other information concerning any spill or any program for prevention thereof, as may be required by the other Party or as required by law or regulation applicable at the time and place of delivery of Marine Fuels.

Buyer is in compliance with all Annexes of the Maritime Protection Convention – MARPOL 73/78 promulgated by the International Maritime Organization ("MARPOL Protocol") applicable to Marine Fuels.  Seller and Buyer are in compliance with the MARPOL Protocol specifically as enacted by the United States in the Act to Prevent Pollution from Ships P.L. 96-478.  The Seller or Supplier agrees, to the extent necessary, to provide a bunker delivery note and will provide the appropriate samples for compliance, each as required under MARPOL Protocol Annex VI.

**T**.  **LIMITATION OF LIABILITY**
EXCEPT AS SET FORTH HEREIN, SELLER MAKES NO OTHER WARRANTY OF ANY KIND WHATSOEVER, WRITTEN OR ORAL, EXPRESS OR IMPLIED, AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED BY SELLER AND EXCLUDED FROM THIS AGREEMENT.  SELLER EXPRESSLY DISCLAIMS ANY WARRANTY AGAINST INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT. EXCEPT AS OTHERWISE PROVIDED IN SECTION M THE PARTIES' LIABILITY FOR DAMAGES UNDER ANY TRANSACTION IS LIMITED TO DIRECT, ACTUAL DAMAGES ONLY AND IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR SPECIFIC PERFORMANCE, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, LOSE OF USE OR SERVICE OR OF CAPITAL, OR CLAIMS OF CUSTOMERS OF THE OTHER PARTY, OR SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, IN TORT, CONTRACT OR OTHERWISE, OF ANY KIND, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE PERFORMANCE, THE SUSPENSION OF PERFORMANCE, THE FAILURE TO PERFORM OR THE TERMINATION OF A TRANSACTION.  EACH PARTY ACKNOWLEDGES THE DUTY TO MITIGATE DAMAGES.

**U**.  **Notices.**
Except as otherwise expressly provided herein, all written notices, reports and documents permitted or required to be

delivered by the provisions of this Agreement ("Notices") shall be delivered by hand, confirmed facsimile, courier, or registered or certified mail (return receipt requested, postage prepaid), using the contact information for each Party set forth in the relevant Contract, and shall be deemed so delivered upon receipt. Any such Notices received on a day that is not a business day (or after 5:00 pm on a business day) will be deemed delivered at the opening of business at such location on the next business day.

Either Buyer or Seller may, by written notice to the other, change its contact details in the relevant Contract at which Notices shall be sent thereunder.

### V. Definitions.
In addition to the terms previously defined in this Agreement, the following terms shall apply:

"Affiliate" means any company, partnership, joint venture, or entity controlled by, controlling or under common control with a Party hereto. For the purposes of this definition, "control" means the direct or indirect beneficial ownership of fifty percent (50%) or more of the stock entitled to vote in the election of directors or, if there is no such stock, fifty percent (50%) or more of the owners' interest in such company, partnership, joint venture or entity.

"Bankrupt" has the meaning set forth in Section M above.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. §§ 101 et. seq.

"Buyer" has the meaning as set forth in any Contract.

"Contract" means any purchase or sales contract incorporating these Marine Fuels GTCs.

"Delivery Port" means each delivery port specified in any Contract.

"Due Date" has the meaning set forth in Section A above.

"Independent Lab" has the meaning as set out in Section H above.

"Interest Rate" has the meaning set forth in Section A above.

"Marine Fuels" means any of marine fuel oil, marine gas oil, marine diesel fuel, gas oil, and any other fuel which can qualify as an engine fuel for maritime use.

"Price" has the meaning set forth in any Contract.

"Product" means, individually and collectively, each type of Marine Fuels specified in any Contract.

"Seller" is as set forth in any Contract.

"Supplier" means the delivering company who has Marine Fuels available at the Delivery Port, and as requested by Seller, makes delivery thereof to Buyer. Where Seller has Marine Fuels available itself, it may act both as Seller and Supplier hereunder.

"Vessel" means any barge (including ocean-going), tow or tugboat, or tankship.

### W. Oral Agreements Binding.
The Parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Contract will be entered into as soon as practicable and may be executed and delivered in counterparts, including by facsimile transmission or other electronic transmission (i.e., a "PDF" or "TIFF" document) or by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails. The Parties will specify therein or through another effective means that any such counterpart, electronic message or e-mail constitutes a Contract.

### X. Export Laws and Controls; Ethical Business.
Each Party agrees to abide by the terms of Annex A of these Marine Fuels GTCs.

### Y. Entire Agreement; Amendment.
This Agreement constitutes the entire agreement and understanding between the parties with respect to its subject matter and supersedes all prior oral communications and prior writings with respect thereto. Neither this Contract nor any provision hereof may be waived or amended except pursuant to a writing between the Parties.

# HESS CORPORATION

## GENERAL TERMS AND CONDITIONS FOR MARINE FUELS

### <u>ANNEX A</u>
### <u>Export Laws and Controls; Ethical Business Practices</u>

**1.1.**    <u>Customs Reporting</u>

(a)    Where Buyer will be the importer of record, Seller shall provide Buyer, in a timely manner, any information or documentation reasonably necessary or otherwise required by U.S. Customs and Border Protection ("<u>Customs</u>") for the purpose of importing into the customs territory of the United States Product purchased by Buyer under this Agreement including, but not limited to, information needed by Buyer to support Buyer's claim as to tariff classification, duty rate, dutiable value and country of origin. In the event that Customs requests additional documentation within Seller's control following importation, Seller shall provide such documentation to Buyer upon Buyer's request.

(b)    Where Buyer will be the importer of record of a Product imported into the United States that may be eligible for preferential duty treatment or other preferential treatment (collectively, "<u>Preferred Treatment</u>") under a free trade agreement, duty preference program, or other trade preference program (any such agreement or program referred to herein as a "<u>Preferential Trade Arrangement</u>"), Seller agrees to:

     (i)    confirm that such Product is so eligible for Preferred Treatment under a Preferential Trade Arrangement and the basis for such eligibility;

     (ii)    provide any documentation required by the relevant Preferential Trade Arrangement and/or Customs in a timely manner to support the applicable Preferred Treatment, including, but not limited to, a certificate of origin;

     (iii)    provide refinery production and related records to Customs upon request by Customs in any inquiry to verify the Preferred Treatment of such Product, including, but not limited to, discharge reports, receiving reports, pipeline tickets, stock and yield reports, load reports, meter tickets, and any other documents sufficient to establish the eligibility of the Product for Preferred Treatment through a traceable production timeline; and

     (iv)    reimburse Buyer for any duties, merchandise processing fees, penalties or liquidated damages assessed by Customs as a result of Seller's failure to provide any such documentation described above in a timely manner and to Customs' satisfaction.

**1.2.**    <u>Customs Costs</u>

Seller shall pay the costs of customs formalities necessary for exportation, and shall secure all export permits, certificates of origin and invoices that may from time to time be required with respect to the Product sold and delivered hereunder; Buyer shall execute and deliver, or cause to be executed and delivered, to Seller or Seller's supplier such certificates and other documents, including certificates of discharge, as may be requested from time to time by Seller or Seller's supplier. In the event that Buyer fails to execute and deliver such documents as Seller may request in a timely manner, Buyer shall be responsible for any costs or damages incurred by Seller or Seller's supplier, and Seller may at its option forthwith suspend this Agreement.

**1.3.**    <u>Origination and Destination Restrictions</u>

(a)    <u>Restricted Destinations</u>. – Product will not be knowingly sold, supplied or delivered, directly or indirectly (including but not limited to the acquisition of any or feedstock that may be incorporated into the Product), to any destination that at the time of disposal is an embargoed destination under the law or policy of the United States or the United Nations; *provided, however,* that if either Party is, or is likely to be, prevented from complying with such restriction by any law, policy, demand or request to which a Party is subject or by any governmental policy, demand or request by which a Party reasonably considers itself to be bound (the "<u>Restricted Party</u>"), then both Parties will meet and discuss the implications and, pending resolution of

Page 7 of 9

any difficulty thereby caused or likely to be caused, the non-Restricted Party may in its discretion suspend in whole or in part supplies or receipts of Product hereunder.

(b)   Final Destination Documents. – The Seller may at any time require the Buyer to provide any relevant documents for the purpose of verifying the final destination of the Cargo and the Buyer undertakes to advise the Seller, upon request, of the destination of the Cargo.

(c)   Prohibition of Cargo. – Where, at any time before the commencement of discharge of the shipment, importation of the Cargo at the designated discharge Terminal is prohibited by order of the governmental authorities of the country in which the Cargo has been produced or loaded or is to be imported, then the Buyer shall arrange for discharge at an acceptable alternative port that is not subject to any such prohibition.  Any resulting additional costs incurred by the Seller as a result of such alternative discharge shall be refunded promptly to the Seller by the Buyer.

(d)   Prohibited Originating Countries. – Cargoes originating in countries subject to comprehensive sanctions under U.S. UK or EU law, including currently Iran, Cuba, Sudan and Syria, are prohibited.

(e)   Sale to Third Party. – In the event Product is disposed of by Buyer to a third party in whole or part, Buyer will ensure that all end users of Product abide by the provisions of this Section 1.3 and without delay provide the Seller with all relevant information as the Seller may require related to such alternative disposal including name of end user, name of the refinery and any other relevant information the Seller may deem necessary.

(f)   Economic Sanctions Laws. – Neither Party will take any action that will cause the other Party to violate applicable economic sanctions laws.

**1.4.   Trade Controls and Anti-Boycott Provisions**

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, NOTHING IN THIS AGREEMENT IS INTENDED, AND NOTHING HEREIN SHOULD BE INTERPRETED OR CONSTRUED, TO INDUCE OR REQUIRE EITHER PARTY HERETO TO ACT IN ANY MANNER (INCLUDING BY NOT TAKING ANY ACTIONS IN CONNECTION WITH A TRANSACTION) WHICH IS INCONSISTENT WITH, PENALIZED OR PROHIBITED UNDER ANY LAWS, REGULATIONS, RULES OR OTHER REQUIREMENTS OF THE UNITED STATES OF AMERICA, THE UNITED KINGDOM OR EU APPLICABLE TO SUCH PARTY WHICH RELATE TO FOREIGN TRADE CONTROLS, EXPORT CONTROLS, EMBARGOES OR INTERNATIONAL BOYCOTTS OF ANY TYPE.

**1.5.   Anti-Corruption, Anti-Bribery, Anti-Money Laundering & Ethical Business**

(a)   Compliance with Laws. – The Parties agree that each will comply with, and will use reasonable endeavors to ensure that any third party used by them to fulfill the Parties' respective obligations under the Agreement will comply with, all laws, rules, regulations, decrees, or official governmental orders of the United Kingdom and the United States of America, relating to anti-bribery, anti-corruption and/or anti-money laundering, applicable to any of the Parties or their ultimate parent companies.

(b)   Ethical Business Practices. – Books and records shall be kept in a complete and accurate manner.  Each Party will maintain the highest reputation for integrity and will conduct its operations consistent with the highest ethical standards prevailing in the business communities in which it operates.

(c)   Bribery & Corruption. – The Buyer and the Seller each represent, warrant and undertake to the other that:

(i)   it has not and will not, whether directly or indirectly, make or permit to be made, with respect to the Product and/or this Agreement, any offer, payment, promise to pay, or authorization of the payment of, any money (or money's worth), or give, offer to give, or promise to give or authorize the offering or giving of anything of value, to or for the use or benefit of:

A.   a government official or an officer or employee of a government or any department, agency or instrumentality of any government;

B.   an officer or employee of a public international organization;

C.    any person acting in an official capacity for or on behalf of any government or department, agency, or instrumentality of such government or of any public international organization;

D.    any political party or official thereof, or any candidate for political office; or

E.    any other person, individual or entity at the suggestion, request or direction or for the benefit of any of the above-described persons and entities;

for the purpose of:

F.    influencing an official act or decision of that person for a corrupt purpose, influencing an official action, or securing an improper advantage, in order to obtain or retain business or to direct business to any person;

G.    inducing that person to do or omit to do any act in violation of his, her or its lawful duty; or

H.    inducing that person to use his, her or its influence within the government to affect any government decision or secure any improper advantage.

(ii)    it will not do, or fail to take appropriate steps to ensure that it will not do, anything that will be in violation of or inconsistent with the anti-bribery or anti-money laundering legislation of any government, including the U.S. Foreign Corrupt Practices Act 1977, the UK Bribery Act 2010, the U.K. Anti-Terrorism, Crime and Security Act 2001, the Money Laundering Regulation 1993 and the Proceeds of Crime Act 2002 and the applicable country legislation implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

(d)    <u>Facilitation Payments</u>. – Each of the Buyer and the Seller agree that, except only where the health and safety of a person is at risk, it shall not authorize or otherwise permit the offer to or payment to any persons, in particular those persons listed in Sections 1.5(c)(i)A through 1.5(c)(i)E above, of a small monetary sum in order to effect a routine action, which payments are commonly known as "facilitation" or "grease" payments.

(e)    <u>Response to Notices</u>. – Each Party shall respond promptly, and in reasonable detail (including documentary support), to any notice from the other Party or its auditors pertaining to the warranty and representation in Sections 1.5(c) and (d) above.

(f)    <u>Seller Representation</u>. – The Seller represents and warrants to the Buyer that it has not made any payments or given anything of value to officials, officers or employees of the government of the country in which the Product originated or any agency, department or instrumentality of such government in connection with the Product which is the subject of the Agreement which would be inconsistent with or contravene any of the legislation as set out in Section 1.5(c)(ii) above.

(g)    <u>Respect for Human and Labor Rights</u>. – Each of the Buyer and the Seller will respect the human and labor rights of its workers and treat them with dignity and respect and shall not employ or utilize the services of any third party or any supplier of goods and/or services that is credibly implicated in human rights or labor rights abuses.

(h)    <u>Termination for Non-compliance</u>. – The Buyer or the Seller may terminate the Agreement forthwith upon written notice to the other at any time, if in their reasonable judgment the other is in breach of any of the above representations, warranties or undertakings, in which case the Buyer or Seller (as applicable) shall determine the Settlement Amount that would be payable with respect to the Transaction as though it were the Liquidating Party in accordance with Section M.

## MARINE FUEL – BARGE TO SHIP OR PORT TO SHIP
### *Aegean Bunkering (USA) LLC*
Contract Reference Number: *CPHY_15311*
Vessel: *Amazon*

### *October 22 2014*

To:          **BERGEN BUNKERS AS**
             EPA Registration No.:

Attn:

Fax:         *011 4755 606 220*

Email:

From:        *Aegean Bunkering (USA) LLC*
             EPA Registration No.: *6188*

             *Christopher Roberts*
             Fax: *+1 212 207 9298*
             Email: *Bunkers@aegeanusa.com*
                      Broker: *No Broker*
                      Fax No.:
                      Email:

We are pleased to confirm with this contract ("Contract") the following transaction concluded on *2014-10-22*.

*Aegean Bunkering (USA) LLC* Contract Reference Number *CPHY_15311,*will cover this transaction.  Please refer to this Contract Reference Number on all correspondence concerning this Contract.

This Contract cancels and supersedes any broker's correspondence in relation to this transaction. Any such broker's correspondence shall be for the sole purpose of documenting any commission, if applicable.

AAA.  Seller:      *Aegean Bunkering (USA) LLC*

BBB.  Buyer:      *BERGEN BUNKERS AS*

CCC.  Product:    *Bunker FO 500 CST*

DDD.  Quantity:   *2100.0 MT*
                  *±5% Buyers option*

EEE.  Quality:    *TO CONFORM TO ISO 8217:2010*

**MARINE FUEL – BARGE TO SHIP OR PORT TO SHIP**
*Aegean Bunkering (USA) LLC*
Contract Reference Number: *CPHY_15311*
Vessel: *Amazon*

### TYPICAL

FFF.   Delivery Terms and Conditions:
Aegean delivers to *Amazon  | IMO # 9476654* at *Philadelphia* via Seller's barge.

Date Range: *2014-10-28 – 2014-10-28*

Estimated Delivery Date:

GGG.   Price: *460*

Per net shoretank upgauge quantity.

Nominations:   Seller to give Buyer five (5) days' notice of a five (5)-day range and seventy-two (72)/forty-eight (48)/twenty-four (24) hours' notice of vessel ETA.

HHH.  Quantity:
The quantity of Marine Fuel delivered shall be determined from the official gauge of the barge effecting delivery or by gauging in Supplier's shoretank or oil meter at Supplier's election.  Except where government regulations or local authorities determine otherwise, adjustment in volume owing to difference in temperature shall be made in accordance with API/ASTM-IP Petroleum Measurement Standards for generalized products or the methods of any other recognized standards authority at the discretion of the Supplier.  In the measurement of Marine Fuels, Supplier shall make allowance for all water and non-petroleum sediment in excess of one-half of one percent (0.5%).  Buyer may be present or represented by properly an accredited agent when such measurements are taken, but if Buyer is not present or represented, then Supplier's determination of quantities shall be deemed to be correct.

Said unit price is exclusive of any and all state and federal motor fuel taxes.

III.    Other Terms and Conditions (if any):

**This Contract is governed by the Hess Corporation General Terms and Conditions for Marine Fuels, effective as of October 29, 2010, as amended from time to time ("Hess Marine Fuels GTCs"), and constitutes a "Contract" as such term is defined thereunder.   In the event of any inconsistency between this Contract and the Hess Marine Fuels GTCs, the terms of this Contract shall prevail.**

**A security interest in, and an assignment of proceeds from, this transaction have been granted to ABN Amro Capital USA LLC. This is our irrevocable instruction for you to pay the full amount of our invoice to ABN AMRO Capital USA LLC, by**

**MARINE FUEL – BARGE TO SHIP OR PORT TO SHIP**
*Aegean Bunkering (USA) LLC*
Contract Reference Number: *CPHY_15311*
Vessel: *Amazon*

**making payment without offset, deduction or counterclaim, according to the instructions on the invoice related to the delivery(ies) under this Contract.**

Should any of the above Contract terms be contrary to Buyer's understanding of our agreement, please provide Aegean with prompt written notice of your specific points of disagreement. In the event that Aegean does not receive any such notification from Buyer by the close of business on the second (2nd) business day following the date of this Contract, the provisions set forth herein shall be binding upon both parties.

The entirety of this Contract set forth above and referred to as our Contract Reference Number *CPHY_15311* is hereby acknowledged and agreed.

JJJ. Notices:

To Seller:     Aegean Bunkering (USA) LLC Attention:
*Christopher Roberts*
Fax: *+1 212 207 9298*

To Buyer:     To be provided separately by Buyer in writing to Seller.

REGARDS,

*Aegean Bunkering (USA) LLC*

ACKNOWLEDGED AND AGREED:

*BERGEN BUNKERS AS*

By: _____

Name: _____

Title: _____

Date: _____

Exhibit C

# BERGEN BUNKERS

## Terms and Conditions for sale of Marine Bunkers
## Edition 2014

## A.      GENERAL INTRODUCTION

A.1     This is a statement of the terms and conditions according to which the
        International Bergen Bunker Group (hereinafter called "BB") will sell marine bunkers.

A.2     These conditions apply to all offers, quotations, orders, agreements, services and all subsequent
        contracts of whatever nature, except where otherwise is expressly agreed in writing by BB.

A.3     General trading conditions of another party will not apply, unless expressly accepted in writing by BB.

A.4     In the case that, for whatever reason, one or more of the (sub)clauses of these general conditions are
        invalid, the other (sub)clauses hereof shall remain valid and be binding upon the parties.


## B.      DEFINITIONS

B.1     Throughout this document the following definitions shall apply:

| | |
|---|---|
| "Seller" | means BB; any office, branch office, affiliate or associate of the BB Group; being the legal entity within the BB Group, whose name is included in the Order Confirmation, sent to the Buyer. |
| "Buyer" | means the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made; |
| "Bunkers" | means the commercial grades of bunker oils as generally offered to the Seller's customers for similar use at the time and place of delivery and/or services connected thereto; |
| "Owner" | means the registered Owner, Manager or Bareboat Charterer of the vessel; |
| "Vessel" | means the Buyer's Vessel, Ship, Barge or Off-Shore Unit that receives the supply/bunkers; either as end-user or as transfer unit to a third party; |
| "Nomination" | means the written request/requirement by the Buyer to the Seller, for the supply of the Bunkers; |
| "Order Confirmation" | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers. In case of conflict between the Nomination and the Order Confirmation, unless the Seller otherwise agrees in writing, the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement; |
| "Agreement" | means the concluded terms for the sale/purchase of the Bunkers; |
| "Supplier" | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers; |
| "GTC" | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |
| "BDR" | means the Bunker Delivery Receipt, being the document(s) which is/are signed by the Buyer's representative(s) at the place of the supply of the Bunkers to the Vessel, evidencing the quality and quantity of the Bunkers supplied to and received by the Vessel. |


## C.      OFFERS, QUOTATIONS AND PRICES

C.1     An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order
        Confirmation to the Buyer. Each Order Confirmation shall incorporate these GTC by reference so that the
        GTC are considered a part of the Confirmation.

C.2     Agreements entered into via brokers, or any other authorised representative on behalf of the Seller, shall
        only bind the Seller upon the Sellers' broker or other authorised representative sending the Order
        Confirmation to the Buyer or the Buyer's broker as the case may be.

C.3     The Seller's offer is based on the applicable taxes, duties, costs, charges and price level of components
        for Bunkers existing at the time of the conclusion of the Agreement. Any later or additional tax,
        assessment, duty or other charge of whatever nature and however named, or any increase of
        components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change
        in the Seller's contemplated source of supply or otherwise, coming into existence after the Agreement
        has been concluded, shall be added to the agreed purchase price, provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances.

C.4     All prices and/or tariffs are exclusive VAT, unless specifically stated otherwise. Any VAT or other charge and/or tax applicable and whenever imposed, shall be promptly paid by the Buyer, and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum.

C.5     If the party requesting Bunkers is not the Owner of the Vessel, the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner. The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner. The Seller's decision to forego obtaining a payment guarantee under this Clause C.5 shall have no effect on Seller's right to a lien on the Vessel for any Bunkers supplied under this Agreement.

C.6     The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel, and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement. If the party requesting Bunkers is not the Owner of the Vessel, Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery.

C.7     If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory, the Seller may require cash payment or security to be provided by the Buyer prior to delivery, failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors.


**D.     SPECIFICATIONS (QUALITY – QUANTITY)**

D.1     The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel. The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose, and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise. This includes but is not limited to the quality, sulphur content and any other specific characteristics of the Bunkers whatsoever. Any and all warranties regarding the satisfactory quality, merchantability, fitness for purpose, description or otherwise, are hereby excluded and disclaimed.
Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Order Confirmation, and conversely where minimum values are provided in a specification, no maximum values are guaranteed unless expressly stated in the Order Confirmation.

D.2     The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller's Order Confirmation. Unless otherwise agreed in writing the Bunkers are delivered and sold based on metric tons in vacuum.

D.3     Where standard specifications are being given or referred to, tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever.

D.4     In respect of the quantity agreed upon the Seller shall be at liberty to provide, and the Buyer shall accept a variation of 5% from the agreed quantity, with no other consequence than a similar variation to the corresponding invoice from the Seller.

D.5     Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered. All grades of produce may contain petroleum industry allowed bio-derived components.


**E.     MEASUREMENTS – NON CLAUSING OF THE BDR(S)**

E.1     The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge, tank truck or of the shore tank in case of delivery ex wharf.

E.2     The Buyer's representative shall together with the Seller's representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made. When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records, which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied. Quantities calculated from the Receiving Vessel's soundings shall not be considered.

E.3     Should the Buyer's representative fail or decline to verify the quantities, the measurements of quantities made by the Seller or the Supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance.

E.4     The Buyer expressly undertakes not to make any endorsement, complaint/ comment (including but without limitation any ''No-lien'' clausing) on the BDR when presented for signature by the Buyer's representative(s), any such insertion shall be invalid and of no effect whatsoever.

E.5     In the event of complaint/comment on the quantity of Bunkers delivered, the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately, followed by a complaint in detail to the Seller, setting out the exact quantity(ies) claimed shortsupplied, and with full supporting vouchers, in writing within 7 (seven) days thereof, failing which, any such claim by the Buyer shall be extinguished as non existent, and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier, the relevant claim being time barred, and the Seller/Supplier's weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered.


**F.      SAMPLING**

F.1     The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation. The Buyer's representative has the responsibility to witness that such samples are drawn  correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles.

F.2     In case that dripsampling is not available onboard the barge, tanktruck or shore tank, samples shall be taken as a composite of each tank from which supplies are made, onboard the barge (respectively at the shore tank or tanktruck), divided with 1/3 from each the top, mid and bottom of the tanks.

F.3     The samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and seal number, authenticated with the Vessel's stamp and signed by the Seller's representative and the Master of the Vessel or his representative. The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts, and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this Chapter F.

F.4     Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers, or if requested by the Buyer in writing, for as long as the Buyer reasonably required. The other two (2) samples shall be retained by the receiving Vessel, one of which being dedicated as the MARPOL sample.

F.5     In the event of a dispute in regard to the quality of the Bunkers delivered, the samples drawn pursuant to this Chapter F, shall be conclusive and final evidence of the quality of the Bunkers delivered. One, and only one, of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests, the result of which is to be made available to both parties. Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested. The parties are to use best endeavours to agree the independent laboratory to perform the tests. If, however, no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested, the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted, and those test result will be final and binding upon Buyer and Seller as set out above.

F.6     The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present, or fails to be present at the appropriate time and place; and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking.

F.7     No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorised person, such sample(s) shall be deemed to have no value as evidence.

F.8     Any eventual samples drawn by Buyer's personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied. The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms. Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels.

**G.          DELIVERY**

G.1          The time of delivery, as given by the Seller, has been given as an approximate time, unless it has been otherwise specifically agreed in writing between the parties.

G.2          The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder, have been properly delivered to the Seller in reasonable time before the delivery. In the event the Nomination addresses a spread of dates for delivery, the Seller has the sole discretion to commence the delivery within any time, day/night/sshinc of these dates, always subject to the circumstances set out below in Clause G.3.

G.3          The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit, having regard to congestion affecting the delivery facilities of Seller, its Suppliers or Agents and to prior commitments of barges or other delivery means. The Seller and/or the Supplier shall not be liable for any consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion of bunkering, and unless otherwise agreed in writing, the Seller shall not be obligated to deliver prior to the nominated date or spread of dates. The Seller is not responsible for delays caused by local customs, pilots, port- or other authorities.

G.4          In any case the Buyer, unless otherwise agreed in writing, must give not less than 72 (seventy two) hours approximate notice of readiness of the Vessel for delivery, which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours such notices, where the last notice must also specify the exact place of delivery. All these notices must be given to the Sellers and the Seller's representatives/agents in writing.

G.5          The Seller shall be entitled to deliver the Bunkers by separate part deliveries, in which case each part delivery shall be construed as a separate delivery.

G.6          The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit required for such purpose has not been obtained in due time before the delivery.

G.7          If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that as a result thereof it may be unable to meet the demands of all its customers, the Seller may allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it may determine appropriate in its sole discretion.

G.8          The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit. The Seller and/or the Supplier shall not be liable for any demurrage paid or incurred by the Buyer or for any loss, damage or delay of the Vessel (consequential and/or liquidating damages included) of any nature whatsoever due to congestion at the loading terminal, prior commitments of available barges or tank trucks or any other reason.

G.9          The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller's representative is rendered in connection with the delivery. If in the Supplier's opinion clear and safe berth is unavailable, delivery might be delayed or, in Seller's option, cancelled and all costs related to above will be on account of the Buyer.

G.10         The Vessel shall moor, unmoor, hoist and lower bunkering hose(s) from the barge(s) whenever required by the Seller, Seller's representative or Supplier, free of expenses and in any way as may be requested to assist the barge equipment to a smooth supply. The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel's bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel's manifold prior to commencement of delivery.
             During bunkering the Vessel's scuppers must be safely blocked, which blocking must be made by the Vessel's own crew. Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are properly checked and ready to receive the bunkers, including but not limited to ensuring proper opening/closing of relevant valves, without any risk for spillages, etc, during the bunkering.
             Local further special requirements for receiving bunkers must be followed strictly by the Vessel, whether advised or not by the Seller or the Seller's representative, as it is always the Vessel and the Buyer who remains solely responsible for the knowledge and awareness of such eventual additional requirements for safety reasons.

G.11         In the event that the Vessel is not able to receive the delivery promptly, the Buyer is thereby in default and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof.

G.12         Delivery shall be deemed completed and all risk and liabilities, including loss, damage, deterioration, depreciation, contamination, evaporation or shrinkage to the Bunkers delivered and responsibility for loss, damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank.

G.13    If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered, the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price. The Seller may exercise this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these conditions.

G.14    The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers; and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer. The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment, for which the Bunkers are supplied, for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory. In the event the Bunkers are not considered satisfactory, the Seller and Supplier are to be notified in writing immediately after such test period has expired. Otherwise, it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard.

G.15    If delivery is required outside normal business hours or on local weekends, Saturday, Sunday, national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs.

G.16    In the event the Bunker delivery is made by vessel or barge as a ship-to-ship transfer, any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident, is to be dealt with by the Owners directly with the owners of the units involved, and Seller/Supplier shall not be held nor be responsible for any such damages. If, however, any of the involved units choose to pursue Seller and/or Supplier, Buyer will fully indemnify and hold Seller harmless in relation thereto.

G.17    For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe, taking weather, swell and forecasts into consideration. Supplier/Seller not to be held responsible for any delays, demurrages, liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection. Supplies being always performed weather permitting.

G.18    Without prejudice to any other article(s) herein, any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time split as per the Order Confirmation forwarded.


## H.    TITLE

H.1    Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery. The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non-payment.

H.2    Until full payment of the full amount due to the Seller has been made and subject to Article G.14 hereof, the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller, and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel, nor mix, blend, sell, encumber, pledge, alienate, or surrender the Bunkers to any third party or other Vessel.

H.3    In case of non or short payment for the Bunkers by the Buyer, the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention, without prejudice to all other rights or remedies available to the Seller.

H.4    In the event that the Bunkers have been mixed with other bunkers on board the Vessel, the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered.

H.5    The provisions of this Chapter H do not prejudice or in any way limit the Seller's right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable), wherever situated in the world, without prior notice.

H.6    Where, notwithstanding these conditions, title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller, the Buyer shall grant a pledge over such Bunkers to the Seller. The Buyer shall furthermore grant a pledge over any other Bunkers present in the respective Vessel, including any mixtures of the delivered Bunkers and other bunkers. Such pledge

will be deemed to have been given for any and all claims, of whatever origin and of whatever nature that the Seller may have against the Buyer.

H.7        For the avoidance of doubt, where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the Seller for fulfilment of the Agreement.


## I.        PAYMENT – MARITIME LIEN

I.1        Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing.

I.2        Payment shall be made in full, without any set-off, counterclaim, deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s).

I.3        (i) If at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying, the Seller may require immediate full payment of all its invoices due and/or those not yet due, or such security as it shall deem to be satisfactory.
(ii) In the event that the Buyer shall default in making any payment due, the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs), or the Seller may, in its discretion, elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreement on whole or in part without prejudice to any claim against the Buyer for damages, including cancellation charges. Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated.
(iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies, default by any one relevant Buyer in respect to any invoice of the Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates, whereupon sub-clauses I.3.(i) and I.3.(ii) shall apply as appropriate.
(iv) Where the Buyer fails to pay timely, the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim; the Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer.
(v) All judicial and extrajudicial costs and expenses, including pre-action costs, fees, expenses and disbursements of the Seller's lawyers/attorneys-at-law, incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions, shall be for the Buyer's account, immediately payable by the latter to the Seller. In case of litigation, the Buyers shall also pay all the relevant expenses to the Seller, including but without limitation all his reasonable attorneys/lawyers' fees, costs and disbursements.

I.4        Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller. If payment falls due on a non-business day, the payment shall be made on or before the business day nearest to the due date. If the preceding and the succeeding business days are equally near to the due date, then payment shall be made on or before the preceding business day.

I.5        Any delay in payment of the full sum due shall entitle the Seller to interest at,  the rate of 3 (three) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller. Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1.50 per mton supplied, or the equivalent thereof in local currency, with a minimum administration fee of USD 350.00 for each delivery made. All reasonable attorneys' fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer.

I.6        Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order: (1) costs of any kind or nature, including but not limited to legal costs and attorneys' fees, (2) interest and administrational fee, and (3) invoices in their order of age, also if not yet due, or in Seller's sole discretion to specify a payment to any such invoice Seller considers relevant.

I.7        All costs borne by the Seller in connection with the collection of overdue payments, including those of the Seller's own legal and credit department and, including but not limited to, reasonable attorneys' fees, whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer, including but not limited to reasonable attorneys' fees, shall be for the sole account of the Buyer.

I.8        The Seller shall at all times, in its absolute discretion, be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer's obligations under the Agreement. Failing the immediate provision of such security upon Seller's demand, the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security.

I.9     Where Bunkers are supplied to a Vessel, in addition to any other security, the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel. It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof; including but not limited to the reasonable attorney's fees), such maritime lien afforded to the Seller over the Vessel. In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law, be it of the place of delivery, or the flag of the Vessel, or the place of jurisdiction and/or an arrest of the Vessel, or otherwise howsoever.

I.10    It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer. All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer, according to these ordinary business terms agreed between them.

## J.      CLAIMS

J.1     In addition to the obligations referred to in Article E.4 and E.5 herein, any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer, or the Master of the Vessel, to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest. If the Buyer or the Vessel's Master fails to present such immediate notice of protest to the Seller or Supplier, such claim shall be deemed to have been waived and shall be absolutely barred for all purposes.

J.2     Always without prejudice to Article G.14 herein, any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation, shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature or the claim(s) along with appropriate supporting documentation, failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes.

J.3     The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions, whether or not it has any claims or complaints. If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied, the Seller or the Seller's nominated representative shall be entitled to board the Vessel and investigate the Vessel's records, log books, engine logs, etc, and to make copies of any such document the Seller or the Seller's nominated representative may consider necessary for its investigations connected to the case. The Buyer shall allow this, or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and support by the Vessel's officers and crew in any such manner the Seller or Seller's nominated representative may require. Failure to allow boarding and/or produce required copies of documents and/or lack of full cooperation by the Vessel's officers and crew shall constitute a waiver of the Buyer's claim.

J.4     The Seller shall be allowed, and the Buyer, Owner, Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller's representative, to draw samples from the Vessel's storage tanks, settling tanks and service tank and/or from before and after the Vessel's centrifuges to have extra tests carried out for such samples at independent laboratory.

J.5     In each and  every case, any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers, or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller.

## K.      LIABILITY – LIMIT TO SELLER'S LIABILITY

K.1     The Seller and/or Supplier shall not be liable for damages of whatever nature, including physical injury, nor for delay of delivery of Bunkers or services, no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller. The Seller shall furthermore not be liable for damages or delay as described above when such damages or delay have been caused by the fault or negligence of its personnel, representatives, Supplier or (sub)contractors.

K.2     Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time, loss of cargo or charter cancelling date, loss of income or profit/earnings, are excluded. In any event and notwithstanding anything to the contrary herein, liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel.

K.3    The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers, its Supplier, agents, Servants, (sub)contractors, representatives, employees and the officers, crews and/or other people whether or not on board of the Vessel(s). The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions. Third party shall mean any other (physical or legal) person/company than the Buyer.

K.4    No servant, supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss, damage or delay, while acting in the course of or in connection with its employment and/or agency for the Seller. Without prejudice to the above every exemption, limitation, condition and liberty herein contained, and every right, exemption from or limit to liability, defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant, representative or agent of the Seller and/or the Supplier acting as aforesaid.

## L.    EXEMPTIONS AND FORCE MAJEURE

L.1    Neither the Seller nor the Seller's Supplier shall be liable for any loss, claim, damage, delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority, or person purporting to act therefore, or (b) when supply of the Bunkers or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by the Seller or Supplier is interrupted, delayed by congestion or other event (also see Article G.3 above), or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption, delay, unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier, including (without limitation) if such is caused wholly or partly by labour disputes, strikes, stoppages, lock-out, governmental intervention, wars, civil commotion, riot, quarantine, fire flood, earthquake, accident, storm, swell, ice, adverse weather or any act of God. Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller's or the Supplier's normal practices. Neither the Seller, nor the Supplier shall be required to make any deliveries which fail in whole or in part as a result of the causes set out in this Article at any later time.

L.2    If the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure. The Buyer shall indemnify the Seller or the Seller's supplier for any damage caused by the Buyer, the Buyer's agent or employees in connection with deliveries hereunder.

L.3    Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same. However, under no circumstances and for no reason whatsoever, can Force Majeure entitle the Buyer not to pay promptly any invoice of the Seller.

L.3    In the event that the Seller, as a result of force majeure, can only deliver a superior grade of bunkers, the Seller is entitled to offer the said grade, and the Buyer must accept delivery thereof and pay the applicable price.

L.4    (a)    These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions.  In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.

        (b)    Without prejudice or limitation to the generality of the foregoing, in the event that the third party terms include:

        (i)    A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.

        (ii)    Any additional exclusion of liability clause, then same shall be incorporated mutatis mutandis into these.

        (ii)    A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions.

(c)    It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party.

**M.    BREACH/CANCELLATION**

M.1    Without prejudice to any other remedies and rights, the Seller shall have the option immediately to cancel the Agreement in full or in part, or to store or procure the storage of the Bunkers, in whole or in part, for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred, or to hold the Buyer fully to the agreement, or take any other measures which the Seller deems appropriate, without prejudice to its rights of indemnification, without any liability on the side of the Seller, in any one of (but not limited to) the following cases:

    a)          when the Buyer, for whatever reason, fails to accept the Bunkers in part or in full at the place and time designated for delivery;

    b)          when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC;

    c)          when, before the date of delivery, it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller;

    d)          when, in case of force majeure, the Seller is of the opinion that the execution of the agreement should be cancelled.

M.2    The Seller may terminate any Agreement with the Buyer in whole or in part, in its full discretion, upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment, ceases to carry on business, makes an arrangement with its creditors or undergoes any form of bankruptcy, administration, re-organisation or asset rearrangement.

M.3    The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller, in its sole discretion, has reasonable grounds to believe that:

    a)          The Vessel; or
    b)          The Charterer of the Vessel; or
    c)          The fully or partly Owner(s) of the Vessel; or
    d)          Any officers of the Vessel; or
    e)          The Operator and/or Manager of the Vessel; or
    f)          Any other person or entity in any way related to the Agreement or delivery is/are
    1)    Iranian(s); or
    2)    Related in any way to Iran or Iranians; or
    3)    Listed on the US OFAC Specially Designated Nationals List; or
    4)    Covered by any US, UN- and/or EU sanctions; or
    5)    Covered by any sanctions of any other jurisdiction and/or administration.

Under no circumstances can the Seller be held liable for any loss, delays, claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article.

The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in combination with any of the above items 1) to 5) are fulfilled/apply. Should the Buyer breach its obligation to inform the Seller, the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach, including consequential or liquidated damages.

M.4    The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law, including but not limited to the U.S. Foreign Corrupt Practices Act ("FCPA"), and the UK Bribery Act.  Therefore, the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not, and will not, offer, promise, pay, or authorize the payment of any money or anything of value, or take any action in furtherance of such a payment, whether by direct or indirect means, to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company. Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties, making any claims for payment, delivery or any other obligation of the Seller under this Agreement void. The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence.

**N.    SPILLAGE, ENVIRONMENTAL PROTECTION**

N.1    If a spill occurs while the Bunkers are being delivered, the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill. Without prejudice to the

generality of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller, but at the expense of the Buyer, to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill. The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action. All expenses, claims, costs, losses, damages, liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission. If both parties have acted negligently, all expenses, claims, losses, damages, liability and penalties, shall be divided between the parties in accordance with the respective degree of negligence. The burden of proof to show the Seller's negligence shall be on the Buyer. The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller, or is required by law or regulation applicable at the time and place of delivery.

## O.   DELAYS AND CANCELLATIONS

O.1   Notwithstanding anything else to the contrary herein, and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer, by its acceptance of these conditions, expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date.

O.2   If the Buyer for whatever reason (including circumstances entirely outside Buyer's control) cancels the Agreement, where Order Confirmation has been sent by Seller, the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation, including, but not limited to, barge costs, re-storing of the Bunkers, and hedging costs, and also in Seller's sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or, if another buyer cannot be found, any market diminution in the value of the product as reasonably determined from available market indexes. These losses and liabilities shall be indemnified by a minimum amount of USD 4,000 by way of agreed minimum liquidated damages, and shall be indemnified in full if they in total exceed USD 4,000.

## P.   LAW AND JURISDICTION

P.1   This Agreement shall be governed and construed in accordance with English law.
The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply.
Except for circumstance referred to in Clause P.5 below all disputes arising in connection with this Agreement or any agreement relating hereto, save where the Seller decides otherwise in its sole discretion, shall be finally settled by arbitration in London, England in accordance with the Arbitration Act 1996 (or any subsequent amendment).

P.2   In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller, one by the Buyer, and one by the two arbitrators already appointed. Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the ''LLMA''). Either party may call for Arbitration by service of written notice, specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject or the Arbitration. If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s), then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly. The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement.  Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either party may apply to the English courts for the appointment of a third arbitrator.
Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise.

P.3   Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

P.4   In cases where neither the claim nor any counterclaim exceeds the amount of USD 100,000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

P.5   The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert

its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York.

P.6     If any procedure of any nature whatsoever is instituted under Clause P.5 above, in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement, the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys' fees incurred in such proceeding.

## Q.      VALIDITY

Q.1     These terms and conditions shall be valid and binding for all offers, quotations, prices and deliveries made by the Bergen Bunker Group, any associated company, representative or agent as of February 15, 2014, or at any later date.

Q.2     These terms and conditions are available at the website www.bergenbunkers.no, on which site as well the Sellers may notify amendments, alterations, changes or verifications to same. Such amendments, alterations, changes or verifications are deemed to be a part of the entire terms once same have been advised on the website.