# EXHIBIT 3



# HESS CORPORATION

## GENERAL TERMS AND CONDITIONS FOR MARINE FUELS

Buyer and Seller (each, a "Party" and collectively, the "Parties") have entered and/or anticipate entering into one or more Contracts governed by these General Terms and Conditions for Marine Fuels ("Marine Fuels GTCs") in reliance on the fact that the Marine Fuels GTCs and all such Contracts form a single agreement between the Parties (collectively, "Agreement"), and would not otherwise enter into any Contracts.

**A**. **Payment Terms**.
Payment shall be made in U.S. Dollars without discount, deduction or setoff within thirty (30) days from date of delivery (the "Due Date"). Payment of all sums due in respect of Marine Fuels delivered hereunder shall be made in full to Seller by means of electronic wire transfer to the bank account stated on the invoice or otherwise provided, such that funds are received into such account by the Due Date. If the Due Date falls on a Saturday, Sunday or public holiday, payment shall be made so as to reach Seller's designated bank account not later than the last banking day prior to the Due Date. Delivery documents may be provided to the Buyer if so requested, but payment shall not be conditional upon the Buyer's receipt of such documents.

In the event that Buyer fails to make any payment when due, Seller shall have the right to charge interest on the outstanding amount at two percent (2%) above the Interest Rate published by the Wall Street Journal, or the maximum amount allowed by law (whichever is less), on the Due Date, and calculated on a three hundred sixty (360) day-per-year basis from the Due Date (the "Interest Rate") until the date such payment is received by Seller. If the Wall Street Journal is not published on the Due Date, the Seller shall use the prime rate published by an internationally-recognized financial publication.

In the event of any dispute with respect to payment amounts hereunder, Buyer shall pay Seller the undisputed amount on the Due Date.

**B**. **Credit**.
If Seller supplies Marine Fuels to Buyer on credit and the financial condition of Buyer becomes, in the sole opinion of Seller, impaired or unsatisfactory, Seller may demand that Buyer make payment for Marine Fuels at any time before the Due Date or provide security.

To the extent Buyer has (i) exceeded any credit limit set by Seller without providing the security demanded by Seller, or (ii) failed to make any payment hereunder, Seller shall, in addition to any other remedy allowed hereunder or at law or in equity, (x) have the right to suspend or terminate any delivery of Product under this Agreement, and/or (y) aggregate all amounts payable by each Party to the other under all agreements between them and net the same, such that a single payment shall be payable by one Party to the other, which amount shall be immediately due and payable. In the event of any such delivery termination or suspension, Buyer shall have no recourse against Seller.

**C**. **Minimum Insurance Amount and Indemnity**.
Any Vessels nominated by Buyer hereunder shall have secured and will maintain while in or about the Delivery Port, oil pollution insurance coverage in at least the maximum amount prescribed by such Vessel's protection and indemnity (P&I) club or mutual insurance association. Should any additional oil pollution insurance coverage become available over and above the current maximum P&I club limit currently available, each Vessel nominated by Buyer shall secure the same.

**D**. **Governing Law**.
This Agreement shall be governed by and construed in accordance with the laws of the State of New York, U.S.A. (without reference to its conflict of law rules). To the extent not inconsistent herewith, Incoterms 2010, ICC publication No. 715, effective January 1, 2011, shall apply hereto.

**E**. **Jurisdiction**.
Each Party expressly submits to the exclusive jurisdiction of any New York State court or federal District Court of the United States of America sitting in the Borough of Manhattan in New York City and any appellate court thereof, in any action or proceeding arising from, arising out of or relating to this Agreement, or for recognition of any judgment, without recourse to arbitration, and each Party consents to service of process by certified mail.

Each Party further agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in

any other manner provided by law. Each Party waives any objections which it may now or hereafter have based on venue and/or forum non conveniens for any such suit, action or proceeding filed in any New York State court or federal District Court of the United States of America sitting in the Borough of Manhattan in New York City.

The Parties hereto specifically and intentionally exclude the applicability to this Agreement, if any, as the United Nations Convention on Contracts for the International Sale of Goods.

F. **WAIVER OF JURY TRIAL**.
EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENTS. EACH PARTY HERETO: (A) CERTIFIES THAT NO REPRESENTATIVE AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION F.

G. **Assignment**.
Seller may assign all or any of its rights and obligations without notice to Buyer. Buyer consents, irrespective of notice, to be bound to the assignee. Delivery of the Marine Fuels by the assignee shall constitute its consent to be bound to Buyer under the terms set out herein. Any assignment by Buyer without Seller's written consent shall be void**.**

H. **General Quality Terms**.
Buyer shall have sole responsibility for selection and acceptance of Marine Fuels, including determination of compatibility with any Marine Fuels already on board any Vessel, for use in such Vessel receiving Marine Fuels. Quality testing shall be by an independent laboratory chosen by Seller ("Independent Lab") from composite samples taken at time of delivery from the shore tank or Vessel from which delivery was made. The tests taken by this Independent Lab shall be conclusive for purposes of determining the quality of Marine Fuels. Unless otherwise indicated to Buyer in writing by Seller or Supplier, any information provided to Buyer regarding the characteristics of Marine Fuels at any delivery location shall not be construed as specifications of Marine Fuels to be delivered hereunder, but only as indications of the characteristics of Marine Fuels available at that location from time to time. Neither Seller nor Supplier offers any guarantees or warranties, express or implied, as to the satisfactory quality, merchantability, fitness, or suitability of Marine Fuels for any particular purpose or otherwise, which extend beyond the description in this Section G.

I. **Other Charges and Taxes**.
Buyer shall be liable for all costs, expenses, and/or charges incurred by Seller or Supplier on account of Buyer's failure, breach, and/or non-compliance with its obligations under any agreed nomination as set forth in Section J below. Buyer shall also pay all applicable duties, taxes, fees, and other costs including, without limitation, those imposed by any government, and barging and other delivery charges, all of which shall be included in Seller's invoices to Buyer. Where Marine Fuels are intended for export use or are imported under bond, or Marine Fuels manufactured from imported crude oil and entitled to a duty drawback is delivered for Buyer's account without payment by Buyer of the applicable customs duty, tariff, fee or other charge thereon, Buyer shall be liable to reimburse Seller for any such tax or charge assessed, including interest and penalties thereon, or for any drawback denied after Supplier's delivery by reason of failure by Buyer or the applicable Vessel to qualify therefore or to furnish the necessary proof within the requisite time period specified by applicable law or regulation.

The price set forth in any Contract excludes all taxes (including, but not limited to, federal, state and local excise (sales and use) taxes). Buyer has stated that Marine Fuels purchased hereunder are to be used or consumed solely by a Vessel or Vessels engaged in foreign commerce and sailing under a foreign flag. Seller has concluded, in reliance on such statement from Buyer, that each sale hereunder is exempt from the applicable state sales and use taxes. If requested by tax auditors from any such applicable state, Buyer shall provide Seller with a completed tax exemption certificate.

Buyer expressly agrees to pay or reimburse Seller for any taxes (including penalties and interest) resulting from the sale of Marine Fuels that Seller is required to collect or pay, that result from any untrue statement made by Buyer and relied upon by Seller, or that are assessed for any other reason.

J. **Nominations**.
Buyer or Buyer's agent shall give Seller at least five (5) calendar days prior written notice of deliveries required, specifying the (i) name of the Vessel, (ii) Delivery Port, (iii) Vessel's agents, (iv) approximate date of delivery, and (v) grade and quantity of Marine Fuel. Buyer or Vessel's local agent shall confirm in writing the details above to Seller or Supplier at least forty-eight (48) hours (excluding non-business days) prior to delivery. Buyer agrees to reimburse Seller or Supplier for overtime and/or other additional expenses incurred due to the failure of Buyer, its servants, or Vessel's local agents to provide Seller or Supplier with written amendments of delivery time, quantity changes, or

cancellations at least forty-eight (48) hours prior to scheduled delivery. A notice as given above shall be invalid if a Vessel's estimated arrival date given therein is later than three (3) calendar days beyond the delivery date and shall be deemed cancelled and subject to cancellation pursuant to Section L below if Vessel has not arrived within three (3) calendar days after Vessel's said estimated arrival date.

**K**. **Deliveries, Demurrage, Title and Risk of Loss**.
Deliveries shall be made at Seller's option into (i) Buyer's Vessel(s) at a terminal as agreed between the parties, (ii) Buyer's Vessel via Seller's Vessel where barging facilities satisfactory to Seller are available to Seller, or (iii) Buyer's Vessel via Supplier's Vessel.

Delivery shall be made during ordinary business hours at the place of delivery unless otherwise agreed by Seller and permitted by the Delivery Port regulations, in which event Buyer shall pay any extra expense incurred. Buyer shall make all connections and disconnections of delivery hose to Buyer's Vessel.

For deliveries into Buyer's Vessel via Seller's or Supplier's Vessel, deliveries need not be made whenever, in Seller's sole opinion, a clear and safe berth for Seller's or Supplier's Vessel is not available. Delivery shall be complete and title and risk of loss shall pass to Buyer at the point at which Marine Fuels pass the flange connecting the Vessel loading arm or hose with the permanent loading connection of Buyer's Vessel. Seller or Supplier shall not be liable to Buyer for any loss or demurrage due directly or indirectly to congestion of the Delivery Port, prior commitments of available Vessels, weather (whether or not unusual), or any other Force Majeure as set forth in Section Q below. Buyer shall pay any demurrage or detention charges at such rate as may be invoiced by Seller or Supplier.

For deliveries into Buyer's Vessel at a terminal, deliveries need not be made whenever, in Seller's opinion, a clear and safe berth for a Vessel is not available. Delivery shall be complete and title and risk of loss shall pass to Buyer at the point at which the Marine Fuels pass the flange connecting the shore loading arm with the permanent loading connection of Buyer's Vessel. Deliveries shall be made on a "first come, first served" basis. Seller shall not be liable to Buyer for any loss or demurrage due directly or indirectly to congestion of the Delivery Port, weather (whether or not unusual), or any other force majeure set forth in Section Q below. Buyer shall receive Marine Fuels into Buyer's Vessel and then withdraw such Vessel from the terminal berth. Buyer shall pay any demurrage or detention charges incurred by Seller resulting from any delay by Buyer in its use of the delivery facilities, including any delay by Buyer vacating its berth at the relevant terminal.

With respect to all forms of delivery listed above, Buyer shall make all connections and disconnections between the delivery hose and the Vessel's intake pipe, and shall render all other necessary assistance and provide sufficient tankage and equipment to receive promptly all deliveries hereunder. In no case shall Seller or Supplier be liable for any damage or delay resulting from causes beyond its control or avoidable by due care on the part of Buyer or its Vessel.

Seller may elect to discontinue operations at any delivery location for any reason without obligation to Buyer.

**L**. **Cancellation**.
If Buyer cancels any Contract in whole or in part for any reason whatsoever, Seller, without prejudice to any other rights it may have hereunder, at law or in equity, shall be entitled to a cover remedy such that Buyer shall owe Seller the difference between the price set forth in Contract and the amount Seller has obtained from a replacement buyer at the current market price as determined by Seller in a commercially reasonable manner. To the extent Seller is unable to resell the Marine Fuels in a commercially reasonable manner, Buyer shall pay the entire remaining price under such Contract and may elect to take delivery of such Marine Fuels.

**M**. **Termination**.
Either Party may terminate this Agreement ("Liquidating Party") if the other Party ("Defaulting Party"): (i) becomes Bankrupt; (ii) fails to make any payment or perform when due any obligations under this Agreement or any other agreement with the Liquidating Party; (iii) fails to provide a prepayment, payment at delivery, or security as may be required pursuant to Section B hereof; or (iv) fails to provide adequate assurance of its ability to perform all of its outstanding obligations hereunder or any other contract with the Liquidating Party or any of Liquidating Party's Affiliates within forty-eight (48) hours of Liquidating Party's written demand therefor when Liquidating Party has reasonable grounds for insecurity. For the purpose of this Section M, "Bankrupt" shall mean, with the respect to any person or entity, such person or entity (i) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under the Bankruptcy Code or any other bankruptcy, insolvency, reorganization or similar law, or has any such petition filed or commenced against it; (ii) makes an assignment or any general arrangement for the benefit of creditors; (iii) otherwise becomes bankrupt or insolvent (however evidenced); (iv) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets; or (v) is generally unable to, or admits in writing its inability to, pay its debts as they fall due.

Upon the occurrence of any of the events specified above, Liquidating Party shall have the right, exercisable in its sole discretion and at any time upon prior notice to Defaulting Party (except with respect to any of the defaults specified in clause (i) of this Section M, in which case no notice is required), to liquidate this Agreement and all other contracts

then outstanding between the parties (however Liquidating Party may be designated thereunder) by declaring all such contracts terminated, whereupon such contracts shall automatically be terminated ("Terminated Contracts") except for the payment obligation below (an "Early Termination"), and by calculating the difference (whether positive or negative), if any, between the price specified in each Terminated Contract and the market price for such Terminated Contract (as determined by Liquidating Party in a commercially reasonable manner at a time or times reasonably determined by Liquidating Party), adding any costs incurred in terminating the Terminated Contracts (including broker fees, resale costs, hedge replacement costs, and collection and enforcement fees), and aggregating or netting such calculated differences and costs to a single liquidated settlement amount ("Settlement Amount"). If such Settlement Amount is a positive number, it shall be payable by Defaulting Party to Liquidating Party, and if such Settlement Amount is a negative number, then the absolute value thereof shall be payable by Liquidating Party to Defaulting Party. The Settlement Amount will be due and payable on demand therefor, and interest shall accrue on any unpaid portion of Settlement Amount at the Interest Rate until paid in full by the Defaulting Party. At the discretion of Liquidating Party and without prior notice to Defaulting Party, the Settlement Amount may be adjusted by set-off against any amounts payable (whether or not arising under this Agreement, matured or contingent, and irrespective of the currency, place of payment, or place of booking of the obligation) between Liquidating Party and Defaulting Party and/or any of their respective Affiliates.

**N. Claims.**
Buyer waives any claim against Seller with respect to the quantity or quality of the Marine Fuels supplied unless Buyer's claim is submitted to Seller in writing within twenty (20) days after the date of delivery of the Marine Fuels.

It is the duty of Buyer to take all reasonable actions, including retention and burning of fuel, to eliminate or minimize any damages or costs associated with any off-specification or suspected off-specification supply. Claims as to quality must be based on quality reports made by an Independent Lab in regards to the composite samples taken at the time of the delivery from the shore tank or Vessel from which delivery was made. Buyer shall cooperate with Seller or Supplier in achieving the most cost-effective solution, and in any event, Seller or Supplier's obligation hereunder shall not exceed the price of that portion of the Marine Fuels sold hereunder on which liability is asserted. Seller or Supplier may also elect to deliver the same quantity of on-specification Marine Fuels to Buyer in settlement of any claim hereunder.
Should any timely claim submitted by Buyer not be settled to Buyer's satisfaction, any legal action brought by it thereon shall be time-barred unless commenced within six (6) months after delivery of Marine Fuels or other event, action, inaction or omission from which such claim arises. This provision shall survive termination of any Contract or this Agreement arising between Seller or Supplier and Buyer.

**O. Indemnities.**
Buyer shall defend, indemnify, and hold Seller and Supplier harmless with respect to any and all liability, loss, claims, expenses or damage Seller or Supplier may suffer or incur by reason of, or in any way concerned with, the fault or default of Buyer or its agents in the purchase, receipt, use, storage, handling or transportation of Marine Fuels hereunder.

Seller warrants that at the time title in the Product delivered under this Agreement passes to Buyer, Seller has the right to sell the said Product to Buyer and Seller has unencumbered title to the Product. Seller shall indemnify and hold Buyer harmless from and against any and all claims, damages, costs, and expenses (including reasonable attorney fees), which Buyer may suffer by reason of any of the shipping documents relating to Product remaining outstanding or for breach of said warranty of title given above. Such indemnification shall include, but not be limited to, claims made by the carrier, Vessel owner, consignor, consignee or any holder or transferee of the shipping documents or by any other party claiming an interest in or lien on the Product or proceeds thereof.

**P. Liens.**
Deliveries of Marine Fuels hereunder are made not only on the credit of Buyer, but also on the faith and credit of Buyer's Vessel that uses the Marine Fuel. Seller and Supplier will have and may assert a lien for the said amount of the delivered Price against any such Vessel, should the laws applicable at (i) the place of Seller's address which is set forth in the relevant Contract, (ii) the place of delivery of Marine Fuels, and/or (iii) the place of seizure of such Vessel; grant or recognize a lien for Marine Fuels delivered to a Vessel. All costs associated with the seizure of any Vessel shall be for Buyer's account. The taking of any additional security measures by Seller or Supplier shall not operate as a waiver of this provision. If at any time, a Price provided under these Marine Fuels GTCs or any Contract shall not conform to the applicable laws, regulations or orders of any government or other competent authority having jurisdiction over Buyer, Seller, or Supplier, Seller shall make appropriate adjustments to such Price. The Buyer shall not be entitled to cancel the effect of this lien by wording on the delivery ticket or otherwise.

**Q. Force Majeure.**
In addition to any other excuses (arising out of the same or other causes) provided by law, no failure or omission by either Party to carry out or observe any of the provisions or conditions of this Agreement shall be deemed to be a breach of contract if the same shall arise out of causes not reasonably within the control of that Party, whether or not

foreseen, including (without limitation) such causes as labor disputes, strikes, governmental intervention, or Seller's response to the insistence or request of any governmental instrumentality or person purporting to act therefor, wars, civil commotion, fire, flood, accident, storm or any act of nature. The term "Party" when used with reference to Seller shall also include Supplier and any subsidiary or Affiliate of Seller or Supplier**.** Under no circumstances, however, shall Buyer be excused from its obligation to pay all amounts due hereunder for undisputed Marine Fuels actually delivered. A Party affected by events described in this Section shall give prompt written notice to the other Party describing in sufficient detail the events and the estimated scope of such disability.

Either Party may terminate this Agreement forthwith if a force majeure event described above continues for a period of at least thirty (30) consecutive days (or if both parties agree that the event will continue for at least thirty (30) consecutive days), by giving to the other Party written notice to that effect.

**R**. **Shortage of Marine Fuel**.
If, as a result of any of the events, matters or things referred to in Section Q above, or any other foreseeable or non-foreseeable event, including: (i) contractual changes relating to the supply of crude oil, feedstock, and/or petroleum products from which Marine Fuels of the type to be sold hereunder is derived, or (ii) supplies of Marine Fuel are curtailed, or are available to Seller or Supplier only under conditions which, in Seller's or Supplier's sole judgment, are deemed unacceptable, Seller may allocate, on any fair and reasonable basis according to its own discretion, its available supplies of Marine Fuels to meet its own requirements and those of its subsidiaries and Affiliates, and other customers, (including Buyer), and Seller and Supplier shall not be required to increase supplies of Marine Fuels from some other source of supply or to purchase Marine Fuels to replace the supplies so curtailed.

No Party affected by Section Q or this Section R shall be required to remove such cause(s) if doing so would cause any additional expense. Neither Seller nor Supplier shall be obligated to purchase additional supplies of Marine Fuels to make up deliveries omitted during any period of disruption, nor will the term of any Contract, if applicable, be extended due to the causes set forth in Section Q and this Section R.

**S**. **Environmental Protection**.
If any spill occurs while Marine Fuels are being delivered, Buyer shall promptly take such action as is reasonably necessary to remove the spilled Marine Fuels and mitigate the effects of such spills. Seller or Supplier, regardless of cause, are authorized, at its option and at Buyer's expense (unless Seller or Supplier is the cause of such spill, in which case, at Seller's expense), to take such measures and incur such expenses (whether by employing its own resources or by contracting with third parties) as are reasonably necessary in the judgment of Seller to remove spilled Marine Fuels and mitigate the effects of any such spills. All expense, claims, loss, damage, liability and penalties arising from any spill shall be borne by the Party who caused such spill. If both parties are at fault, all expense, claims, loss, damage, liability and penalties shall be divided between the parties in accordance with their respective degrees of fault. Buyer or Seller shall provide to the other Party, as soon as possible, all documents and other information concerning any spill or any program for prevention thereof, as may be required by the other Party or as required by law or regulation applicable at the time and place of delivery of Marine Fuels.

Buyer is in compliance with all Annexes of the Maritime Protection Convention – MARPOL 73/78 promulgated by the International Maritime Organization ("MARPOL Protocol") applicable to Marine Fuels. Seller and Buyer are in compliance with the MARPOL Protocol specifically as enacted by the United States in the Act to Prevent Pollution from Ships P.L. 96-478. The Seller or Supplier agrees, to the extent necessary, to provide a bunker delivery note and will provide the appropriate samples for compliance, each as required under MARPOL Protocol Annex VI.

**T**. **LIMITATION OF LIABILITY**
EXCEPT AS SET FORTH HEREIN, SELLER MAKES NO OTHER WARRANTY OF ANY KIND WHATSOEVER, WRITTEN OR ORAL, EXPRESS OR IMPLIED, AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED BY SELLER AND EXCLUDED FROM THIS AGREEMENT. SELLER EXPRESSLY DISCLAIMS ANY WARRANTY AGAINST INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT. EXCEPT AS OTHERWISE PROVIDED IN SECTION M THE PARTIES' LIABILITY FOR DAMAGES UNDER ANY TRANSACTION IS LIMITED TO DIRECT, ACTUAL DAMAGES ONLY AND IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR SPECIFIC PERFORMANCE, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, LOSE OF USE OR SERVICE OR OF CAPITAL, OR CLAIMS OF CUSTOMERS OF THE OTHER PARTY, OR SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, IN TORT, CONTRACT OR OTHERWISE, OF ANY KIND, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE PERFORMANCE, THE SUSPENSION OF PERFORMANCE, THE FAILURE TO PERFORM OR THE TERMINATION OF A TRANSACTION. EACH PARTY ACKNOWLEDGES THE DUTY TO MITIGATE DAMAGES.

**U**. **Notices**.
Except as otherwise expressly provided herein, all written notices, reports and documents permitted or required to be

delivered by the provisions of this Agreement ("Notices") shall be delivered by hand, confirmed facsimile, courier, or registered or certified mail (return receipt requested, postage prepaid), using the contact information for each Party set forth in the relevant Contract, and shall be deemed so delivered upon receipt. Any such Notices received on a day that is not a business day (or after 5:00 pm on a business day) will be deemed delivered at the opening of business at such location on the next business day.

Either Buyer or Seller may, by written notice to the other, change its contact details in the relevant Contract at which Notices shall be sent thereunder.

**V. Definitions**.
In addition to the terms previously defined in this Agreement, the following terms shall apply:

"Affiliate" means any company, partnership, joint venture, or entity controlled by, controlling or under common control with a Party hereto. For the purposes of this definition, "control" means the direct or indirect beneficial ownership of fifty percent (50%) or more of the stock entitled to vote in the election of directors or, if there is no such stock, fifty percent (50%) or more of the owners' interest in such company, partnership, joint venture or entity.

"Bankrupt" has the meaning set forth in Section M above.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et. seq.*

"Buyer" has the meaning as set forth in any Contract.

"Contract" means any purchase or sales contract incorporating these Marine Fuels GTCs.

"Delivery Port" means each delivery port specified in any Contract.

"Due Date" has the meaning set forth in Section A above.

"Independent Lab" has the meaning as set out in Section H above.

"Interest Rate" has the meaning set forth in Section A above.

"Marine Fuels" means any of marine fuel oil, marine gas oil, marine diesel fuel, gas oil, and any other fuel which can qualify as an engine fuel for maritime use.

"Price" has the meaning set forth in any Contract.

"Product" means, individually and collectively, each type of Marine Fuels specified in any Contract.

"Seller" is as set forth in any Contract.

"Supplier" means the delivering company who has Marine Fuels available at the Delivery Port, and as requested by Seller, makes delivery thereof to Buyer. Where Seller has Marine Fuels available itself, it may act both as Seller and Supplier hereunder.

"Vessel" means any barge (including ocean-going), tow or tugboat, or tankship.

**W. Oral Agreements Binding**.
The Parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Contract will be entered into as soon as practicable and may be executed and delivered in counterparts, including by facsimile transmission or other electronic transmission (i.e., a "PDF" or "TIFF" document) or by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails. The Parties will specify therein or through another effective means that any such counterpart, electronic message or e-mail constitutes a Contract.

**X. Export Laws and Controls; Ethical Business**.
Each Party agrees to abide by the terms of Annex A of these Marine Fuels GTCs.

**Y. Entire Agreement; Amendment**.
This Agreement constitutes the entire agreement and understanding between the parties with respect to its subject matter and supersedes all prior oral communications and prior writings with respect thereto. Neither this Contract nor any provision hereof may be waived or amended except pursuant to a writing between the Parties.

# HESS CORPORATION

# GENERAL TERMS AND CONDITIONS FOR MARINE FUELS

## ANNEX A
## Export Laws and Controls; Ethical Business Practices

**1.1. Customs Reporting**

(a) Where Buyer will be the importer of record, Seller shall provide Buyer, in a timely manner, any information or documentation reasonably necessary or otherwise required by U.S. Customs and Border Protection ("Customs") for the purpose of importing into the customs territory of the United States Product purchased by Buyer under this Agreement including, but not limited to, information needed by Buyer to support Buyer's claim as to tariff classification, duty rate, dutiable value and country of origin. In the event that Customs requests additional documentation within Seller's control following importation, Seller shall provide such documentation to Buyer upon Buyer's request.

(b) Where Buyer will be the importer of record of a Product imported into the United States that may be eligible for preferential duty treatment or other preferential treatment (collectively, "Preferred Treatment") under a free trade agreement, duty preference program, or other trade preference program (any such agreement or program referred to herein as a "Preferential Trade Arrangement"), Seller agrees to:

   (i) confirm that such Product is so eligible for Preferred Treatment under a Preferential Trade Arrangement and the basis for such eligibility;

   (ii) provide any documentation required by the relevant Preferential Trade Arrangement and/or Customs in a timely manner to support the applicable Preferred Treatment, including, but not limited to, a certificate of origin;

   (iii) provide refinery production and related records to Customs upon request by Customs in any inquiry to verify the Preferred Treatment of such Product, including, but not limited to, discharge reports, receiving reports, pipeline tickets, stock and yield reports, load reports, meter tickets, and any other documents sufficient to establish the eligibility of the Product for Preferred Treatment through a traceable production timeline; and

   (iv) reimburse Buyer for any duties, merchandise processing fees, penalties or liquidated damages assessed by Customs as a result of Seller's failure to provide any such documentation described above in a timely manner and to Customs' satisfaction.

**1.2. Customs Costs**

Seller shall pay the costs of customs formalities necessary for exportation, and shall secure all export permits, certificates of origin and invoices that may from time to time be required with respect to the Product sold and delivered hereunder; Buyer shall execute and deliver, or cause to be executed and delivered, to Seller or Seller's supplier such certificates and other documents, including certificates of discharge, as may be requested from time to time by Seller or Seller's supplier. In the event that Buyer fails to execute and deliver such documents as Seller may request in a timely manner, Buyer shall be responsible for any costs or damages incurred by Seller or Seller's supplier, and Seller may at its option forthwith suspend this Agreement.

**1.3. Origination and Destination Restrictions**

(a) Restricted Destinations. – Product will not be knowingly sold, supplied or delivered, directly or indirectly (including but not limited to the acquisition of any or feedstock that may be incorporated into the Product), to any destination that at the time of disposal is an embargoed destination under the law or policy of the United States or the United Nations; *provided, however,* that if either Party is, or is likely to be, prevented from complying with such restriction by any law, policy, demand or request to which a Party is subject or by any governmental policy, demand or request by which a Party reasonably considers itself to be bound (the "Restricted Party"), then both Parties will meet and discuss the implications and, pending resolution of

any difficulty thereby caused or likely to be caused, the non-Restricted Party may in its discretion suspend in whole or in part supplies or receipts of Product hereunder.

- (b) <u>Final Destination Documents</u>. – The Seller may at any time require the Buyer to provide any relevant documents for the purpose of verifying the final destination of the Cargo and the Buyer undertakes to advise the Seller, upon request, of the destination of the Cargo.

- (c) <u>Prohibition of Cargo</u>. – Where, at any time before the commencement of discharge of the shipment, importation of the Cargo at the designated discharge Terminal is prohibited by order of the governmental authorities of the country in which the Cargo has been produced or loaded or is to be imported, then the Buyer shall arrange for discharge at an acceptable alternative port that is not subject to any such prohibition. Any resulting additional costs incurred by the Seller as a result of such alternative discharge shall be refunded promptly to the Seller by the Buyer.

- (d) <u>Prohibited Originating Countries</u>. – Cargoes originating in countries subject to comprehensive sanctions under U.S. UK or EU law, including currently Iran, Cuba, Sudan and Syria, are prohibited.

- (e) <u>Sale to Third Party</u>. – In the event Product is disposed of by Buyer to a third party in whole or part, Buyer will ensure that all end users of Product abide by the provisions of this Section 1.3 and without delay provide the Seller with all relevant information as the Seller may require related to such alternative disposal including name of end user, name of the refinery and any other relevant information the Seller may deem necessary.

- (f) <u>Economic Sanctions Laws</u>. – Neither Party will take any action that will cause the other Party to violate applicable economic sanctions laws.

**1.4. Trade Controls and Anti-Boycott Provisions**

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, NOTHING IN THIS AGREEMENT IS INTENDED, AND NOTHING HEREIN SHOULD BE INTERPRETED OR CONSTRUED, TO INDUCE OR REQUIRE EITHER PARTY HERETO TO ACT IN ANY MANNER (INCLUDING BY NOT TAKING ANY ACTIONS IN CONNECTION WITH A TRANSACTION) WHICH IS INCONSISTENT WITH, PENALIZED OR PROHIBITED UNDER ANY LAWS, REGULATIONS, RULES OR OTHER REQUIREMENTS OF THE UNITED STATES OF AMERICA, THE UNITED KINGDOM OR EU APPLICABLE TO SUCH PARTY WHICH RELATE TO FOREIGN TRADE CONTROLS, EXPORT CONTROLS, EMBARGOES OR INTERNATIONAL BOYCOTTS OF ANY TYPE.

**1.5. Anti-Corruption, Anti-Bribery, Anti-Money Laundering & Ethical Business**

- (a) <u>Compliance with Laws</u>. – The Parties agree that each will comply with, and will use reasonable endeavors to ensure that any third party used by them to fulfill the Parties' respective obligations under the Agreement will comply with, all laws, rules, regulations, decrees, or official governmental orders of the United Kingdom and the United States of America, relating to anti-bribery, anti-corruption and/or anti-money laundering, applicable to any of the Parties or their ultimate parent companies.

- (b) <u>Ethical Business Practices</u>. – Books and records shall be kept in a complete and accurate manner. Each Party will maintain the highest reputation for integrity and will conduct its operations consistent with the highest ethical standards prevailing in the business communities in which it operates.

- (c) <u>Bribery & Corruption</u>. – The Buyer and the Seller each represent, warrant and undertake to the other that:
    - (i) it has not and will not, whether directly or indirectly, make or permit to be made, with respect to the Product and/or this Agreement, any offer, payment, promise to pay, or authorization of the payment of, any money (or money's worth), or give, offer to give, or promise to give or authorize the offering or giving of anything of value, to or for the use or benefit of:
        - A. a government official or an officer or employee of a government or any department, agency or instrumentality of any government;
        - B. an officer or employee of a public international organization;

- C. any person acting in an official capacity for or on behalf of any government or department, agency, or instrumentality of such government or of any public international organization;
- D. any political party or official thereof, or any candidate for political office; or
- E. any other person, individual or entity at the suggestion, request or direction or for the benefit of any of the above-described persons and entities;

for the purpose of:

- F. influencing an official act or decision of that person for a corrupt purpose, influencing an official action, or securing an improper advantage, in order to obtain or retain business or to direct business to any person;
- G. inducing that person to do or omit to do any act in violation of his, her or its lawful duty; or
- H. inducing that person to use his, her or its influence within the government to affect any government decision or secure any improper advantage.

(ii) it will not do, or fail to take appropriate steps to ensure that it will not do, anything that will be in violation of or inconsistent with the anti-bribery or anti-money laundering legislation of any government, including the U.S. Foreign Corrupt Practices Act 1977, the UK Bribery Act 2010, the U.K. Anti-Terrorism, Crime and Security Act 2001, the Money Laundering Regulation 1993 and the Proceeds of Crime Act 2002 and the applicable country legislation implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

(d) Facilitation Payments. – Each of the Buyer and the Seller agree that, except only where the health and safety of a person is at risk, it shall not authorize or otherwise permit the offer to or payment to any persons, in particular those persons listed in Sections 1.5(c)(i)A through 1.5(c)(i)E above, of a small monetary sum in order to effect a routine action, which payments are commonly known as "facilitation" or "grease" payments.

(e) Response to Notices. – Each Party shall respond promptly, and in reasonable detail (including documentary support), to any notice from the other Party or its auditors pertaining to the warranty and representation in Sections 1.5(c) and (d) above.

(f) Seller Representation. – The Seller represents and warrants to the Buyer that it has not made any payments or given anything of value to officials, officers or employees of the government of the country in which the Product originated or any agency, department or instrumentality of such government in connection with the Product which is the subject of the Agreement which would be inconsistent with or contravene any of the legislation as set out in Section 1.5(c)(ii) above.

(g) Respect for Human and Labor Rights. – Each of the Buyer and the Seller will respect the human and labor rights of its workers and treat them with dignity and respect and shall not employ or utilize the services of any third party or any supplier of goods and/or services that is credibly implicated in human rights or labor rights abuses.

(h) Termination for Non-compliance. – The Buyer or the Seller may terminate the Agreement forthwith upon written notice to the other at any time, if in their reasonable judgment the other is in breach of any of the above representations, warranties or undertakings, in which case the Buyer or Seller (as applicable) shall determine the Settlement Amount that would be payable with respect to the Transaction as though it were the Liquidating Party in accordance with Section M.