**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Aegean Bunkering (USA) LLC,

        Plaintiff,

        v.

M/T AMAZON (IMO 9476654), its
 engines, tackle and apparel, *et al.*,

        Defendants and Garnishee.

---

14 CV 9447(KBF)
ECF Case


**AEGEAN'S MEMORANDUM**
**SUPPORTING ITS MOTION FOR**
**SUMMARY JUDGMENT**

J. Stephen Simms
Simms Showers LLP
201 International Circle
Baltimore, Maryland 21030
410-783-5795
jssimms@simmsshowers.com

# TABLE OF CONTENTS

| | | |
|---|---|---:|
| | Table of Contents | 2 |
| | Table of Authorities | 3 |
| I. | Introduction | 5 |
| II. | Facts | 8 |
| III. | Legal Standards | 11 |
| IV. | Argument | 12 |
| | A. Canpotex:  The Aegean Terms Bind the Vessel, Jasper, and OW (and ING as OW's purported assignee). | 12 |
| | B. Aegean Has Maritime Liens *In Rem* Against the Vessel Because it Provided the Bunkers to the Vessel – And Jasper and OW Ratify and Confirm Aegean's Liens. | 15 |
| | C. Aegean Has Direct Unjust Enrichment Claims Against Jasper, OW/ ING and the Vessel *In Rem*. | 21 |
| | D. ING Is Not Assignee of the $981,708.20 Due Aegean. | 23 |
| | E. Overall, This Court Should Grant Aegean's Summary Judgement Applying the Equitable Principles of Both Interpleader and Admiralty | 25 |
| V. | Conclusion | 28 |

# TABLE OF AUTHORITIES

*American-Hawaiian S.S. Co. v. Bowring & Co.,*
    150 F. Supp. 449 (S.D.N.Y. 1957)……………………………………………26

*Atlas Corp. v. Marine Ins. Co.,*
    155 F.R.D. 454 (S.D.N.Y. 1994)…………………………………….….25

*Belcher Co. of Ala., Inc. v. M/V MARATHA MARINER,*
    724 F.2d 116 (5th Cir. 1984)…………………………………………….15

*Bominflot, Inc. v. M/V Henrich S,*
    465 F.3d 144 (4th Cir. S.C. 2006)……………………………………..24

*Bronx Entm't LLC v. St. Paul's Mercury Ins. Co.,*
    265 F. Supp. 2d 359 (S.D.N.Y. 2003)…………………………….…….20

*Equilease Corp. v. M/V Sampson,*
    793 F.2d 598 (5th Cir. 1986)…………………………………………..21

*Galehead v. M/V ANGLIA,*
    183 F.3d 1242 (11th Cir. 1999)…………………………………...…15

*Great Lakes Business Trust v. M/T Orange Sun,*
    855 F. Supp. 2d 131 (S.D.N.Y 2012)…………………………………..23

*Gulf Oil Trading Co. v. Creole Supply,*
    596 F.2d 515 (2d Cir. 1979)…………………………………………22, 28

*Home Indem. Co. v. Moore,*
    499 F.2d 1202 (8th Cir. 1974)…………………………………………26

*Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*
    36 N.Y.2d 121 (N.Y. 1975)…………………………………………..20

*Itel Containers Int'l Corp. v. Atlanttrafik Express Service, Ltd.*
    982 F.2d 765 (2d Cir. N.Y. 1992)………………………………….…16

*Kristensons-Petroleum, Inc. v. Sealock Tanker Co.*
    2005 U.S. Dist. LEXIS 5235 (S.D.N.Y. Mar. 30, 2005)………………………21

*Lake Charles Stevedoring v. M/V PROFESSOR VLADIMIR POPOV,*
    199 F.3d 220 (5th Cir. 1999)…………………………………………..14, 15

*Marine Fuel Supply & Towing, Inc. v. M/V KEN LUCKY,*
    869 F.2d 473 (9th Cir. 1988) ……………………………………………………15, 17

*Noramco Shipping Corp. v. Bunkers Int'l Corp.*
    2003 U.S. Dist. LEXIS 20169 (M.D. Fla. Apr. 30, 2003)……………………..17

*Rozenfeld v. MTA Bus Co.,*
    2015 U.S. Dist. LEXIS 31918 (S.D.N.Y. Mar. 16, 2015)……………………..11

*Skippers & Mar. Servs. v. KfW,*
    2008 U.S. Dist. LEXIS 101510 (S.D.N.Y. Dec. 8, 2008)……………………...22

*Smith v. Seaport Marine, Inc.,*
    981 F. Supp. 2d 1188 (S.D. Ala. 2013)………………………………………...26

*State Farm Fire & Casualty Co. v. Tashire,*
    386 U.S. 523 (U.S. 1967)………………………………………………………25

*Valero v. ALMI SUN*
    (2:14-cv-02712-NJB-KWR, E.D. La. Feb. 8, 2016)…………………………...12, 13

*Wardley International Bank, Inc. v. Nasipit Bay Vessel,*
    841 F.2d 259 (9th Cir. 1988)…………………………………………………...26

*Weininger v. Castro,*
    462 F. Supp. 2d 457 (S.D.N.Y. 2006)………………………………………..20

*Wilmington Trust Co. v. Gillespie,*
    397 F. Supp. 1337 (D. Del. 1975)……………………………………………25

## STATUTES/REGULATIONS

46 U.S.C. § 31301 et seq……………………………………………………………8, 16, 17

18 U.S.C. § 2315……………………………………………………………………..23

This Court cannot allow ING Bank N.V. ("ING") to steal $981,708.20 from Aegean Bunkering (USA) LLC ("Aegean"). In arguing that ING is entitled to the interpled funds (as the purported assignee of OW) – including the amounts for Aegean's provision of bunkers to the M/T AMAZON ("Vessel") – that is exactly what ING asks this Court to do. ING offers no evidence that it (or OW) provided the bunkers to the Vessel, but now erroneously asserts that it is entitled to a maritime lien. There is simply no basis in law or fact to award ING the funds due Aegean for Aegean's provision of bunkers to the Vessel.

## I.     **INTRODUCTION**

Like many of the OW-related interpleader cases before this and other courts,[1] this case involves a series of interlocking relationships and transactions beginning with a vessel owner and ending with a physical supplier of bunkers. Jasper Exporting Ltd. ("Jasper"), the owner of the Vessel – acting through its management company, Dynacom Tankers Management Ltd. ("Dynacom") – engaged O.W. Bunker Malta Ltd. ("OW Malta") for the provision of bunkers to the Vessel. OW Malta then engaged O.W. Bunker USA, Inc. ("OW USA"), which engaged

---

[1] This is one of over 820 world-wide litigations and arbitrations arising out of the collapse of the OW Bunker Group.

Headquartered in Denmark, the OW Bunker Group had some 25 subsidiaries and affiliates and was one of the world's largest bunker traders and brokers. A consortium of lenders (for which ING Bank, N.V. ("ING") claims to act as "Security Agent") in December, 2013 gave the OW Bunker Group a $700 million credit line and in January, 2014 the OW Bunker Group had a $1 billion IPO.

The $1 billion, however, dissipated in 2014 as the OW Bunker Group paid debts and oil (and thus bunker) prices dropped. The OW Bunker Group stopped paying physical bunker suppliers such as Aegean and on November 7, 2014, filed insolvency proceedings in Denmark, followed quickly by U.S. bankruptcies. Shipowners such as Jasper received demands for payment from the unpaid suppliers and from ING as agent for the lenders consortium. The unpaid suppliers and ING each began arresting ships, and shipowners concerned about having to make double payment for the same bunkers supply began filing interpleaders and posting security.

**Exhibit A** hereto lists the present U.S. federal court litigation involving suppliers, shipowners/charterers, OW entities, and ING as agent for the lenders' consortium. Many of the cases are before this Court, in interpleader. Each is in various stages of pleading and motions.

Bergen Bunkers A/S ("Bergen"), which ultimately engaged Aegean to physically supply the bunkers.

All parties agree that only Aegean physically provided the subject bunkers to the Vessel. As set forth below, Aegean's sales terms (the "Aegean Terms") were specifically incorporated all the way up the transaction chain by virtue of a clause in the sales terms of Bergen, OW USA, and OW Malta (collectively, the "OW Entities"),[2] binding Bergen, OW USA, OW Malta, Jasper, and the Vessel. The Aegean Terms, and their explicit incorporation through the Bergen / OW Terms, confirm both Aegean's maritime lien rights *in rem* against the Vessel (acquired by virtue of Aegean's physical supply to the Vessel) as well as Aegean's *in personam* rights against Jasper. To the extent ING actually took assignment of any OW claims (including those of Bergen, OW USA, and/or OW Malta), Aegean also has claims *in personam* against ING.

There is absolutely no dispute here that Aegean provided the bunkers to the Vessel and that Jasper did not pay for them. Nevertheless, in a bizarre attempt to express its interest in how the interpled funds are awarded, and ignoring that Jasper is essentially a disinterested stakeholder, Jasper has previously argued that Aegean is not entitled to summary judgment on its *in rem* lien claim against the Vessel. (Dkt. 63, p. 11). Without disputing that Aegean was not paid for the bunkers it provided, Jasper confuses the purpose of an interpleader. While it appears that Jasper's concern is that it will somehow be required to "double pay" for the bunkers, this is impossible, given the very nature of interpleader. (Dkt. 62, p.22). Once the interpled funds were deposited into the Court's registry, the potential for any additional competing claims against the

---

[2] Bergen, OW USA, and OW Malta are all entities within the worldwide OW Bunker Group and all of them used the same version of OW Bunker Group Terms and Conditions of Sale for Marine Bunkers, Edition 2013, except allowing for differences in the parties' names. For each of reference, these terms will collectively be referred to as the "Bergen / OW Terms," copies of which are attached hereto as **Exhibits B and C**.

Vessel or Jasper **outside** of this interpleader action was extinguished.[3]   The next step is for this Court to do what admiralty and interpleader require – award Aegean summary judgment for the amount it invoiced for the bunkers it provided (plus interest and costs, as allowable).   This is exactly what the parties to the original transaction intended – that Aegean would be paid for the bunker supply, and the OW Entities would receive their respective commissions for facilitating the transaction.   What ING requests, however, is that this Court disregard the underlying facts of the transaction, discount the terms of the agreements between the parties, and ignore the questionable assertion of ING that it is the assignee of the OW Entities (and a real party in interest here).   ING's baseless position that it is entitled to a lien, notwithstanding the fact that **ING provided nothing of value to the Vessel,** simply cannot be reconciled with the undisputed fact that Aegean is the only party that provided the bunkers (and any value) to the Vessel.

---

[3] Jasper's contention that there is a potential for a "double payment" is completely unfounded, as is its continued participation in filings in this action.  In fact, at this point, Jasper should be discharged from liability and enjoined from further filings in this case:

> **When a court decides that an interpleader action is appropriate, it may discharge a disinterested stakeholder from further liability.** 28 U.S.C. § 2361; see 7 Wright, Miller & Kane, supra § 1714. Courts will not discharge an interpleader stakeholder who is not disinterested- that is where the stakeholder has some claim to the property at issue in the interpleader. *See Bankers Trust Co. of W. New York v. Crawford*, 559 F. Supp. 1359, 1365 (W.D.N.Y. 1983).

*Citigroup Glob. Mkts., Inc. v. KLCC Invs., LLC*, 2007 U.S. Dist. LEXIS 2709, at *23-24 (S.D.N.Y. Jan. 11, 2007) (emphasis added).

Jasper does not actually have a claim to the property (the interpled funds) here, and is a disinterested stakeholder. Should Jasper continue to actively participate in the case as a stakeholder, which the facts and claims by the parties here do not merit, then it should not be awarded any attorneys' fees as an interpled party:

> Attorney's fees and costs are generally awarded to a **disinterested** stakeholder who has "expended time and money participating in a dispute 'not of his own making and the outcome of which has no impact on him.'" *Fidelity Brokerage Services, LLC v. Bank of China*, 192 F. Supp. 2d 173, 183 (S.D.N.Y. 2002) (quoting *Companion Life Ins. Co. v. Schaffer*, 442 F. Supp. 826, 830 (S.D.N.Y.1977)); *Sparta Florida Music Group, Ltd. v. Chrysalis Records, Inc.*, 566 F. Supp. 321, 322 (S.D.N.Y. 1983); see also *Septembertide Pub'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 683 (2d Cir. 1989).

*Weininger v. Castro*, 462 F. Supp. 2d 457, 501-02 (S.D.N.Y. 2006) (emphasis added).

This Memorandum and the supporting affidavit of Emmanouil Chochlakis ("Chochlakis Affidavit", attached hereto as **Exhibit D**), Director of Aegean, confirm that there is no material fact dispute and that this Court now should grant Aegean summary judgment, awarding Aegean the $981,708.20 principal amount which has been deposited into this Court's Registry, as well as contractual and maritime prejudgment interest and costs.

## II.    Facts[4]

On October 22, 2014, Bergen, on behalf of Jasper, the Vessel's owner, placed an order through the OW Entities with Aegean for provision of certain bunkers to the Vessel. Chochlakis Affidavit ¶ 5. Bergen was acting for Jasper on behalf of, and pursuant to a contract with, OW USA. OW USA was acting for Jasper on behalf of, and pursuant to a contract with OW Malta. (OW Malta contracted with its affiliate, O.W. USA.) OW Malta was acting for Jasper on behalf of, and pursuant to a contract with, Dynacom (Exhibit 5 to Jasper's Amended Answer (Dkt. No. 27)). Dynacom was acting on behalf of, and pursuant to a contract with, Jasper.[5]

On October 31, 2014, at the direction of Jasper through its local port agent (Inchcape Shipping Services), Aegean physically provided 2,100.87 metric tons of bunkers to the Vessel at Marcus Hook, Pennsylvania. Chochlakis Affidavit ¶ 6.

By law,[6] and as confirmed by the Aegean Terms which the Bergen / OW Terms specifically incorporated, Aegean holds a maritime lien *in rem* against the Vessel – and therefore

---

[4] Pursuant to Local Civil Rule 56.1, Aegean also herewith submits its Statement of Material Facts.

[5] Dynacom was, at all relevant times, acting as the Vessel's general manager. In its Amended Answer (Dkt. 27), Jasper does not include Dynacom in the chain of events. Rather, Jasper assumes the direct role of contracting for the subject purchase. While it is understood that Dynacom, acting on behalf of Jasper in its capacity as General Manager, actually contracted with OW Malta, for purposes of continuity, Jasper will be referred to herein as the primary contractor for the bunkers.

[6] Section 31342 of the Commercial Instruments and Maritime Lien Act ("CIMLA") (46 U.S.C. § 31301 *et seq.*) provides in pertinent part as follows:

against the security provided for the release of the Vessel (as detailed below) for the value of the bunkers.

Aegean's contract for providing bunkers to the Vessel (Exhibit 1 to the Chochlakis Affidavit) is governed by, and specifically incorporates, the Aegean Terms (Exhibit 3 to the Chochlakis Affidavit)(collectively hereinafter, the "Bunker Contract").  Chochlakis Affidavit ¶ 8.

Pursuant to United States maritime law, and confirmed by the Aegean Terms, a maritime lien *in rem* was created in favor of Aegean and against the Vessel upon Aegean's provision of the bunkers to the Vessel:

> P. Liens.
>
> Deliveries of Bunkers hereunder are made not only on the credit of Buyer, but also on the faith and credit of Buyer's vessel that uses the Bunkers. Seller and Supplier will have and may assert a lien for the said amount of the delivered price against any such Vessel….The Buyer shall not be entitled to cancel the effect of this lien by wording on the delivery ticket or otherwise.

Chochlakis Affidavit ¶ 10, Exhibit 3 thereto.

Immediately following Aegean's provision of the bunkers to the Vessel, the Vessel's Chief Engineer (an employee of Jasper), confirmed receipt of and accepted the bunkers by signing Aegean's Bunker Delivery Receipt ("BDR") (Exhibit 2 to the Chochlakis Affidavit). Chochlakis Affidavit ¶ 6.  Although ING and Jasper may attempt to discount the express

---

(a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

   (1) has a maritime lien on the vessel;
   (2) may bring a civil action *in rem* to enforce the lien; and
   (3) is not required to allege or prove in the action that credit was given to the vessel.

(b) This section does not apply to a public vessel.

The Vessel is, and was at the time of arrest and of the provisions which are the subject of this action, a private vessel.

language of the BDR by contending that select language on the BDR is a requirement for MARPOL compliance, this does not account for the additional language on the BDR (discussed below), which constitutes an express agreement between the parties (Jasper and Aegean). What ING and Jasper will likely conveniently ignore is that the Chief Engineer (the agent of the Vessel) could absolutely cross out or refuse to confirm any provision on the BDR that does not directly address MARPOL requirements (and had plenty of opportunity to do so, but did not). Among its relevant provisions, the BDR states as follows:

> The Bunkers described herein is delivered in accordance with the applicable terms and conditions of sale (a copy of which has been provided to Buyer prior to delivery) and on credit of the vessel. Any disclaimers as to creation of a maritime lien … and/or restrictions as to the authority of the ships officer signing the Receipt to bind the vessel and her owner to the above are null and void, unless an authorized representative of Aegean Bunkering (USA) LLC shall have otherwise agreed in writing at the time Buyer initially orders the Bunkers.

Chochlakis Affidavit ¶ 7, Exhibit 2 thereto.

The Bergen / OW Terms governed the Jasper-OW Malta, OW Malta-OW USA, and OW USA-Bergen transactions. The Bergen / OW Terms specifically recognize, incorporate, and are superseded by the Aegean Terms pursuant to Clause L.4 of the Bergen / OW Terms, which provides as follows:

> (a) **These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists[7] that the Buyer is also bound by its own terms and conditions**. In such circumstances, **these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.**

---

[7] Aegean of course insists (as that term is used in the Bergen / OW Terms) that its terms control, including binding the "Buyer[s]." Proof of Aegean's insistence includes the BDR, signed by Jasper's employee; the instant action; and the instant motion for summary judgment. Never once has Aegean disclaimed that its terms control, and any attempt to argue otherwise blatantly ignores the facts of this case.

Exhibits B and C, ¶ 10 (emphasis added).  The applicable Bergen / OW Terms thus extend the

Aegean Terms to Jasper, the Vessel, and the OW Entities (all of which are defined as "Buyer" in

the Bergen / OW Terms), so that each is liable to and must pay Aegean.  *Id.*

On October 31, 2014, Aegean invoiced Bergen, acting for Jasper, $981,708.20 for the

provision of bunkers to the Vessel (Exhibit 4 to the Chochlakis Affidavit). Chochlakis Affidavit

¶ 9.  As Mr. Chochlakis confirmed in his deposition, it was clear that Bergen was acting as an

agent for the Vessel:

> Q. So you would agree that Aegean's basis for saying what you have, that the
> brokers and traders are acting as agent, was that they did not have a product to
> deliver to the vessel?
>
> A. That's why they using Aegean as a physical supplier.

(Chochlakis Deposition, pp. 61-62, the relevant pages of which are attached hereto as **Exhibit**

**E**).  When Bergen entered liquidation proceedings on November 18, 2014, Aegean arrested the

Vessel in the Bahamas.[8]  Chochlakis Affidavit ¶ 11.  The Vessel was released from arrest on

November 24, 2014, pursuant to the terms of a Letter of Undertaking ("LOU") (**Exhibit F**

hereto) issued by NEPIA on behalf of Jasper.[9]  Chochlakis Affidavit ¶ 12.  Despite demand,

Aegean has never been paid for its provision to the Vessel.  Chochlakis Affidavit ¶ 13.  Aegean

is owed the principal amount of $981,708.20, plus interest and costs, as detailed below.

Chochlakis Affidavit ¶ 14.

### III.    Legal Standards

This Court now should grant Aegean summary judgment because:

---

[8] Aegean's arrest of the Vessel in the Bahamas resulted in costs incurred by Aegean of $20,088.69.  Chochlakis Affidavit ¶ 11.

[9] Pursuant to the Court's Order issued March 31, 2015 (ECF No. 41), Jasper deposited $1,150,000 into the Court's Registry in lieu of the LOU, and the LOU was subsequently released.

all the submissions taken together [will] "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal citation and quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

*Rozenfeld v. MTA Bus Co.*, 2015 U.S. Dist. LEXIS 31918, 9 (S.D.N.Y. Mar. 16, 2015).

## IV.    Argument

### A.    *Canpotex*: the Aegean Terms Bind the Vessel, Jasper, and the OW Entities (and ING as OW's purported assignee).

Aegean is entitled to a maritime lien for the same reasons the *Canpotex Shipping Services Limited, et al. v. Marine Petrobulk Ltd., et al.,* 2015 FC 1108 (Sept. 23, 2015) interpleader case before the Federal Court of Canada (**Exhibit G** hereto and discussed below) awarded the physical supplier a lien on nearly identical facts.[10] In *Canpotex*, the Canadian Federal Court considered a factual scenario nearly identical to the one presented here and entered – as this Court now should – summary judgment for the unpaid supplier and against ING.[11]

---

[10] There have been no trials or summary judgment decisions issued in any of the U.S. interpleader cases involving OW / ING and a physical supplier (as is the case here). ING / Jasper may raise a recent decision denying summary judgment (*Valero v. ALMI SUN* (2:14-cv-02712-NJB-KWR, E.D. La. Feb. 8, 2016)) in a vessel arrest involving a physical supplier unpaid by the shipowner and an OW entity. Importantly, unlike the case here, **that case is not an interpleader action**. Even more significant, ***Valero did not involve ING***. Thus, the *Valero* court did not consider the purported assignment from the OW Entities to ING. In addition, the *Valero* court did not make any determination regarding the pass through provision of the physical supplier's terms to the Vessel and its owner. Here, especially in light of the parallel situation in *Canpotex*, ING / Jasper cannot reconcile their arguments with the fact that the Bergen / OW Terms passed on the Aegean Terms to the Vessel, and evidence the Vessel's authorized agent's acknowledgment of Aegean and its role in the transaction. Any reliance by Jasper / ING on the *Valero* opinion is entirely misguided here. Rather, in the *Valero* case, the court considered competing claims for a maritime lien by entities who were actually involved in the transaction in some capacity. That is simply not the case here.

Furthermore, this is certainly not the end of the line for the *Valero* case. Valero has indicated that it intends to appeal this decision, which is forthcoming on or before March 8, 2016 (as the final judgment date was February 8, 2016).

[11] While ING may attempt to discount the *Canpotex* ruling, ING cannot refute that there are no distinctions between the pertinent US and Canadian interpleader and maritime law here. Indeed, the provisions of the Canadian Marine Liability Act, SC 2001, c 6, Section 139 (2), mirror the related provisions under U.S. maritime law:

**Maritime Lien**

Aegean's confirmation of the bunkers order specifically and expressly incorporates the Aegean Terms. Chochlakis Aff., ¶ 7. The Bergen / OW Terms (which incorporate the Aegean Terms) also govern the bunker sale. Exhibits B and C, ¶ 10, Clause L.4. Both the Aegean BDR signed by Jasper's Chief Engineer and the Bergen / OW Terms (which expressly incorporated the Aegean Terms) confirm that Jasper and its authorized agents knew Aegean was providing the bunkers to the Vessel – and that OW Malta was only a trader / broker for them. Importantly, and distinct from *Valero* is the fact that here, the Aegean Terms were expressly passed through to the Vessel / its owner, which evidences knowledge, approval, and acceptance of Aegean's role in the transaction by the authorized agent of the Vessel. *See* FN 10 *supra*.

This is why this Court, as the court awarded the physical supplier in *Canpotex* [12] (Exh B hereto), should also grant Aegean summary judgment. Marine Petrobulk ("MP"), the physical supplier there, was in Aegean's same position. Canadian maritime law recognizes materially the same maritime lien and *in personam* claim rights that U.S. law does. Canpotex (charterer) ordered bunkers through O.W. Bunkers (UK) Limited ("OW UK"). OW UK then contacted MP to physically supplied two vessels at Vancouver. OW collapsed; Canpotex brought an interpleader action after it received payment demands from both the physical supplier and ING.

The court found that OW UK (and therefore ING as its purported assignee), was **not** entitled to the deposited funds because it had not paid the supplier, MP (just as Aegean remains

---

A person, carrying on business in Canada, has a maritime lien against a foreign vessel for claims that arise

    (a)   in respect of goods, materials or services wherever supplied to the foreign vessel for its operation or maintenance, including, without restricting the generality of the foregoing, stevedoring and lighterage; or

    (b)   out of a contract relating to the repair or equipping of the foreign vessel.

[12] This decision presently in its early stages of appeal to the Canada Federal Court of Appeal, No. A-462-15, see http://cas-cdc-www02.cas-satj.gc.ca/fca-caf/IndexingQueries/infp_RE_info_e.php?court_no=A-462-15.

unpaid here),[13] and because MP's terms and conditions (including through the terms of OW UK)

applied to the bunker supply and were binding upon Canpotex (just as the Aegean Terms apply

and are binding here), requiring Canpotex to make direct payment to MP.   In holding that the

physical supplier's terms and conditions applied to both OW UK and the charterer/vessel, the

court reasoned:

> The record before me shows that **OW UK provided purchase order confirmations for the supply of bunkers to both Vessels. No objection was raised to the Standard Terms and Conditions, and no objection has even been raised. So it is clear that OW UK understood and accepted that MP would supply the bunkers to the Vessels on MP's Standard Terms and Conditions**. It is also clear from Schedule 3 of the General Terms and Conditions between Canpotex and OW UK that **Canpotex and OW UK understood and agreed that their contractual arrangements would be varied where the physical supply of the fuel was undertaken by a third party** such as MP, and that the buyer was deemed to have read and accepted the terms and conditions imposed by the third party. Consequently, **I conclude that both Canpotex and OW UK were bound by MP's General Terms and Conditions** for the supply of the marine bunkers to the Vessels that are the subject of this dispute.
>
> Given the clear import of the documentation between MP and OW UK, **I cannot accept ING's argument that OW UK contracted with MP on OW's Standard Terms and Conditions**. It is, of course, understandable why ING would now want that to be the case, but ING cannot assert greater rights against Canpotex and/or MP that were enjoyed by OW UK, and the record is clear that OW UK accepted that the marine bunkers would be supplied to the Vessels on MP's Standard Terms and Conditions. **ING is looking for a technical way out of the consequences of this agreement between MP and OW UK** but, in my view, ING cannot assert contractual rights or equities that OW UK did not have.

2015 FC 1108 at 58-59 (emphasis added).

> In the present case it seems to me **that ING has no contractual or lien right to assert against the Funds or the Vessels, and that MP is entitled to the disputed portion of those funds as a function of contract law and equity.** In

---

[13] U.S. and Canadian maritime law are identical in this regard – a broker or trader is never entitled to a maritime lien without having paid the physical supplier.  Even in the cases (distinct from the facts here) where the court found the facts did not give rise to a maritime lien in favor of the supplier, the court did not grant a lien, instead, to a party who merely brokered the physical supplier's services and then refused to pay the physical supplier.  See generally *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220 (5th Cir. 1999).  That is to say, just because the court does not find that a physical supplier is entitled to a maritime lien, does not mean that the court has ever awarded a lien to a broker who refused to pay its supplier.  The Canadian Court in *Canpotex* followed this same principle in declining to award a lien to OW / ING because it failed to pay its supplier.

*Balcan*, above, Balcan pursued a necessaries claim under s 22(2)(m) of the *Federal Courts Act* in a situation where Balcan had not paid for the necessaries. The Court concluded that Balcan was not in the position of a necessaries claimant (para 19) so that Balcan had no *in rem* right of action because no such action could arise where a claimant fails to supply necessaries to a ship. In the present case, OW UK did not supply the marine bunkers and, in addition, OW UK has not paid for the marine bunkers that were supplied by MP to the Vessels. Consequently, based upon the reasoning in *Balcan*, I do not see how ING can now assert any *in rem* claims against the Vessels or the Funds. **MP has supplied the marine bunkers to the Vessels under MP's Standard Terms and Conditions which supersede any contractual arrangements to the contrary between Canpotex and OW UK**. MP is contractually entitled to payment for the bunkers from Canpotex. **ING, standing in the shoes of OW UK, is not entitled to any payment representing the purchase price of the bunkers because MP was not paid that purchase price** and, under the Standard Terms and Conditions, has thus triggered a direct liability for Canpotex to pay it.

2015 FC 1108, p. 65 (emphasis added).[14]

**B.    Aegean Has A Maritime Lien *In Rem* Against the Vessel Because it Provided the Bunkers to the Vessel – And Jasper and the OW Entities Ratify and Confirm Aegean's Lien.**

There are two general approaches regarding maritime liens for physical suppliers -- the

*KEN LUCKY* (the "intermediate supplier" cases, pursuant to which Aegean wins[15]) and *Lake*

*Charles Stevedores* (the "general contractor" cases, pursuant to which Aegean loses[16]).  Distinct

from those cases:

- The Bergen / OW Terms explicitly extend the Aegean Terms to the Vessel, as well as to Jasper and the OW Entities (and by extension here, ING, and thus recognize Aegean's contractual rights and maritime lien rights to recovery);

- The Aegean Terms give Aegean a direct *in personam* claim against Jasper and the

---

[14] The UAE Khorfakkan Federal Appeal Court (November 9, 2015) in a non-interpleader case, reached a similar result for a physical supplier and against ING in an OW-involved bunker provision.  The original decision, translation and explanation by one of the law firms involved, is **Exhibit H** hereto (UAE law requires redaction of party identifying information from publicly-released opinions).

[15] These include *Marine Fuel Supply & Towing, Inc. v. M/V KEN LUCKY*, 869 F.2d 473, 477-78 (9th Cir. 1988) and *Belcher Co. of Ala., Inc. v. M/V MARATHA MARINER*, 724 F.2d 1161, 1164 (5th Cir. 1984).

[16] These include *Lake Charles Stevedoring v. M/V PROFESSOR VLADIMIR POPOV*, 199 F.3d 220 (5th Cir. 1999); *Galehead v. M/V ANGLIA*, 183 F.3d 1242 (11th Cir. 1999); and *Valero v. ALMI SUN* (2:14-cv-02712-NJB-KWR, E.D. La. Feb. 8, 2016).

OW Entities (and thus against ING, if ING has actually taken assignment from any of the OW Entities, which as discussed below, it has not); and,

- This is both an interpleader and admiralty case (not a direct vessel arrest case), where application of the equitable principles at the core of interpleader and admiralty give Aegean superior and direct claims to the interpled funds.

Notably, these considerations, among others, form the basis of the *Canpotex* Court's decision in favor of the physical supplier.

It is well-settled that maritime liens arise only by operation of law, rather than by agreement of parties. *Itel Containers Int'l Corp. v. Atlanttrafik Express Service, Ltd*., 982 F.2d 765, 766 (2d Cir. N.Y. 1992). The agreements between the parties confirm the authority upon which Aegean provided the bunkers to the Vessel, and that Aegean therefore holds a maritime lien against the Vessel as a matter of law. *Id.*

The Aegean Terms (incorporated directly through the Bergen / OW Terms to Jasper, the Vessel, and the OW Entities) confirm that Aegean provided bunkers to the Vessel and, by law, holds a maritime lien against the Vessel *in rem* for the amount Aegean invoiced for its provision. The Bergen / OW Terms' pass through of the Aegean Terms makes the OW Entities the agent for Aegean to provide the bunkers directly to the Vessel. That is, the Vessel ordered the bunkers from the OW Entities, which have terms saying that the third party supplier has the lien for the third party's supply. Therefore, the Vessel (Jasper, here) has ordered directly from Aegean through the OW Entities. By the Bergen / OW Terms, the OW Entities have the lien for their respective commission, and Aegean for its provision. Only once the OW Entities paid Aegean (which they **never** did) could the Aegean lien be assigned to the OW Entities. Of course, without payment to Aegean, Aegean continues to hold its lien against the Vessel.

Bunkers are established "necessaries" under the Commercial Instruments and Maritime Lien Act ("CIMLA"), 46 U.S.C. § 31301. Jasper (the Vessel's owner[17]) undisputedly procured the bunkers, and Aegean provided the bunkers not only on Jasper's order (directly through the incorporated Aegean Terms; if Jasper had not ordered the bunkers, of course, Aegean never would have provided them) through Bergen, (undisputedly authorized by Jasper) to Aegean. The Aegean Terms also confirm its insistence on the Aegean Terms and reliance on the Vessel's credit and resulting maritime liens *in rem*.[18]

The principles supporting Aegean's rights to the deposited funds here come through (but not only through) the "intermediary line of cases" (mentioned above, *KEN LUCKY, et al.*). *See also Noramco Shipping Corp. v. Bunkers Int'l Corp.*, 2003 U.S. Dist. LEXIS 20169, 2003 WL 22594419 (M.D. Fla. Apr. 30, 2003 (the "[V]essel's chief engineering officer accepted the fuel, the fuel was delivered to the [V]essel, and the [V]essel certainly benefitted from the bunker supply.").

---

[17] 46 U.S.C. § 31341 ("Persons presumed to have authority to procure necessaries")

(a) The following persons are presumed to have authority to procure necessaries for a vessel:
      (1) the owner;
      (2) the master;
      (3) a person entrusted with the management of the vessel at the port of supply; or
      (4) an officer or agent appointed by—
            (A) the owner;
            (B) a charterer;
            (C) an owner *pro hac vice*; or
            (D) an agreed buyer in possession of the vessel.

[18] 46 U.S. Code § 31342 - Establishing maritime liens

    Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
      (1) has a maritime lien on the vessel;
      (2) may bring a civil action *in rem* to enforce the lien; and
      (3) is not required to allege or prove in the action that credit was given to the vessel.

If Aegean was at minimum a "subcontractor," then this line of cases confirms that Aegean holds maritime liens for the invoiced amount of its provision to the Vessel. Jasper unquestionably knew that Aegean (and not the OW Entities) was the source of the bunkers; it was Aegean and not the OW Entities (and certainly not ING) which put the bunkers on the Vessel, as Jasper's Chief Engineers confirmed (signing Aegean's receipts confirming application of the Aegean Terms). Furthermore, the Vessel was well aware that Aegean would be the physical supplier of the bunkers, as evidenced by emails (attached hereto as **Exhibit I**) from Norton Lilly, agent of the Vessel, confirming the delivery of the bunkers by Aegean.

Aegean, however, is more than a "subcontractor" – it is a contractor – through – the Aegean Terms which the Bergen / OW Terms incorporated. It is a contractor both to Jasper (defined as "Buyer"), the OW Entities (also "Buyer"), and the Vessel (providing bunkers to it, on Jasper's orders through the OW Entities) and thus holding a maritime lien *in rem* against the Vessel.

**1. Jasper – and the OW Entities (and ING) Have Ratified and Recognized Aegean's Maritime Lien**: The Bergen / OW Terms of course also incorporate the Aegean Terms stating, that Aegean holds a maritime lien *in rem* for Aegean's provision. The OW Entities (thereby binding ING as assignee; ING insisting that the Bergen / OW Terms apply) by this recognizes and ratifies Aegean's maritime lien rights. At the least, the Bergen / OW Terms estop OW (and ING) from contending that Aegean has no maritime liens. The Aegean Terms state specifically that Aegean has a maritime lien – and the Bergen / OW Terms incorporate those Aegean Terms.

The same is true for Jasper. Jasper agrees that the Bergen / OW Terms control – and the Bergen / OW Terms recognize and ratify Aegean's maritime lien rights. Jasper thereby must agree that Aegean holds maritime liens against the Vessel.

**2. So Who Has a Maritime Lien?  Both Aegean and (if it really is assignee and there was a "supply receivable") – OW/ING**:  The answer is (if the OW Entities actually provided anything, which they did not; Aegean addresses this below) – Aegean holds a maritime lien for its $981,708.20 provision – and the OW Entities (and ING, if it actually is "assignee" of a "receivable," addressed below) holds a maritime lien for its commission (the OW Entities' total invoicing of $253,250.94 less Aegean's for $981,708.20).[19]

Jasper (and other shipowners) have been concerned about paying twice – but application of the Bergen / OW Terms incorporating the Aegean Terms, results in proper, and **not** double, payment.  The Bergen / OW Terms recognize that Aegean has a maritime lien to the extent of Aegean's provision ($981,708.20); the Bergen / OW Terms also recognize the OW Entities' maritime lien for amounts beyond Aegean's provision.  Maritime liens are fully assignable, so, if the OW Entities **had** paid Aegean, they would have taken assignment of the Aegean maritime lien that the Bergen / OW Terms recognized, and **only then** (directly or through ING) been able to claim the entire lien amount against the Vessel.  The OW Entities have not paid of course; thus the OW Entities / ING have taken (by the Bergen / OW Terms) no assignment of Aegean's maritime lien or *in personam* claims.  Jasper therefore can satisfy any obligation it has to the OW Entities / ING (if it has any) by paying only the commission amount – and its obligation to Aegean through summary judgment for Aegean for the value of the bunkers Jasper undisputedly received directly from Aegean (and admittedly used and benefitted from).

There is no overriding reason – especially given the OW Entities' incorporation of the Aegean Terms – that there cannot be separate two maritime liens *in rem* and two separate *in personam* claims against Jasper (as set out immediately below) of different amounts.  It follows

---

[19] As set out below, Aegean (and if ING is entitled to any payment for what the OW Entities would have received in commission only, ING) also should receive prejudgment maritime interest, on the principal amount due.

that there would then be no double payment concerns because each entity to the transaction would receive its respective amount due, as the parties originally contemplated.

### 3. Aegean Has Direct Contract Claims Against Jasper and the OW Entities (ING)[20]

Aegean has direct contract claims against Jasper and the OW Entities (ING) – and again, applying the Bergen / OW Terms and the Aegean Terms, there is no double payment. Jasper and the OW Entities (ING) are all, under the Aegean Terms (incorporated through the Bergen / OW Terms), in direct contractual privity to Aegean. Therefore, $981,708.20 of the money interpled by Jasper is Aegean's.

If ING has stepped into the OW Entities' shoes (if it actually did take assignment of any OW "supply receivable" which includes Aegean's $981,708.20), however, the result is the same looking either at the contractual liability that the OW Entities have to Aegean, or, as an offset against the funds which ING claims through the OW Entities. "It is clear law that **an assignee** steps into the shoes of the assignor and **gains only that to which the assignor is entitled**." *Bronx Entm't LLC v. St. Paul's Mercury Ins. Co.*, 265 F. Supp. 2d 359, 361 (S.D.N.Y. 2003) (emphasis added). Moreover, "an assignee never stands in any better position than his assignor. He is subject to all equities and burdens which attach to the property assigned because he receives no more … than his assignor." *Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 126 (N.Y. 1975). "[A]n assignee of a claim takes with it **whatever limitations it had in the hands of the assignor**." *Bronx Entm't LLC*, 265 F. Supp. 2d at 359 (*quoting Caribbean S.S. Co., S.A. v. Sonmez Denizcilik Ve Ticaret*, 598 F.2d 1264 (2d Cir. 1979)) (emphasis added).

---

[20] To the extent that ING / Jasper will attempt to argue that Aegean's contractual and *in personam* claims should be disregarded at this stage of the proceedings, there is no requirement in interpleader, which is undeniably rooted in equity, that the parties serve cross- or counter-claims against each other. The focal point in interpleader is the question of which party has the superior claim to the deposited funds. *Weininger v. Castro*, 462 F. Supp. 2d 457, 500 (S.D.N.Y. 2006). The argument also ignores the principle of Fed. R. Civ. P. 15 conforming pleadings to proof, that "[a] party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue."

Even assuming that ING is the OW Entities' "receivables" assignee (Doc. 30, p. 4, ¶ 18), Aegean nevertheless retains the superior claim to the interpled funds in the form of a maritime lien, and a security interest through Aegean's title retention clause. ING, on the other hand, has (if it has anything at all) a claim against Jasper/the Vessel for its commission. Again considering the OW Entities' incorporation of the Aegean Terms, the $981,708.20 owed to Aegean should be paid to Aegean.

### C. Aegean Has Direct Unjust Enrichment Claims Against Jasper, OW/ ING and the Vessel *In Rem.*

Given that the Vessel benefitted from (but Jasper never paid for) the bunkers to which Aegean holds title or a security interest, Jasper and the OW Entities / ING and the Vessel *in rem* also are liable to Aegean under the principle of unjust enrichment, because:

> "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004) (*citing Astor Holdings, Inc. v. Roski*, 2002 U.S. Dist. LEXIS 758, No. 01 Civ. 1905 (GEL), 2002 WL 72936, *17 (S.D.N.Y. Jan. 17, 2002) (*citing Louros v. Cyr*, 175 F. Supp. 2d 497 (S.D.N.Y. 2001))).

*Kristensons-Petroleum, Inc. v. Sealock Tanker Co.*, 2005 U.S. Dist. LEXIS 5235, 12-13 (S.D.N.Y. Mar. 30, 2005).[21] Without Aegean's bunkers, the Vessel would not have continued on its journey to deliver the goods the Vessel carried. Therefore, the Vessel was undoubtedly enriched at Aegean's expense. To the extent that ING claims a purported security interest in the OW Entities' receivables, which would not even exist but for Aegean's provision of the bunkers (which the OW Entities (and ING) never paid Aegean for), the OW Entities / ING were also unjustly enriched. A constructive trust analysis therefore applies here:

---

[21] Assuming *arguendo* that the Court finds that neither Aegean nor ING is entitled to a maritime lien, Aegean undoubtedly is entitled to the interpled funds based on the principles of unjust enrichment. *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 607 n.11 (5th Cir. 1986).

The relevant standard for unjust enrichment within a constructive trust claim is "an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it." *In re First Cent. Fin. Corp.*, 377 F.3d [209,]t 213 [(2d Cir. 2004)] (*quoting Miller v. Schloss*, 218 N.Y. 400, 113 N.E. 337 (N.Y. 1916)).

\* \* \*

It is well established, however, that the elements of a constructive trust "are not talismanic," and a constructive trust may be found even in the absence of one or more factors. *Brand v. Brand*, 811 F.2d 74, 77 (2d Cir. 1987). Moreover, it is the final factor -- unjust enrichment -- that "lies at the heart" of the remedy. *Id.* at 80; *see also Simonds v. Simonds*, 45 N.Y.2d 233, 380 N.E.2d 189, 194, 408 N.Y.S.2d 359 (N.Y. 1978) ("What is required, generally, is that a party hold property under such circumstances that in equity and good conscience he ought not to retain it.") [*14] (citations and quotations omitted); *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 354 (2d Cir. 1992) (finding that unjust enrichment is the "key factor" in determining whether a constructive trust should be imposed).

*Skippers & Mar. Servs. v. KfW*, 2008 U.S. Dist. LEXIS 101510, 13-14 (S.D.N.Y. Dec. 8, 2008).

The Court particularly should consider *Gulf Oil Trading Co. v. Creole Supply*, 596 F.2d 515 (2d Cir. 1979), where Second Circuit affirmed subordination of a bank's ship mortgage. The bank inequitably and unjustly had attempted to destroy other claims. The Second Circuit Court upheld a monetary award against the bank for unjust enrichment, writing as follows:

When justice requires it, quasi-contract will serve as the remedy for unjust enrichment. 1 Williston on Contracts § 3A (3d ed. 1957). See *Bloomgarden v. Coyer*, 156 U.S.App.D.C. 109, 479 F.2d 201, 210-11 (1973); *Bradkin v. Leverton*, 26 N.Y.2d 192, 196-97, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970). The remedy requires no finding of consent, for it can support a recovery quite opposed to the defendant's intention to pay. 1 Corbin on Contracts § 19 (2d ed. 1963). *See generally* Corbin, Quasi-Contractual Obligations, 21 Yale L.J. 533 (1912). **When the retention of the benefit without payment is unjustified**, *See* Restatement of Restitution § 1, comments b, c (1937), **the remedy lies in quasi-contract**, *See id.*, introductory note at 4-9. When there is no *Res* to restore, money damages are awarded to prevent unjust enrichment. 1 Corbin on Contracts S 19; Restatement of Restitution § 4, comment e.

*Id.* at 520 (emphasis added).

Remarkably, the OW Entities / ING now claim Aegean's property – $981,708.20 of bunkers. – However, ING may not have even financed (given that the credit line may have ran out well before Aegean's provision days before the OW Bunker Group's insolvency) OW's role in this transaction. Nonetheless, the OW Entities never paid for this provision and do not hold title to it. [22] ING's attempt to retain a benefit – without payment – is equitably unjustified. Aegean further addresses equity, below, and through the equitable unjust enrichment and constructive trust remedies, the Court further should hold that the $981,708.20 belongs to Aegean.

There is no question that this Court, sitting in admiralty, possesses equitable powers and can "award what is fair to avoid injustice." *See generally Great Lakes Business Trust v. M/T Orange Sun*, 855 F. Supp. 2d 131, 146 (S.D.N.Y 2012). This Court will ultimately determine whether ING is entitled to any amount of the interpled funds, either by way of an *in rem* maritime lien claim or an *in personam* breach of contract claim. If the Court finds that ING prevails on either of those claims, Aegean's unjust enrichment claim would immediately become ripe for disposition in this proceeding. Aegean respectfully submits that under principles of equity, its unjust enrichment claim remain and be heard now in the interest of judicial economy and efficiency.

**D.**     **ING Is Not Assignee of the $981,708.20 Due Aegean.**

ING claims here as "Security Agent" (not as principal) having received through "Finance Documents" a purported assignment of "Supply Receivables," which it here alleges to include

---

[22] Parallel criminal law, 18 U.S.C. § 2315, states that "[w]hoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise . . . of the value of $5,000 or more, or pledges or **accepts as security for a loan** any goods, wares, or merchandise . . . of the value of $500 or more, which have crossed a State or United States boundary after being stolen, **unlawfully converted, or taken**, knowing the same to have been stolen, **unlawfully converted, or taken** . . . Shall be fined under this title or imprisoned not more than ten years, or both." (Emphasis added).

the $981,708.20, which is actually owed to Aegean.

Under ING's Security Agreement (**Exhibit J** hereto):

> Supply Receivables means **any amount owing, or to be owed**, to a Receivables Chargor [OW here] or a Danish Receivables Chargor under any Supply Contract.

(Emphasis added). A "Supply Contract" under the Security Agreement is defined as follows:

> Supply Contract means any one-time contract, any contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the Group, **in each case governed by English law** and relating to the sale of oil products traded by the Group . . . .

(Emphasis added). The Security Agreement also defines "Security Assets" to be:

> [A]ll assets and rights, title and interest of each Receivables Chargor . . . .

As set out above, the $981,708.20 is the amount that Jasper and the OW Entities owe Aegean. It is not the amount owed to any of the OW Entities ("Chargor"). The deposit is not an amount "owing or to be owed" to the OW Entities; the bunkers are not an asset giving rise to any payment to which the OW Entities have a right. The deposit is not for any "receivable" owed or belonging to the OW Entities. ING therefore never took assignment of Aegean's $981,708.20 (or of Aegean's bunkers that the deposit stands for) and has no rights to the deposit here under the "Security Agreement" or otherwise.

In the same way, ING never took assignment of maritime lien rights *in rem*, either. Furthermore, English law does not recognize a maritime lien for necessaries. *Bominflot, Inc. v. M/V Henrich S*, 465 F.3d 144, 147 (4th Cir. 2006). ING takes no assigned maritime lien claim under its own Security Agreement because it only takes claims under "Supply Contract[s] . . . in each case governed by English law".[23] Such "Supply Contract[s]" under English law by definition cannot provide for maritime liens.

---

[23] If the amounts owed Aegean are somehow "Security Assets," however, (which they are not as detailed above), the OW Entities were in breach of the Security Agreement. Under Security Agreement § 3.1 (a) "[e]ach Receivables

Notably, English solicitors have opined in related interpleader cases involving ING's purported assignment that the "purported assignment of OW[]'s right, title and interest in respect of the amounts owing under the Supply Contracts was, at best, an equitable assignment. That means that the assignment would be recognised in equity, but not at law."[24] Importantly, English solicitors distinguish that "Clause 2.3(a) [of the Security Agreement] does not purport to assign property rights [as an *in rem* lien], merely contractual rights." (Exh. I, p. 11). According to the same English solicitor, under English law, "the general rule is that **such [maritime] liens are not capable of assignment or transfer**, because the maritime lien is treated as a personal privilege for the sole benefit of the maritime lienee." (Exh. I 12). Thus, even assuming *arguendo* that ING is the assignee of OW, as a matter of law, it certainly is **not** the assignee of any maritime lien rights against the Vessel.

### E. Overall, This Court Should Grant Aegean's Summary Judgement Applying the Equitable Principles of Both Interpleader and Admiralty

The result as set out above is that whether under a direct contract payment approach – or through the maritime lien approach all parties to the transaction receive what they rightfully should have been paid. This result

> achiev[es] the purpose of the interpleader statute [and] [Fed. R. Civ. P.] 22 . . .
> adopted in order to provide a broad remedy for the formerly inadequate method of

---

Chargor…represents and warrants to each Finance Party that (i) it is the sole legal and beneficial owner of its Security Assets; (ii) its Security Assets are free from any Security…and any other rights or interests in favor of third parties…." Aegean confirms here that it owns and holds rights to the principal amount of $981,708.20. ING either made no effort to confirm that the OW Entities were in compliance with the Security Agreement's "free and clear" conditions, or knowing of Aegean's and other superior claims, decided to overlook the conditions.

[24] *See* Declaration of Peter John Sibley MacDonald Eggers, practicing barrister and a Queen's Counsel in the Bar of England and Wales, filed in *Bonny Gas Transport Limited v. O.W. Bunker Germany GmbH et al* in the U.S. District Court of the Southern District of New York (Case No. 1:14-cv-09542-VEC), a related OW / ING interpleader case also involving a physical supplier. (A copy of which is attached hereto as **Exhibit K.**) Mr. Eggers was asked to opine on whether any maritime lien which OW was entitled to assert over the vessels has been assigned to ING pursuant to clause 2.3(a) of the Security Agreement (which is governed by English law pursuant to Clause 20 of the Security Agreement), whether a maritime line is capable of assignment under English law, and whether a maritime lien was created by OW's terms and conditions.

relief available to litigants. All are thus to be 'construed and applied liberally' so as best to effectuate their beneficent purposes.

*Wilmington Trust Co. v. Gillespie*, 397 F. Supp. 1337, 1342 (D. Del. 1975). "[T]he language of the present [interpleader] statute . . . is remedial and to be liberally construed," *State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 533 (U.S. 1967); *accord, Atlas Corp. v. Marine Ins. Co.*, 155 F.R.D. 454, 462 (S.D.N.Y. 1994).

"[C]ourts have substantial flexibility in [the] application [of interpleader]," *Citigroup Global Mkts., Inc. v. KLCC Invs.*, LLC, 2007 U.S. Dist. LEXIS 2709 (S.D.N.Y. Jan. 11, 2007). This is because:

> It is well-established that the remedy of interpleader is equitable in nature and is governed by equitable principles. *See State of Texas v. State of Florida*, 306 U.S. 398, 59 S.Ct. 563, 830, 83 L.Ed. 817; *Holcomb v. Aetna Life Insurance Company*, 10 Cir., 228 F.2d 75, *certiorari denied* 350 U.S. 986, 76 S.Ct. 473, 100 L.Ed. 853, *rehearing denied* 350 U.S. 1016, 76 S.Ct. 657, 100 L.Ed. 875; 2 Baron & Holtzoff, Federal Practice and Procedure, p. 128 (2nd Ed.).

*American-Hawaiian S.S. Co. v. Bowring & Co.*, 150 F. Supp. 449, 453 (D.N.Y. 1957).[25]

Directly alongside of the equitable principles controlling this interpleader action are the controlling equitable principles of admiralty. Equitable principles are equally central to admiralty. Thus, applying equity through interpleader and admiralty, this Court should grant Aegean summary judgment. In *Wardley International Bank, Inc. v. Nasipit Bay Vessel*, 841 F.2d 259, 264 (9th Cir. 1988), for example, the court applied the principle of equitable subordination to re-rank the lien priorities of various claimants after finding that the purported maritime lienholder had engaged in a "contrived financial scheme" in an attempt to "destroy the liens of

---

[25]     **Interpleader is an equitable remedy**. *See, e.g., Texas v. Florida*, 306 U.S. 398, 83 L. Ed. 817, 59 S. Ct. 563 (1939); *Koehring Co. v. Hyde Const. Co.*, 424 F.2d 1200 (7th Cir. 1970); [**7] *Great American Insur. Co. v. Bank of Bellevue*, 366 F.2d 289 (8th Cir. 1966). **And many courts have conditioned the grant of interpleader relief upon basic equitable doctrines**. *See generally* 3A Moore's Federal Practice para. 22.16[1]; 7 Wright & Miller, Federal Practice & Procedure § 1709.

*Home Indem. Co. v. Moore*, 499 F.2d 1202, 1205 (8th Cir. 1974) (emphasis added).

suppliers." *Id.* As the court emphasized in *Smith v. Seaport Marine, Inc.*, 981 F. Supp. 2d 1188

(S.D. Ala. 2013), *aff'd Jurich v. Compass Marine, Inc.*, 764 F.3d 1302 (11th Cir. 2014):

> **Admiralty jurisdiction and maritime law are firmly grounded in principles of equity**. *See Allied Maritime, Inc. v. Descatrade SA*, 620 F.3d 70, 76 (2nd Cir. 2010) ("As a court sitting in admiralty, we may use equitable principles where appropriate to avoid injustice.") (citation and internal quotation marks omitted); *C.N.R. Atkin v. Smith*, 137 F.3d 1169, 1171 (9th Cir. 1998) ("equity is part of the law of admiralty"); *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1089 (5th Cir. 1982) ("A court of admiralty is, as to all matters falling within its jurisdiction, a court of equity.") (citation omitted); *Texas Gulf Sulphur Co. v. Blue Stack Towing Co.*, 313 F.2d 359, 362 (5th Cir. 1963) ("In assaying the merits, we reaffirm the view many times expressed that the Admiralty is administered with equitable liberality and a simultaneous freedom from restraints or frustrations occasioned by technicalities or formal imperfections."); *Mascuilli v. United States*, 411 F.2d 867, 873 (3rd Cir. 1969) (referencing "the equitable origins of maritime law"); *Walck v. Discavage*, 741 F. Supp. 88, 90 (E.D. Pa. 1990) (recognizing "the fact that maritime law includes traditional common-law rules and modifications thereof, including discretionary principles of equity"); *Drew Ameroid Int'l v. M/V Green Star*, 681 F. Supp. 1056, 1061 (S.D.N.Y. 1988) ("The maritime law prides itself upon equitable traditions and antecedents."); *Complaint of Valley Towing Service*, 629 F. Supp. 139, 147 (E.D. Mo. 1985) ("Admiralty is essentially the law of equity and courts are privileged to exercise flexibility and award what is fair. The hands of the court are not tied by the rigidity of common law."); *The Denali*, 13 F. Supp. 686, 687 (D. Wash. 1936) ("Admiralty issues are submitted on equitable principles in harmony with rules of justice and expressed rules of procedure, and in consonance with principles of maritime law which pervades the practice of admiralty in this country," such that "the supreme purpose of doing justice is paramount to technical forms"). In that regard, **the Supreme Court has emphasized the judiciary's role in "formulating flexible and fair remedies in the law maritime**." *Exxon Shipping*, 554 U.S. at 508 n.21 (citations omitted).

981 F. Supp. 2d at 1202-1203 (emphasis added).

There is no fair dispute that Aegean equitably should receive at least the principal amount

for the bunkers Aegean physically supplied to the Vessel, and again, the Bergen / OW Terms

incorporating the Aegean Terms (recognizing Aegean's right to payment and maritime liens)

confirm that.

It is a fact that neither the Vessel nor the OW Entities / ING has paid **any** entity for the

bunkers provided by Aegean, even though the OW Entities and the Vessel directly benefited

from Aegean's physical supply of the bunkers. In particular, the Court should consider the situation of the bank consortium (ING as purported "agent") credit line, in the eight (8) (October 31, 2014 – provision to the M/V AMAZON) days before the OW insolvency filing. The bank consortium (ING as agent) provided **no value at all** for the Aegean provision. Even more inequitably, as allegedly "senior" claimants, the consortium made no effort to notify Aegean of the OW Entities' dire situation, including the overdrawn credit line. What ING permitted the OW Entities to do, instead, is continue to take bunkers from Aegean and other suppliers, which ING knew the OW Entities had no means to pay for. ING now does and had planned, unjustifiably, to retain the supposed "benefits" of supposed accounts receivable for bunkers the OW Entities never paid for (recalling the situation in *Gulf Oil Trading*, 596 F.2d at 502).

As such, it is consistent with the admiralty and interpleader principles here, for Aegean (and **not** ING) to receive the $981,708.20 deposit for its bunkers. To award ING the interpled funds instead would essentially countenance ING's theft of the bunkers Aegean supplied and undermine the foundation of admiralty law – equity.

## V. CONCLUSION

The undisputed material facts confirm that Aegean has the superior claim to the deposited funds. Aegean has an *in rem* maritime lien claims against the Vessel, an *in personam* claims against Jasper and the OW Entities / ING, and retains title to or a continuing security interest in the bunkers it physically supplied (and for which it was never paid).

The deposit by Jasper is comprised of funds due to Aegean for each of these claims, and the OW Entities / ING (and certainly Jasper, which must be, under interpleader procedure, disinterested as to the deposit) has no superior claim to them. Likewise, Jasper has **no** claim to

the interpled funds, and also has no potential of having to "double pay" for the bunkers, given

that the interpled funds have already been deposited in this Court's registry.

Aegean therefore respectfully requests this to Court now to order payment of

$981,708.20 for Aegean's provision of bunkers to the M/V AMAZON from the total of the

deposit, plus accrued prejudgment interest[26] and costs.


Dated: March 4, 2016.                    Respectfully Submitted,

                                         /s/ J. Stephen Simms
                                         J. Stephen Simms
                                         Simms Showers LLP
                                         201 International Circle, Suite 250
                                         Baltimore, Maryland 21030
                                         Telephone: 410-783-5795

                                         Counsel for Aegean

---

[26] In admiralty cases prejudgment interest "**should be granted** in the absence of exceptional circumstances." *Magee v. United States Lines, Inc.*, 976 F.2d 821, 822 (2d Cir. 1992) (internal citations omitted) (emphasis added). The prime rate is one measure of the rate of maritime prejudgment interest. *World Fuel Servs. Trading, DMCC v. M/V Hebei Shijiazhuang*, 12 F. Supp. 3d 810, 815 (E.D. Va. 2014)(discussing various approaches to maritime prejudgment interest measurement)). If the Court's bases its decision on contract and the Aegean Terms, those Terms provide for interest at a 1.5% per month rate. The Court should require Jasper's direct payment to Aegean of prejudgment interest and costs awarded, given that the deposit does not include amounts for costs or interest.

## CERTIFICATE OF SERVICE

I certify that on March 4, 2016 a copy of the foregoing was served upon counsel of record by operation of the ECF system.

/s/ J. Stephen Simms