UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| O'ROURKE MARINE SERVICES L.P., L.L.P.<br><br>    Plaintiff,<br><br>v.<br><br>M/V COSCO HAIFA, IMO NO. 9484338, her engines, apparel, furniture, equipment, appurtenances, tackle, etc., *in rem*;<br><br>    and<br><br>M/V COSCO VENICE, IMO NO. 9484405, her engines, apparel, furniture, equipment, appurtenances, tackle, etc., *in rem*;<br><br>    Defendants. | 15 Civ. 02992 (DAB)<br><br><br>**O'ROURKE'S MEMORANDUM SUPPORTING ITS MOTION FOR RECONSIDERATION OF THIS COURT'S APRIL 8, 2016 SUMMARY JUDGMENT OPINION AND ORDER [ECF 79]** |

**Oral Argument Requested**

J. Stephen Simms
Simms Showers LLP
201 International Circle
Baltimore, Maryland 21030
410-783-5795
jssimms@simmsshowers.com

O'Rourke Marine Services L.P., L.L.P.
Counsel

i

# TABLE OF CONTENTS

| | |
|---|---|
| Table of Contents | ii |
| Table of Authorities | iii |
| This Court Should Reconsider Judge Scheindlin's April 8, 2016 Summary Judgment Opinion And Order [ECF 79] – Issued with No Oral Argument and on Issues of Substantial Dispute Not Only before at least Four Judges of This Court But Also Multiple Federal Courts Around the United States and the Internationally | 1 |
| The Complex, World-Wide ING-OW Litigation | 1 |
| This Court's and Second Circuit Standards Support Reconsideration | 5 |
| The Opinion Entirely Missed OW Sales Terms Clause L.4 – Which Incorporates OMS' Sales Terms | 7 |
| The Opinion Ignores that the OW Terms Extend OMS' Terms to the Vessels and the OW Entities, Which Shows that OMS Provided the Bunkers on the Order of a Person Authorized by the Owner | 11 |
| The Opinion Incorrectly Relies on *Valero* (Now On Appeal to the 5th Circuit) and Omits Key Facts from Consideration | 14 |
| *Lake Charles* is Not the Controlling Case Law | 14 |
| The Opinion Further Misses the Fact that OMS Retains Title to or a Security Interest in the Bunkers and Thus to and in the Registry Funds | 15 |
| The Opinion Also Ignores and Did Not Mention, the Application of Equity, at the Foundation of both Admiralty and Interpleader | 17 |
| The Opinion Further Missed OMS' Showing that Under the English Law Controlling ING's Agency, ING Takes No Assignment of Maritime Liens *In Rem* | 21 |

## TABLE OF AUTHORITIES

*Analytical Surveys*, *L.P.*,
    Fed. Sec. L. Rep. (CCH) P 96936 (2d Cir. 2012)…………………………………………5

*Catskill Dev., L.L.C. v. Park Place Entm't Corp*.
    154 F.Supp.2d 696, 701 (S.D.N.Y.2001) …………………………………………6n14

*Cont'l Coffee Prods. Co. v. Banque Lavoro S.A.*, 852 F. Supp. 1235 (S.D.N.Y. 1994) ………17

*Lake Charles Stevedores v. M/V PROFESSOR VLADIMIR POPOV*
199 F.3d 220 (5th Cir. 1999)……………………………………………………………...14

*Logan & Kanawha Coal Co. v. Banque Francaise du Commerce Exterieur*
    1996 U.S. Dist. LEXIS 14197 (S.D.N.Y. Sep. 26, 1996) ……………………………….. 17

*Marine Fuel Supply & Towing, Inc. v. M/V KEN LUCKY*
    869 F.2d 473 (9th Cir. 1988)  …………………………………………………………..15

*Martin Energy Services v. M/V BRAVANTE IX et al*,
    5:14-cv-00322-RH-GRJ (N.D. Fla) …………………………………………………3,18

*Shrader v. CSX Transp., Inc*.
    70 F.3d 255 (2d Cir.1995)……………………………………………………………….5

*Tramp Oil and Marine, Ltd. v. M/V Mermaid I*
    805 F.2d 42 (1st Cir. 1986) …………………………………………………………..15

*Valero v. ALMI SUN*
    (2:14-cv-02712-NJB-KWR, E.D. La. Feb. 8, 2016)……………………….…..............3,15

## STATUTES/REGULATIONS

46 U.S.C. § 31301 et seq. …………………………………………………………………..11


Local Rule 6.3…………………………………………………………………………….6,21

**This Court Should Reconsider Judge Scheindlin's April 8, 2016 Summary Judgment
Opinion And Order [ECF 79] – Issued with No Oral Argument and
on Issues of Substantial Dispute Not Only before at least Four Judges of This Court
But Also Multiple Federal Courts Around the United States and the Internationally**

**The Complex, World-Wide ING-OW Litigation**

Judge Scheindlin's opinion [ECF 79] opens explaining that "[t]his action is one of

numerous actions related to the 2014 collapse of O.W Bunker ("OW"), formerly one of the

largest maritime fuel providers in the world." (Opinion ("Op.") at 2). By "numerous," Judge

Scheindlin refers to over 350 actions around the world dealing with OW – including at least 37[1]

before this Court, an vast insolvency action administered by Price Waterhouse in England,[2] and a

significant Chapter 11 liquidation (1434 docket entries presently and counting) of OW's U.S.

operations.[3] OW matters have also gone up to – and returned from – the Second Circuit,[4] on the

question of the permissibility of interpleader actions, such as the OMS action here.

Many of these cases involve claims by ING as "agent" against marine fuel ("bunker")

suppliers like O'Rourke Marine Services ("OMS"). ING says the consortium (now of mostly

bad debt-buying funds) it represents is "assignee" of all OW receivables. These ING insist

include the $248,806.23 value of OMS' bunkers – and tens of millions of dollars of other

---

[1]      A list of these cases before this Court is Exhibit A hereto.

[2]      *See* http://www.pwc.co.uk/services/business-recovery/administrations/owbunker.html

[3]      Before the U.S. Bankruptcy Court for the District of Connecticut, in *O.W. Bunker
Holding North America Inc. and O.W. Bunker USA Inc*., No. 14-51720 (lead case/consolidated)
– as of this date, with 1434 docket entries.

[4]      *Hapag-Lloyd Aktiengesellschaft v. United States Oil Trading LLC*, 814 F.3d 146, 2016
U.S. App. LEXIS 3232 (2d Cir. 2016). The Court of Appeals remanded the case to Judge
Caproni for further proceedings, which are also ongoing.

suppliers' bunkers - which OW never paid for – and in OMS' case here – **to which OW never had any claim of title**.[5]

Of the at least 37 OW-related cases before this Court alone, Judge Caproni has most of them (over 30) – and has ordered (ECF 207 in 1:14-cv-09949-VEC, Exhibit B hereto) a detailed briefing schedule designating four (4) of them test cases (VEC 14-cv-9287,14-cv-9949, 15-cv-6718, and 14-cv-10091), with motions due May 13, 2016, oppositions due June 10, 2016 and replies due July 13, 2016 (ECF 213 in 1:14-cv-09949-VEC, Exhibit B hereto). Thereafter, Judge Caproni will likely schedule oral argument. In the cases before Judge Caproni, Judge Caproni has stated that she believes, that the suppliers (like OMS) should be paid for the supply they made, and IMG should receive (if anything at all) its commission.

Before Judge Forrest is *Aegean Bunkering (USA) LLC v. M/T Amazon (IMO 9476654) et al. , N*o. 14 Civ. 9447 (KBF). This case is in the process of summary judgment briefing, with final reply briefs due April 28, 2016, also after which, Judge Forrest likely will schedule oral argument.

Judge Pauley heard oral argument on summary judgment, on April 8, 2016 in *ING Bank v. M/V TEMARA*, 1:16-cv-00095-WHP. A copy of the oral argument transcript is Exhibit C

---

[5]     OMS is a division of O'Rourke Petroleum, a family-owned fuel and environmental services distributor with one location, in Houston, Texas. *See* http://www.orpp.com/site/about-orourke-petroleum/ . OMS provided bunkers to four (4) vessels involved in the OW situation, $248,806.23 to the COSCO (China Ocean Shipping Corporation) vessels involved here, and $179,327.29 which OMS seeks in from the two vessels involved in the parallel, ongoing case (among the many) before Judge Caproni involving OMS, *Hapag-Lloyd AG v. O'Rourke Marine Services L.P., L.L.P.* , No. 14-cv-10027 (VEC).

The amount of product (and money) taken from OMS - $428,133.52 – is a significant amount for this family-owned company.

hereto.  Judge Pauley has asked to receive further briefing by April 29, 2016.[6]  Judge Pauley at

oral argument ( as set out below) also has focused on the fact that suppliers are unpaid, but that

ING claims what the suppliers otherwise should receive.

Elsewhere throughout the U.S. there are 25 or more ING-OW-supplier-related cases,

mainly before the United States District Courts for the Northern District of Florida, Eastern

District of Louisiana, Southern District of Texas, Central District of California and Western

District of Washington.  One OW case (not involving ING) which Judge Scheindlin heavily

relied on for her opinion here  – is on appeal to the Fifth Circuit[7] and thus subject to reversal.  In

the entire United States, one ING-OW case has been tried - *Martin Energy Services v. M/V*

*BRAVANTE IX et al*, ING as intervenor, 5:14-cv-00322-RH-GRJ,

https://ecf.flnd.uscourts.gov/cgi-bin/DktRpt.pl?630215434029753-L_1_0-1.  on March 28, 2016

before the U.S. District Court, Northern District of Florida.   The instructive transcript of this

trial – addressing the complex issues also involved in OMS' claims here  – is Exhibit D hereto.

The Court's opinion after trial is pending.

Outside of the United States, the United Kingdom Supreme Court in March, accepting

U.K. procedure's version of  U.S. Supreme Court *certiorari*, heard argument in an OW-ING case

involving the vessel RES COGNITANS, a decision which could also touch on OMS' case here.[8]

---

[6]     Judge Torres presently has before her *China Shipping Container Lines Co. Ltd. v. Big Port Service DMCC*, Case No. 1:15-cv-02006-AT, another ING-OW case, which is stayed pending outcome of a related case before the Supreme Court of Singapore.

[7]     *Valero Mktg. & Supply Co. v. M/V ALMI SUN*, 2015 U.S. Dist. LEXIS 172258 (E.D. La. Dec. 28, 2015), *reconsideration denied by, summary judgment granted by, judgment entered by, dismissed by*: *Valero Mktg. & Supply Co. v. M/V Almi Sun, IMO No. 9579535*, 2016 U.S. Dist. LEXIS 15086 (E.D. La. Feb. 8, 2016), *appeal docketed*, No. 16-30194 (5th Cir. Mar. 7, 2016)).

[8]     *See  In a Nutshell: What is the "Res Cogitans" OW Bunker UK Test Case and Why is it Important* , http://shipandbunker.com/news/features/industry-insight/880134-in-a-nutshell-what-is-the-res-cogitans-ow-bunker-uk-test-case-and-why-is-it-important

OMS presented extensively to Judge Scheindlin but her opinion did not even mention, the important Canada Federal Court decision in Canpotex, applying in the case here (and which OMS also addresses further, below).[9]

The complexity and expanse of the world-wide ING-OW litigation including the many actions at various stages before this Court, punctuates the need for extended and detailed analysis of the issues which this litigation involves. Those include the issues of this case.

When Judge Scheindlin on March 23, 2016 announced retirement[10] she had as all judges in this Court do, an extensive and complex docket before her. Summary judgment briefing in this case opened on February 1, 2016 [ECF 59] and concluded on March 14, 2016 [ECF 78]. Judge Scheindlin issued the Opinion here on April 8, 2016. By comparison,[11] in the period between March 23, 2015 and April 8, 2015, Judge Scheindlin issued three (3) opinions, two in one case; in the March 23, 2016-April 8, 2016 period, Judge Scheindlin issued five (5) opinions.[12] The Opinion here also was issued without oral argument, the summary judgment decision (or judgment in a contested case of this type) issued, thusfar, in the United States.

---

[9]     *Canpotex Shipping Services Limited, et al. v. Marine Petrobulk Ltd., et al.*, 2015 FC 1108 (Sept. 23, 2015) presently in its early stages of appeal to the Canada Federal Court of Appeal, No. A-462-15, see http://cas-cdc-www02.cas-satj.gc.ca/fca-caf/IndexingQueries/infp_RE_info_e.php?court_no=A-462-15.

[10]     *Manhattan federal judge known for groundbreaking e-discovery ruling is retiring from the bench*, http://www.abajournal.com/news/article/manhattan_federal_judge_known_for_groundbreaking_e_discovery_ruling_is_reti/

[11]     The source of these figures is a Lexis search for the March 23, 2015-April 8, 2015, and March 23, 2016-April 2016 opinions of this Court.

[12]     The opinions ranged in subjects from this one on arcane (but critical, in maritime law) issues of bunkering and maritime law, to federal securities regulation and class certification, to Methyl Tertiary Butyl Ether "MTBE" products liability litigation, to the question of an inmate's solitary confinement.

4

OMS submits that – as the omissions and oversights of the April 8, 2016 Opinion show – this case (and the many others involving OW-ING and suppliers like OMS) requires more extended analysis than events presented Judge Scheindlin with time to engage. The Opinion as a result includes manifest errors of law and fact, leaving many grounds not even mentioned or apparently considered, which should alter the Court's decision. Without reconsideration (particularly given the other similar cases before Judge Caproni and other Judges of this and other Courts operating under different schedules of consideration) if appealed (including alongside opinions from those other cases), the Second Circuit will reverse this opinion.

**This Court's and Second Circuit Standards Support Reconsideration**

This Court therefore should now pursuant to Local Rule 6.3 reconsider the April 8th Opinion "to correct manifest errors of law or fact, hear newly discovered evidence, consider a change in the applicable law or prevent manifest injustice."[13] The Court should grant reconsideration because OMS as "the moving party . . . [herein] point[s] to controlling decisions or data that the court overlooked." 3 Motions in Federal Court § 9:36.50 (3d ed.), citing *Analytical*, *L.P.*, 684 F.3d 36, Fed. Sec. L. Rep. (CCH) P 96903, Fed. Sec. L. Rep. (CCH) P 96936 (2d Cir. 2012). These "controlling decisions or data" that the Court overlooked "might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp.*,

---

The judges of this Court, and including of course Judge Scheindlin, are presented with an extraordinary range of complex subject matter with which they do an extraordinary job addressing and resolving.

OMS' point here is that with compressed time for resolution, the challenge of addressing and resolving complex and varied cases becomes even more extraordinary.

[13] *U.S. Titan, Inc. v. Guangzhou Men Hua Shipping Co., Ltd.*, 182 F.R.D. 97, 100 (S.D.N.Y. 1998), aff'd, 241 F.3d 135 (2d. Cir. 2001)

*Inc.*, 70 F.3d 255, 256–57 (2d Cir.1995).   *See Allied Ir. Banks, P.L.C. v. Citibank, N.A.*, 2015

U.S. Dist. LEXIS 114687 (S.D.N.Y. Aug. 24, 2015)(Batts, J.). [14]

    Just as the Court in *Trudeau v. Bockstein*, No. 05-cv-1019 (GLS-RFT), 2008 U.S. Dist.

LEXIS 13962 (N.D.N.Y. Feb. 25, 2008) explained that because "the state of the law was

sufficiently unsettled" and "the court [was] not convinced that the holding [relied upon by the

parties] represents new law," this Court now should reconsider the April 8th opinion.  Here as in

*Trudeau,* unsettled areas of law underlie the parties' the legal principles.  OMS confirms here

that Judge Scheindlin did not (and again OMS wants to make clear, most likely because of their

complexity and compressed time available) give full consideration to OMS arguments, and the

case law and facts OMS explicitly presented (but the opinion does not mention).  Here, the Court

---

[14]     This Court (including, Judge Scheindlin, *see Gucci Am., Inc. v. Guess?, Inc.*, 2011 U.S.
Dist. LEXIS 145180 (S.D.N.Y. Dec. 15, 2011)(Scheindlin, J.)(" For the reasons stated above,
Gucci's motion for reconsideration is granted.")) and others in the Second Circuit have granted
reconsideration in situations like this one, where movant meets Local Rule 6.3 and Second
Circuit standards:  *SEC v. Bronson*, 2015 U.S. Dist. LEXIS 145446, 12-13 (S.D.N.Y. Oct. 23,
2015)("The basis for Plaintiff SEC's motion is properly grounded in the permissible reasons
[*13]  for reconsideration."); *Fitzpatrick v. Am. Int'l Group, Inc.*, 2013 U.S. Dist. LEXIS 143541,
9-10 (S.D.N.Y. Sept. 27, 2013)("Defendant's motion to reconsider is granted because the August
7 Opinion overlooked the agreements presented to the Court");  *Clarex Ltd. v. Natixis Sec. Ams.
LLC*, 2013 U.S. Dist. LEXIS 106611, 11-12 (S.D.N.Y. July 29, 2013)("Accordingly,
reconsideration of the dismissal  [*12] of the contract claims as to these 5,000 warrants is
granted. Plaintiffs' contract claim as to those warrants is reinstated."); *In re HSBC Bank, USA,
N.A.,* 14 F. Supp. 3d 99, 108 (E.D.N.Y. 2014)("[T]he Court finds that the Plaintiffs have satisfied
the strict standard governing motions for reconsideration."); *Smith v. Perlman*, 2014 U.S. Dist.
LEXIS 175341, 7-8 (S.D.N.Y Dec. 18, 2014)("Thus, Plaintiff's motion for reconsideration does
not attempt to raise arguments or evidence Plaintiff neglected to put forth earlier, but rather urges
the Court to grant due consideration to overlooked evidence Plaintiff presented.  . . . Such
evidence "might reasonably be expected to alter the conclusion reached by the court" upon
consideration of a motion for summary judgment. [*8]  *Shrade*r, 70 F.3d at 257. In the interest of
avoiding manifest injustice, Plaintiff is entitled to have the Court consider this evidence.
Accordingly, the Court hereby ORDERS that Plaintiff's motion for reconsideration is
GRANTED and the Court's Order dated March 13, 2014 is VACATED."); *Catskill Dev., L.L.C.
v. Park Place Entm't Corp.*, 154 F. Supp. 2d 696, 701-02 (S.D.N.Y. 2001) (granting
reconsideration due to the court's erroneous application of a statute);

not only did not consider determinative legal principles raised by OMS, but also missed material facts that ground OMS' entire claim.

The Opinion as a result falls well short of requisite consideration of the controlling law and the facts of record. Without any oral argument or consideration of controlling authorities and facts that OMS' briefing cited, the Court missed key facts and authorities confirming that OMS has a maritime lien for the $248,806.23 of bunkers it physically provided. The Court also missed that ING in fact took no assignment of OMS' maritime liens, and that OMS continues to hold title to all of its claims (including to the bunkers themselves).

The Opinion entirely missed – and did not address at all - the following critical facts and principles that OMS' summary judgment briefing detailed:

> - OW's own sales terms and conditions ("OW's Terms") incorporate OMS' sales terms ("OMS' Terms") and expressly provide for OMS' direct contractual claims against OW and COSCO;
>
> - OMS holds maritime liens *in rem* against the Vessels because OW served as OMS' agent for the order from COSCO to OMS, through OW's sales terms incorporating OMS';
>
> - OMS retains title to the bunkers it supplied through its retention of title clause incorporated and conveyed through OW's Terms; and
>
> - The equitable principles at the core of interpleader and admiralty further provide for payment to OMS for the bunkers OMS provided.

**The Opinion Entirely Missed OW Sales Terms Clause L.4 – Which Incorporates OMS' Sales Terms**: What is most critical – that the Opinion entirely missed – is OW's own contractual terms, a part of the overall OW sales terms which ING insists controls the transactions:

**All** parties here agree that the OW Bunker Group Terms and Conditions of Sale for Marine Bunkers, Edition 2013 (the "OW Terms," ECF 60, Exh. E thereto) control the bunkers

sale to the COSCO claimants and Vessels. The Opinion in error **entirely overlooks** and does

not mention this critical Clause L.4 of OW's sales terms – controlling the transaction here - and

which provides as follows:

> (a) **These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists[15] that the Buyer is also bound by its own terms and conditions**. In such circumstances, **these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.**

(ECF 60, Exh. E thereto, ¶ 10) (emphasis added).

Why is this critical? Because through OW's Clause L.4:

- OW becomes OMS' agent for the purpose of competing the order from COSCO to OMS for the bunkers;

- OMS has a direct claim against COSCO for payment;

- OMS has a maritime lien against the COSCO vessels;

- The payment (including that which OMS' maritime lien secures) belongs to OMS, not OW and therefore, there was never anything of OW's to assign to ING; and

- COSCO never had to have any notice of the OMS terms - - L.4 states plainly that COSCO was "deemed to have read" them.

The result, which the Opinion entirely misses and does not even mention, is that **at most**, ING

has a maritime lien for the OW commission over and above the $248,806.23 value of OMS'

bunkers.

---

[15]    OMS of course insisted, including through the instant litigation, (OW's Terms using the word, "insists") that its Terms control including binding the "Buyer[s]" – proof of OMS' insistence includes this suit, including OMS' motion here.

The OW Terms through "L.4" extend OMS' Terms to COSCO (which the OW Terms also define as "Buyer"), OW/ING, and the Vessels so that each must pay OMS. ( ECF 60, Exh. C thereto ¶¶ 6, 8). The COSCO-employed Chief Engineer of each vessel accepted OMS' bunker provisions and signed OMS' bunker delivery receipts – accepting OMS' Terms.[16] Each signed a receipt not just incorporating, but setting out entirely, OMS' General Terms and Conditions. (ECF 60, Exh. C thereto ¶ 9; Material Facts Statement ¶ 6).[17]

The Opinion entirely misses that OMS' Terms include the COSCO claimants here, OW, and the Vessels, all defined as "buyer[s]," meaning "a Receiving Vessel supplied and, jointly and severally, her master, owners, managers, operators, disponent owners, charterers and any person(s) who contract(s) to purchase, take delivery of and pay for the Marine Fuels." (ECF 60, Exh. E thereto).

---

[16]    COSCO and ING contend that law requires provision of and signature to a receipt, on provision of bunkers to a vessel, and so the Chief Engineers'/COSCO employees' signatures mean nothing but legal compliance.

This is not true: nothing required the COSCO employees to sign a receipt stating, on behalf of COSCO and the Vessel, that they agreed that the provision was subject to the OMS Terms and had received them. The COSCO employees could have – **but did not** – demand a bunker receipt which omitted their agreement to and ratification for COSCO and the Vessels, of OMS' Terms.

[17]    OMS' bunker receipt for each Vessel appended, in full, OMS' Terms, referring prominently on their first page to OMS' maritime lien rights and the Terms:

No disclaimer stamp of any type or form will be accepted on the bunker receipt, nor should any stamp be applied, will it alter change or waive the sellers maritime lien against the vessel, or waive the vessel's ultimate responsibility for the debt incurred thru this transaction.

SIGNATURE BELOW ACKNOWLEDGES THAT YOU HAVE RECEIVED A COPY OF OUR GENERAL TERMS AND CONDITIONS. ANY OFFER TO SELL TO CUSTOMER IS SUBJECT TO AND INCORPORATES BT REFERENCE ALL OF O'ROURKE MARINE SERVICES, L.P. L.L.P CURRENT GENERAL TERMS AND CONDITIONS. A COPY OF WHICH IS APPENDED HERETO OR AVAILABLE FROM O'ROURKE MARINE SERVICES, L.P., L.L.P.

The Opinion also entirely misses and makes no mention that OMS' Terms confirm that OMS retains title (OMS' Terms, ¶ 13) and holds a maritime lien *in rem* over the receiving vessels until OMS is fully paid (¶ 15), and has a direct contractual claim against any "buyer" for payment. United States law governs OMS' bunkers sale (¶ 22):

13 - RISK/TITLE

Risk of loss in the Marine Fuels shall pass to the Buyer once the Marine Fuels have passed the flange connection between (a) the Receiving Vessel's bunker manifold and (b) the delivery facilities provided by the Seller. **Title to the Marine Fuels shall pass to the Buyer upon full payment for the value of the Marine Fuels delivered**, pursuant to the terms of Clause 11. **Until such full payment has been made, the Seller shall have a lien over the Receiving Vessel and her bunkers for the value of the Marine Fuels delivered**. If the Marine Fuels have been commingled with other bunkers on board of the Receiving Vessel, the Seller shall have a lien over the Receiving Vessel and such part of the commingled bunkers as corresponds with the value of the quantity of the Marine Fuels delivered.

\*       \*       \*

15 - COLLECTION AND LIEN

Deliveries of Marine Fuels are made not only on the credit of the Buyer but also on the faith and credit of the Receiving Vessel, and the Seller shall have, and may assert a lien against the Receiving Vessel and her bunkers and against all assets, vessels and bunkers, in the same ownership, management, operation or control for all sums due and owing in connection with the Sale Contract, including interest and costs.

It is expressly agreed between the Seller and the Buyer that Written Acceptance of the Buyer's Order or delivery of Marine Fuels following the Buyer's Order creates a maritime lien in accordance with article 46 U.S.C.§ 31342 (2013) of the United States Federal Maritime Liens Act.

\*       \*       \*

22 - LAW AND JURISDICTION

Any dispute arising out of or in connection with the Sale Contract or these GTCs, including, without limitation, any dispute with multiple defendants/claimants and indemnity claims, shall be exclusively interpreted and construed in accordance

with the laws of the State of Texas, U.S.A., excluding any choice of law rules that
would otherwise require application of the laws of any other jurisdiction. . .

( ECF 60, Exh. C thereto) (emphasis added).   The Opinion's omissions therefore lead it to an

entirely wrong result.  Through the provisions that ING insist apply (but that the Opinion does

not even consider or mention) OMS is the only party entitled to a lien *in rem* against the Vessels

and the award of the amount of its provisions of the bunkers to the Vessels.

**The Opinion Ignores that the OW Terms Extend OMS' Terms to the Vessels and the OW
Entities, Which Shows that OMS Provided the Bunkers on the Order of a Person
<u>Authorized by the Owner</u>**

The Opinion completely ignores the undisputed fact that OMS' Terms (incorporated

directly through the OW Terms to COSCO) confirm that OMS provided bunkers to the Vessels

and by law holds a maritime lien against the Vessels *in rem* for the amount OMS invoiced for its

provision.  The Opinion incorrectly jumps to the conclusion that OMS' maritime lien arises by

contract.  Rather, had the Opinion the benefit of further analysis, it is clear that the OW Terms

evidence that OMS provided the bunkers to the Vessels on the order of an agent authorized by

the Vessels.  Bunkers are established "necessaries" under the Commercial Instruments and

Maritime Lien Act ("CIMLA"), 46 U.S.C. § 31301.   COSCO – owner[18] - undisputedly procured

the bunkers from OMS (again, see "Clause L.4") and OMS provided the bunkers not only on

---

[18] 46 U.S.C. § 31341 ("Persons presumed to have authority to procure necessaries")

(a)  The following persons are presumed to have authority to procure necessaries for
a vessel:
(1)   the owner;
(2)   the master;
(3)   a person entrusted with the management of the vessel at the port of supply; or
(4)   an officer or agent appointed by—
(A)   the owner;
(B)   a charterer;
(C)   an owner *pro hac vice*; or
(D)   an agreed buyer in possession of the vessel.

COSCO's order (directly through OMS' incorporated Terms; if COSCO had not ordered the

bunkers, of course, OMS never would have provided them) through OW (a person undisputedly

authorized by COSCO) to OMS.[19]  The Opinion therefore misses  that OMS holds maritime liens

against the Vessels, and its Terms also confirm its insistence on the Terms and reliance on the

Vessels' credit and resulting maritime liens *in rem* (although, under CIMLA, OMS need neither

allege nor prove this reliance on the Vessels' credit).[20]

---

[19]      The Opinion further misses that – as it is well-established under New York law - that
there can be, at the very least, apparent authority based on the actions of the principal (here,
COSCO).  **Apparent authority**

> "**may arise absent any direct contact between the principal and the third
> party**," *Prop. Advisory Grp., Inc. v. Bevona*, 718 F. Supp. 209, 211 (S.D.N.Y.
> 1989). For example, "a principal may make [a] manifestation" that creates
> apparent authority "by permitting or requiring the agent to serve as the third
> party's exclusive channel of communication to the principal." Restatement
> (Third) Of Agency § 3.03 cmt. b (2006). Additionally, a principal is "estopped"
> from denying an agent's authority where "a person of ordinary prudence
> conversant with business usages and the nature of the particular businesses is
> justified in assuming that such agent has authority to perform a particular act."
> Prop. Advisory Grp., 718 F. Supp. at 211 (finding apparent authority on this
> theory after an evidentiary hearing); see also *Graffman v. Delecea*, No. 96-7270,
> 1997 U.S. Dist. LEXIS 15525, 1997 WL 620833, at *5 (S.D.N.Y. Oct. 8, 1997)
> (finding a question of fact under this theory).

*Korea Trade Ins. Corp. v. Oved Apparel Corp.*, 2015 U.S. Dist. LEXIS 38214, 6-8 (S.D.N.Y.
Mar. 23, 2015)(Batts, J).  Thus, it is simply nonsensical for ING to argue here that OW was not
acting on behalf of COSCO, especially in light of OW's **express incorporation** of OMS' Terms
to COSCO.

[20]      46 U.S. Code § 31342 - Establishing maritime liens

Except as provided in subsection (b) of this section, a person providing necessaries to a
vessel on the order of the owner or a person authorized by the owner—

(1)   has a maritime lien on the vessel;

(2)   may bring a civil action *in rem* to enforce the lien; and

(3)   is not required to allege or prove in the action that credit was given to the
vessel.

Because the Opinion lacks any consideration of the relevant pass-through provision of the OW terms, it follows that it **fails to apply or even consider or mention** the pertinent decision in the *Canpotex, supra* interpleader decision by the Federal Court of Canada (a complete copy of this opinion, is exhibited to OMS' summary judgment briefing). The Opinion entirely fails to mention this critical case[21] which recognizes the physical supplier's payment rights, as this Court now should for OMS on nearly identical facts. The Canada Federal Court specifically decided against ING's supposed claim, as this Court should here. U.S. and Canadian maritime law are identical in this regard – a broker or trader is **never** entitled to a maritime lien or claim for the value that the physical supplier provides - **without having paid the physical supplier**.[22]

---

[21]     United States Supreme Court Justice Ruth Bader Ginsburg commented as follows about the importance of looking to instructive foreign – an in this instance – **Canadian** – law:

> "Why shouldn't we look to the wisdom of a judge from abroad with at least as much ease as we would read a law review article written by a professor?" she asked.

> She added that the failure to engage foreign decisions had resulted in diminished influence for the United States Supreme Court.

> The Canadian Supreme Court, she said, is "probably cited more widely abroad than the U.S. Supreme Court." There is one reason for that, she said: "You will not be listened to if you don't listen to others."

Liptak, Adam, *Ginsburg Shares Views on Influence of Foreign Law on Her Court, and Vice Versa,* The New York Times, Apr. 1, 2009, http://www.nytimes.com/2009/04/12/us/12ginsburg.html?_r=0

[22]     The Canadian Marine Liability Act, SC 2001, c 6, Section 139 (2) mirrors the related provisions under U.S. maritime law:

> Maritime Lien

> A person, carrying on business in Canada, has a maritime lien against a foreign vessel for claims that arise

**The Opinion Incorrectly Relies on *Valero* (Now On Appeal to the 5th Circuit) and Omits Key Facts from Consideration**

The Opinion also misses integral facts of the *Valero, supra*. The integral facts confirm that *Valero* is not controlling. The Opinion missed that *Valero* is **not** an interpleader and does **not** involve ING. Rather, in the *Valero* case, the court considered competing claims for a maritime lien by entities who were actually involved in the transaction in some capacity. That is simply not the case here. ING was **not** before the *Valero* court and was **not** involved in, nor did it provide value to the underlying transaction here.

The Opinion thus missed that *Valero* does not consider the purported assignment from the OW Entities to ING, including the validity of the assignment and whether ING, as a party who provided no value to the underlying transaction, is entitled to a maritime lien. The Opinion also misses that *Valero* makes no consideration of "L.4"

***Lake Charles* is Not the Controlling Case Law**

The Opinion further overlooks that *Lake Charles Stevedores* focuses only on the relationship between the parties in the contractual chain. It cannot be reconciled with longstanding and systemic bunker industry practice and the fundamental CIMLA purpose of protecting materialmen like OMS. 199 F.3d 220 (5th Cir. 1999). The *Lake Charles Stevedores* Court held that:

> We are persuaded by our review of these cases that it is not whether an intermediary can be expected to supply the necessaries itself that distinguishes instances in which the actual suppliers have liens, but it is rather the nature of the relationship between each pair of entities involved in the transaction at issue (e.g., agent v. independent contractor).

---

> (a)     in respect of goods, materials or services wherever supplied to the foreign vessel for its operation or maintenance, including, without restricting the generality of the foregoing, stevedoring and lighterage; or
>
> (b)     out of a contract relating to the repair or equipping of the foreign vessel.

14

*Id.* at 230. *Lake Charles Stevedores* only addresses the selection requirement in the context of the general contractor/subcontractor line of cases. The Opinion misses that this criterion does not operate in the context of the "middle-man" line of cases, with physical suppliers tasked with delivering goods and services on short notice to meet operational requirements. Adopting "selection" as the criterion for awarding a maritime lien virtually forecloses such liens favoring American materialmaen like OMS. *Tramp Oil and Marine, Ltd. v. M/V Mermaid I,* 805 F.2d 42, 46 (1st Cir. 1986):

> The primary concern of the Federal Maritime Lien Act is the protection of American suppliers of goods and services. See H. Rep. No. 92-340, 92nd Cong., 1st Sess., reprinted in 1971 U.S. Code Cong. & Ad. News 1363-65; *Gulf Trading & Transportation Co. v. The Vessel Hoegh Shield*, 658 F.2d 363, 367 (5th Cir. 1981), *cert. denied*, 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982)("The congressional intent is that an American supplier of goods, services or necessaries to a foreign vessel obtains a maritime lien in the vessel when the goods or services are supplied or performed in the United States.").

The Opinion similarly misses, that *Ken Lucky* did not require proof of agency between the intermediary and the subcharterer. Quite to the contrary, the court found the existence of a maritime lien noting that an agency relationship did not exist. *See Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473, 477 (9th Cir. 1989). This Court should reconsider for this further reason. Again, overall though – if the Court had simply read and applied OW's own "Clause L.4" it never would have had to default to either *Ken Lucky* or *Lake Charles* – or *Valero*.

**The Opinion Further Misses the Fact that OMS Retains Title to or a Security Interest in the Bunkers and Thus to and in the Registry Funds**

The Opinion further misses that OMS' Terms – which "L.4" again incorporated -provide that OMS retains title to the bunkers (COSCO deposited Registry Funds to release the bunkers as

well as the Vessels from arrest. The Opinion makes no mention, and does not consider that

OMS' Terms, as set out above, incorporated into OW's, specify as follows:

> 13 - RISK/TITLE
>
> Risk of loss in the Marine Fuels shall pass to the Buyer once the Marine Fuels have passed the flange connection between (a) the Receiving Vessel's bunker manifold and (b) the delivery facilities provided by the Seller. **Title to the Marine Fuels shall pass to the Buyer upon full payment for the value of the Marine Fuels delivered**, pursuant to the terms of Clause 11. **Until such full payment has been made, the Seller shall have a lien over the Receiving Vessel and her bunkers for the value of the Marine Fuels delivered**. If the Marine Fuels have been commingled with other bunkers on board of the Receiving Vessel, the Seller shall have a lien over the Receiving Vessel and such part of the commingled bunkers as corresponds with the value of the quantity of the Marine Fuels delivered.

(Emphasis added). OW's terms extend OMS' title retention and themselves make clear that no

clear bunkers title passed to COSCO because, COSCO never paid for the bunkers.[23]

None of the transactions (as between the allegedly involved entities – OW and COSCO)

were true sales, because a sale requires two things: 1) a transfer of property 2) in exchange for

money before title can pass. Fundamentally, there was no sale of the bunkers OMS provided

from OMS to any entity, because "[a] 'sale' consists in the passing of title from the seller to the

---

[23]     The Opinion further misses (detailed by OMS' briefing) UCC § 2-401(1)(Tex. Bus. & Com. Code Ann. § 2.401(a)),[23] provides in pertinent part as follows:

> Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2.501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this title. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the chapter on Secured Transactions (Chapter 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

Similarly, § 2-401(1) (Tex. Bus. & Com. Code Ann. § 2.401(a)) provides that "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest."

buyer for a price (Section 2.401) ….” Tex. Bus. & Com. Code Ann. § 2.106(a).   The Opinion

thus missed altogether that OW (and thus ING) has neither title (per OMS' Terms) nor any

security interest in the bunkers or deposited funds:

> The New York Uniform Commercial Code [as does Texas'] provides that a security agreement is effective between the parties, against purchasers of the collateral and against creditors. N.Y.U.C.C. Law § 9-201. However, **the creditor's security interest does not become enforceable against the debtor or third parties until three events have occurred**: (1) Either the collateral has come into the possession of the secured party, or the debtor has signed a security agreement that contains a description of the collateral; (2) **The secured party has given value to the debtor**; and (3) The debtor has acquired rights in the collateral. N.Y. U.C.C. Law § 9-203(1).

*Cont'l Coffee Prods. Co. v. Banque Lavoro S.A.*, 852 F. Supp. 1235, 1236 (S.D.N.Y. 1994)

(emphasis added); *accord Logan & Kanawha Coal Co. v. Banque Francaise du Commerce*

*Exterieur*, 93 Civ. 4678 (LBS), 1996 U.S. Dist. LEXIS 14197, at *9 (S.D.N.Y. Sep. 26, 1996)

(emphasis added).

**The Opinion Also Ignores and Did Not Mention, the Application of Equity, at the Foundation of both Admiralty and Interpleader**

As this Court in *Burton v. Iyogi, Inc.*, 2015 U.S. Dist. LEXIS 33809, 29-30 (S.D.N.Y.

Mar. 16, 2015)(Batts, J.) makes clear:

> To succeed on an unjust enrichment claim under New York law, a plaintiff must show: (i) defendant was enriched (ii) at plaintiff's expense; and (iii) equity and good conscience require restitution. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). Plaintiff must also allege "a relationship or connection between the parties that is not 'too attenuated'" *Georgia Malone & Co., Inc., v. Rieder et ano.*, 19 N.Y.3d 511, 973 N.E.2d 743, 950 N.Y.S.2d 333, 336 (N.Y. 2012) (citations omitted). Unjust enrichment "lies as a quasi-contract claim" and "is an obligation the law creates in the absence of any agreement." *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 841 N.E.2d 742, 807 N.Y.S.2d 583, 587 (N.Y. 2005) (citation omitted). It is "not a catchall cause of action to be used when others fail" and is **"available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff**." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 779, 967 N.E.2d 1177, 944 N.Y.S.2d 732, *reargument denied*, 19 N.Y.3d 937, 973 N.E.2d 187, 950 N.Y.S.2d

91, (N.Y. 2012). Unjust enrichment is not available where it simply duplicates, or replaces, a conventional contract or tort claim. Id.

2. Plaintiff's Unjust Enrichment Claim is Not Precluded

Defendant does not claim that Plaintiff [*30] failed to allege the requisite elements of her unjust enrichment claim. Rather, Defendant argues that the claim is precluded because "there is a valid and enforceable contract covering the subject matter of the claim." (Def. Memo at 15.) To support this argument, Defendant cites a string of cases holding that recovery under a quasi-contract theory is unavailable where there is an adequate remedy available at law, namely, through contract. Id. Defendant is correct about the law**. However, the cases Defendant cites are inapplicable here because there is a dispute of fact as to whether there is a valid and enforceable contract**.

(Emphasis added). ING (and COSCO) have insisted that OMS had no contract with COSCO or direct relationship with COSCO which gave rise to a maritime lien. This is where equity then enters to assure that the parties all nevertheless – even if this is true – received what they all agreed in the first place to receive. These inherent principles of equity therefore resist unjust enrichment – just the sort of unjust enrichment ING attempts here (where ING has advanced nothing, including payment to OMS) – recognize payment to OMS here given that "(1) [ING seeks to be] enriched, (2) at [OMS'] expense, and (3) **equity and good conscience militate against permitting the [ING] to retain what [OMS] is seeking to recover**." *See Briarpatch Ltd. L.P v. Phoenix Pictures, Inc*., 373 F. 3d 296, 306 (2d Cir. 2004) (emphasis provided). The Opinion entirely missed and does not address, OMS' extensive caselaw about the application of equity here.

Had the Court been able to hold oral argument, it would have been able to direct its own questions to ING, and OMS. For example, in the just-concluded *Martin Energy Services* trial before the U.S. District Court for the Northern District of Florida, involving OW/ING and a factually similar situation to this case, U.S. District Judge Robert L. Hinkle questioned Claus Eric Mortensen, a witness called by ING who worked for the O.W. Bunker Group since 1983:

18

THE COURT: I want to follow up on a question that Mr. Maloney asked you pretty early, so a couple of hours now. Essentially, the question and answer wound up with you saying that, if an owner doesn't pay for the fuel, the loss is borne by O.W. I want to ask a couple of questions about that. First, somebody has a lien when the fuel is put into the vessel. Are there occasions when one of the O.W. entities winds up enforcing the lien?

THE WITNESS: Yes.

THE COURT: And I'm really asking about the roughly 15 years -- if I understood it, you got your position in collections and dispute resolution in 2000. So I'm asking between that time and when the company went into bankruptcy, became insolvent. So during that period there were times when an O.W. entity enforced a lien?

THE WITNESS: Yes, I can confirm that. Several times, actually.

THE COURT: Were there any times when the physical supplier enforced a lien?

THE WITNESS: No, not before the bankruptcy, because up to that we always paid our physical supplier. So that was also what I meant by saying that the loss would be borne by O.W. Bunker if the customer didn't pay, because we paid our physical suppliers.

(Trial Transcript, Exh. D at 154-152, lines 10-25, 1-9). Judge Hinkle continued with questions regarding the inherent inequities in what ING asks the Court to do in terms of awarding it a windfall with no amount being paid to the physical supplier:

THE COURT: Let me shift gears a little bit. I'm going to use rough numbers for this transaction. Rough numbers, if everything had happened exactly like it was envisioned at the outset. Nobody became insolvent. This transaction just went forward as an ordinary commercial transaction. Then what the Boldini group would have gotten out of this is 300 tons of fuel on board the BRAVANTE VIII, and they would have paid out $291,000 in rough numbers; Martin would have wound up with $287,000 in rough numbers; and O.W. would have wound up with $4,000 in rough numbers. That's where things would have been, right?

THE WITNESS: That's correct.

THE COURT: In the 15 years that you did this, has there ever been a transaction like this one where what happened was, again, using these numbers just as a hypothetical example, the physical supplier wound up with nothing and O.W. wound up with $291,000?

THE WITNESS: There was no such cases before the bankruptcy, no.

THE COURT: Can you think of any reason how that would be a fair result?

THE WITNESS: Well, since we were selling to the customers on our own terms and conditions, always, we also had an obligation to make sure that the physical supplier was paid, so that was a policy of the entire group. No matter, if the customer for any reason went bankrupt or couldn't pay, then we still paid our physical suppliers.

(*Id.*, pp. 155-156, lines 24-25, 1-25).

Similarly, in oral argument in the *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929,*

No. 16 CV 95 (WHP) pending before Judge Pauley of this Court, Judge Pauley expressed similar

concerns about the issues with ING's claim to the funds due to CEPSA, the physical supplier in

that case (here, OMS):

THE COURT:  Just stepping back for a moment, looking at the big picture, and from 40,000 feet, **is it fair to say that ING seeks to claim all of the money that's in the court registry account**, the 266,175.54, pursuant to the assignment from OW Bunkers, **despite the fact that under the original terms of the deal that OW Bunkers had with its subsidiary OW would have only received a commission and CEPSA would have received a majority of the money**?

MR. BERCAW (ING):  Yes.  That's what we're saying.  And I think there's a dispute as to the amount. But our position is that ING Bank steps into the shoes of OW Bunkers & Trading A/S, which would have been entitled to 100 cents on the dollar from Copenship for the supply of the bunkers ultimately to the TEMARA.  OW Bunkers & Trading was not going to receive a part payment from Copenship and then accept the balance that would be paid to CEPSA.  That was not the deal.  OW Bunkers & Trading could have supplied this or could have fulfilled the contract by itself, had it chose to do so.

THE COURT:  Right.  But it didn't.  It subcontracted it.

(Oral Argument Transcript, pp. 5-6, lines 25; 1-9, a copy of which is attached hereto as Exhibit

C) (emphasis added).  Judge Pauley expressed further concern about the violation of equitable

principles in the result that ING now seeks:

THE COURT:  What about CEPSA's -- I'll call it equitable argument that in essence, **since CEPSA was the supplier of the fuel, that it is essentially left**

**without any of the money that was paid for that fuel by reason of the assignment**?

(*Id.*, pp. 12-13, lines 22-25; 1) (emphasis added).

**The Opinion Further Missed OMS' Showing that Under the English Law Controlling ING's Agency, ING Takes No Assignment of Maritime Liens In Rem**

Finally, the Opinion misses entirely OMS' showing (*see* ECF 78 at 17-19) – supported by a detailed affidavit of an English solicitor, that because English law controls the ING Security Agreement – even if ING somehow does take assignment, it is not of maritime liens in rem, including OMS' – because English law does not recognize maritime liens *in rem*.

The Opinion makes no mention of OMS' showing, also, entirely missing analysis of the fundamental (non) basis of ING's claims.

## This Court Now Should Reconsider the April 8, 2016 Opinion

Overall, as detailed above but as it will be even more clear to the Court as the Court reviews the summary judgment briefing, this Court should pursuant to Local Rule 6.3 reconsider the Opinion.

The OW/ING situation is very complex. There are many proceedings around the world, involving detailed facts and points of law and equity. Correct decision requires the benefit of detailed attention and analysis which circumstance did not permit the Opinion to undertake.

Thorough and well-considered decision here also calls for this Court's consideration of the decisions, briefing and argument in the many proceedings around the world, including those ongoing before this Court. It is a certainty that with the benefit of further consideration, there will be further opinions which will benefit this Court's reconsideration, and final decision. Soon upcoming opinions likely include, for example, the Northern District of Florida opinion after trial in Martin Energy, the summary judgment opinions which Judges Pauley and Forrest will issue respectively in the now nearly fully briefed and (now for the CEPSA-TEMARA case)

21

argued cases before this Court, and also, Judge Caproni's opinion to issue from the test case briefing, to proceed and be argued over the coming months.

One approach to reconsideration, therefore, is that the Court simply may recognize that the Opinion missed important facts, law and equity, and vacate the opinion pending further proceedings. This approach will allow the Court to consider further authority developing throughout the world, and in this Court. Otherwise, however, OMS would without reconsideration, if the summary judgment in fact is a final judgment or otherwise by statute, proceed to the Court of Appeals- again – with the Opinion likely to be reversed not only considering the points it misses, but also because of the law further announced in the many OWING-supplier proceedings throughout the world and issuing further, with more in-depth analysis than circumstances permitted for the Opinion, from this Court.

On reconsideration, this Court may correct the Opinion's manifest errors of law and fact.

With reconsideration, this Court may prevent a manifest injustice – namely – not countenancing ING (paying nothing for OMS' bunkers) taking $248,806.23 from OMS, for bunkers for which ING paid nothing – for which OMS holds title - and which the well-considered facts, law and equity prohibit ING from taking.

OMS as the moving party has pointed to controlling decisions or data that the Opinion court overlooked, which certainly might reasonably be expected to alter the Opinion's conclusion. OMS respectfully requests this Court to grant its motion.

**Oral Argument Requested**

OMS also respectfully requests this Court to hold oral argument on this motion, and on or in consideration with reconsideration, on the summary judgment motions overall.

Dated: April 22, 2016.

Respectfully Submitted,

/s/ J. Stephen Simms
J. Stephen Simms
Simms Showers LLP
201 International Circle
Baltimore, Maryland 21030
410-783-5795
jssimms@simmsshowers.com

O'Rourke Marine Services L.P., L.L.P.
Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2016 I caused the foregoing to be filed on this Court's CM/ECF system for service on all record counsel.

/s/ J. Stephen Simms