USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>August 24, 2016</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

AEGEAN BUNKERING (USA) LLC, :
:
     Plaintiff, :
:
    -v- :
:
M/T AMAZON (IMO 9476654), its engines, :
tackle and apparel and CERTAIN BUNKERS :
FO 500 CST aboard or loaded aboard the M/T :
Amazon, :
:
    Defendants <u>in rem</u>, :
:
BERGEN BUNKERS, AS and JASPER :
EXPORTING LTD., :
:
    Defendants <u>quasi in rem</u>,:
:
THE MASTER OF THE M/T AMAZON, :
:
    Garnishee. :
-------------------------------------------------------- :
JASPER EXPORTING LTD., :
:
    Third-Party :
    Interpleader Plaintiff, :
:
    -v- :
:
O.W. BUNKER MALTA, LTD. :
and ING BANK N.V., :
:
    Third-Party :
    Interpleader :
    Defendants. :
-------------------------------------------------------- X

14-cv-9447 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

   This is one of a large number of admiralty cases currently pending in this and

other districts relating to the non-payment of bunkers.  Bunkers are marine fuel

necessary to the operations of ocean-going vessels.  This Opinion & Order sets forth the Court's determination of whether, on the facts presented on this motion, the physical supplier of the bunkers, Aegean Bunkering (USA) LLC ("Aegean") is entitled to a maritime lien. It is not.[1] Accordingly, its claims in this action must be dismissed.

The resolution of this motion requires reference to the structure of the transaction at issue and principles of maritime law, contract law, and agency. Careful consideration of the relevant facts and principles leads the Court to conclude that while Aegean did, in fact, supply the bunkers at issue, it did not do so "on the order of the owner or a person authorized by the owner" of the vessel.  It is in the position of a subcontractor.  As such, and on the facts presented here, it lacks a maritime lien.

Before this Court are three motions for summary judgment, each of which seeks determination of this same question.  Accordingly, as set forth below this Court DENIES Aegean's motion for summary judgment (ECF No. 108), and GRANTS ING Bank N.V.'s ("ING's") and Jasper Exporting Ltd.'s ("Jasper's") cross-motions for summary judgment (ECF Nos. 114 & 119) and dismisses Aegean's claims.  To be clear, this Opinion & Order does not determine what entity, if any, in fact holds a maritime lien against the vessel.

---

[1] Simultaneously with this Opinion & Order, the Court has issued opinions in two other cases, O'Rourke Marine Services L.P. v. M/V Cosco Haifa, IMO No. 9484338, 15-cv-2992, and ING Bank N.V. v. M/V Temara, IMO No. 9333929, 16-cv-95, determining the same question.  In each instance, based on the facts in each case, the outcome is the same:  the physical supplier does not possess a maritime lien.

I.      PROCEDURAL HISTORY

The bunkers, the payment for which are at issue in this case, were invoiced to various entities (as described below) on October 31, 2014.  On or about November 14, 2014, Aegean arrested the vessel at issue, the Amazon, in the Bahamas.  Jasper, the vessel owner, subsequently posted a Letter of Undertaking and the Amazon was released.  Aegean commenced the instant action against Jasper in this district on November 26, 2014.  (ECF No. 2.)  Aegean asserted <u>in rem</u> claims against the Amazon based on a purported maritime lien in the amount of $981,708.20 and <u>quasi in rem</u> claims against Jasper.

Jasper answered the complaint on February 27, 2015 (ECF No. 22) and then amended its answer on March 20, 2015 to assert counterclaims, cross-claims, and a third party complaint for interpleader naming Bergen Bunkers, AS ("Bergen"), O.W. Bunker Malta, Ltd. ("OW Malta") and ING.  (ECF No. 27.)  ING answered Jasper's third party complaint on June 12, 2015 and counterclaimed against Jasper for the disputed funds.  (ECF No. 70.) Jasper and ING both filed a Second Amended Complaints in July and September respectively, with Jasper's adding a new third party defendant, O.W. Bunker USA, Inc. ("OW USA").  (ECF Nos. 83, 87.)  Aegean answered Jasper's third party complaint on August 10, 2015. (ECF No. 85.)

Neither OW Malta nor OW USA have appeared in this action; OW USA was dismissed from the action on February 10, 2016. (ECF No. 103.)  A Clerk's Certificate of Default was entered against OW Malta on February 25, 2016, and

default judgment was entered against OW Malta on May 23, 2016.  (ECF Nos. 105 & 141.)  Fact discovery closed on March 4, 2016.

On March 4, 2016, Aegean moved for summary judgment as to the existence of its maritime lien, and thus to dismiss the claims of ING and contrary to the position of Jasper.  (ECF No. 108.)  Jasper and ING cross-moved for summary judgment against Aegean.  (ECF Nos. 114 & 119.)  These three motions are the subject of the instant decision.

II.    FACTS[2]

The provision of bunkers to the Amazon has the feel of a game of musical chairs:  On October 22, 2014, Jasper, the Amazon's owner, acted through its management agent, Dynacom Tankers Management Limited ("Dynacom") to place an order with OW Malta for bunkers.  OW Malta then contracted with OW USA for the provision of the bunkers; OW USA in turn contracted with Bergen, and finally Bergen contracted with Aegean.  When the music stopped, Aegean was in fact the physical supplier of the bunkers which it duly delivered to the Amazon on October 31, 2014 at Marcus Hook, Pennsylvania.

On the same day the bunkers were delivered, October 31, 2014, Aegean invoiced Bergen in the amount of $981,708.20; OW Malta then invoiced Jasper (through Dynacom) $994,313.42, with a notation that payment should be made to

---

[2] The facts set forth herein are undisputed as based on uncontroverted documentation and other facts, unless otherwise noted.

ING as assignee.  To date, no entity has been paid for the bunkers.[3]  Bergen has gone bankrupt.

A.   The Dynacom / OW Malta Transaction

Jasper contracted with Dynacom to act as its agent for, inter alia, the acquisition of bunkers.  The first transaction in the long chain of transactions which are implicated in this lawsuit is that between Dynacom[4] and OW Malta.[5]

In October 2014, Dynacom contracted with OW Malta for the provision of marine fuel, or bunkers.  The documentation reflecting the Dynacom / OW Malta transaction indicates a purchase order for 2,100 metric tons of marine fuel of a particular grade and at a price of $466 per ton.  (Potter Decl., ECF No. 120, Exh. 1.) The documentation specifies delivery and sampling requirements to insure quality. (Id.)  OW Malta confirmed the order by a "Sales Order Confirmation" dated October 22, 2014.  (Potter Decl. Exh. 2.)  That confirmation is on OW Malta letterhead, with an address in Greece and telephone numbers with national prefixes associated with Greece.  It reiterates the essential terms of the purchase order.  As to payment it states "Within 30 days from date of supply upon presentation of invoice."  (Id.)  The second page of the Confirmation states:

---

[3] As stated, the vessel was arrested in the Bahamas on November 18, 2014; Jasper subsequently posted a letter of Undertaking and the vessel was released.

[4] Throughout this Opinion, the Court's reference to "Dynacom" is interchangeable with the owner of the vessel, "Jasper."  There is no dispute that at all times relevant to this action, Dynacom was acting as Jasper's agent.

[5] There is no evidence in the record that Jasper made OW Malta an agent.  At his deposition in this matter, Jasper's representative testified that Dynacom, as the management company for Jasper, was Jasper's agent.  (Skoutelas Tr. 14:2-5.)  Jasper's representative further testified that Jasper never authorized OW Malta to grant a maritime lien to any physical supplier: "Q:  Did you, on behalf of Jasper, ever authorize OW-Malta to grant a right of lien on the M/T Amazon to a physical supplier, or anyone else? A: No." (Skoutelas Tr. 17:20-24.)  OW-Malta's representative further testified that OW Malta was the entity obligated to deliver the fuel to the Amazon – but in doing so was not acting in an "agent" capacity.  (Lykouri Tr.: 8:7-13; 29:15-20.)

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to OW Bunker Malta Ltd. as 'Seller'.

(Id.) The OW Bunker Group Terms and Conditions provide, in pertinent part:

A.2 These conditions apply to all offers, quotations, orders, agreements, services and all subsequent contracts of whatever nature, except where otherwise is expressly agreed in writing by OWB [OW Bunkers].

A.3 General trading conditions of another party will not apply, unless expressly accepted in writing by OWB.

…

B. DEFINITIONS

"Seller" means OWB…

"Buyer" means the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or order Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made.
…
"Owner" means the registered Owner or Bareboat Charterer of the vessel.
…
"Agreement" means to concluded terms for the sale/purchase of the Bunkers.

"Supplier" means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers.

"GTC" means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer.
…
C.1 An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order Confirmation to the Buyer.  Each Order Confirmation shall incorporate these GTC by reference…

C.2 Agreements entered into via brokers, or any other authorised representative on behalf of the Seller, shall only bind the Seller upon the Seller's broker or other authorised representative sending the Order Confirmation to the Buyer or the Buyer's broker as the case may be.
…
C.5 If the party requesting Bunkers is not the Owner of the Vessel, the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner.
…
H.1 Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery.
…
I.1 Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing.

I.2 Payment shall be made in full, without set-off, counterclaim, deduction and/or discount…

J.3 The Buyer shall be obliged to make payment in full and fulfill other obligations in accordance with the terms of the Agreement and these conditions, whether or not it has any claims or complaints.
…
L.  EXEMPTIONS AND FORCE MAJEURE
[various rather standard force majeure provisions]

L.4 (a) These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions.  In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.
(b) Without prejudice to the generality of the foregoing, in the event that the third party terms include:
(i) A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.
(ii) Any additional exclusion of liability clause contained in third party terms shall be incorporated mutatis mutandis into these terms and conditions.
…
P.1 This agreement shall be governed and construed in accordance English law.

7

…
P.5 The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien…

(Potter Decl. Exh. 3.)

Notably, there is nothing in any Dynacom / OW Malta documentation before this Court that in any way reflects Dynacom itself had the authority from Jasper to authorize a third party (for instance, OW Malta) to act as its agent and bind the vessel. Nor do the order, confirmation, and terms documents contemplate such an authorization, regardless of authority. Moreover, there is no documentation reflecting what would necessarily need to be a separate authorization from Dynacom to OW Malta allowing OW Malta to in turn transfer any such authorization to yet another third party. Put bluntly: nothing in the record supports a finding that Dynacom agreed to allow unknown third parties to bind the vessel and subject it to arrest for debts.

B.  The OW Malta / OW USA Transaction

The second step in the transaction series is that between OW Malta and OW USA. By a separate agreement, also dated October 22, 2014, OW Malta contracted with OW USA for the provision of the same quantity of fuel (2,100 metric tons) to be supplied to the Amazon, this time at a slightly lower price of $462.50 per ton (enabling the arbitrage opportunity). (Potter Decl. Exh. 4.) The Purchase Order is on OW Malta letterhead indicating an address and telephone numbers in Greece, and addressed to OW USA at an address in Houston, Texas. Payment terms are indicted as "Within 37 days from date of supply against hard copy invoice." (Id.)

8

OW USA provided OW Malta with a Sales Order Confirmation relating to the same transaction.  (Potter Decl. Exh. 5.)  It, again, lists a Houston address for OW USA and indicates OW Malta's address and contact information are located in Greece.  (Id.)  While it specifies the same amount and price for the fuel as the purchase order, it alters the payment terms to 30 days instead of 37.  (Id.)  The second page of the confirmation states, as did the confirmation in the OW Malta / Dynacom transaction referenced above, that the sale and delivery are "subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers.  The acceptance of the marine bunker by the vessel named above shall be deemed to constitute acceptance of said general terms applicable to you as the 'Buyer' and to O.W. Bunker USA Inc. as 'Seller'."  (Id.)  Nothing in the documentary record of this transaction identifies further third parties closer to the actual provision of bunkers such as Bergen or Aegean.

      C.     <u>The OW USA / Bergen Transaction</u>

The third step in the transaction occurred immediately thereafter.  OW USA turned around and contracted with Bergen for delivery of the bunkers to the Amazon.  OW USA's contract with Bergen is also dated October 22, 2014.  (Potter Decl. Exh. 6.)  OW USA sent a Purchase Order Confirmation on letterhead indicating its address in Houston, TX, to Bergen at its address in Norway.  (Id.)  This order was for the same quantity of fuel but indicates a lower price of $461 per ton – allowing for OW USA to have its own arbitrage opportunity.  Payment terms are indicated as 30 days from date of delivery against hard copy invoice.  (Id.)

Bergen, in turn, issued a Sales Order Confirmation to OW USA confirming the details of the transaction and referencing the same addresses of the parties as indicated in the Purchase Order. (Potter Decl. Exh. 7.)  The second page of the Confirmation states:

> TERMS:
>
> The sale and delivery of marine fuels described above are subject to Bergen Bunkers AS Terms and Conditions of sale(s) for Marine Bunkers.  The acceptance of the marine bunker by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as the 'Buyer' and to [sic] as 'Seller'.

The Bergen / OW USA contract does not mention OW Malta, Dynacom, or Aegean.

D.    <u>The Bergen / Aegean Transaction</u>

The chain of transactions continued on.  Bergen turned around and entered into its own contract for the provision of the bunkers to the Amazon with Aegean. (Potter Decl. Exh. 8.)  Aegean sent Bergen a confirmation setting forth the terms of the transaction as 2,100 metric tons of fuel at, again, a yet lower price per ton of $460 (that is, $1.00/ton less than the price at which Bergen had agreed with OW USA to provide the bunkers).  This confirmation states:

> This Contract is governed by the Hess Corporation General Terms and Conditions for Marine Fuels, effective as of October 29, 2010, as amended from time to time ("Hess Marine Fuels GTCs"), and constitutes a "Contract" as such term is defined thereunder.  In the event of any inconsistency between this Contract and the Hess Marine Fuels GTCs, the terms of this Contract shall prevail.
>
> A security interest in, and an assignment of proceeds from, this transaction have been granted to ABN Amro Capital USA LLC.  This is our irrevocable instruction for you to pay the full amount of our in our invoice to ABN AMRO Capital USA LLC…

(Id.)  The Aegean / Bergen contract identifies Aegean as the Seller and Bergen as the Buyer.  (Id.)  The contract does not mention Jasper, Dynacom, OW Malta, or OW USA.

E.   Aegean's Bunker Delivery

It is with Aegean that the music stops –and it is Aegean that delivered the bunkers to the Amazon on October 31, 2014. (Potter Decl. Exh. 9.)  "David Pratt" (as chief engineer for the Amazon) signed the Marine Bunker Delivery Note presented to him by Aegean.  (Id.)  The note indicates the quantity received but not the price nor any payment terms.  (Id.)  In fine print below the signature the receipt states:

> The marine fuel described herein is delivered in accordance with the applicable terms and conditions of sale (a copy of which has been provided to Buyer prior to delivery) and on credit of the vessel.  Any disclaimers as to creation of a maritime lien in the amount of the purchase price and delivery charges and/or restrictions as to the authority of the ships officer signing the Receipt binding the vessel and her owner to the above are null and void, unless an authorized representative of Aegean Bunkering (USA) LLC shall have otherwise agreed in writing at the time the Buyer initially orders the marine fuel.  Failing such agreement delivery shall under no circumstance constitute a waiver by Aegean Bunkering (USA) LLC.

(Id.)

On October 31, 2014, Aegean invoiced Bergen for fuel "DLVD" [delivered], in the amount of $981,708.20.  (Potter Decl. Exh. 10.) Later that same day OW Malta invoiced Dynacom for the delivery in the amount of $994,313.42. (Potter Decl. Exh. 11.)  Both invoices remain unpaid.

III.    STANDARD OF REVIEW AND LEGAL PRINCIPLES

    A.    <u>Summary Judgment Standard</u>

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010). The Court's function on summary judgment is to determine whether there exist any genuine issues of material fact to be tried, not to resolve any factual disputes. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).

    B.    <u>Maritime Liens</u>

"As a general rule, maritime liens are disfavored by the law." <u>Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.</u>, 982 F.2d 765, 768 (2d Cir. 1992); <u>see also, e.g.</u>, <u>Integral Control Systems Corp. v. Consolidated Edison Co. of N.Y.</u>, 990 F. Supp. 295, 301 (S.D.N.Y. 1998) (Haight, J.). They can arise only by operation of law, and not by the agreement of the parties. <u>See, e.g.</u>, <u>Bird of Paradise</u>, 72 U.S. 545, 555 (1866). Moreover, because these liens operate without requiring the parties' agreement, the statutory provisions creating maritime liens are <u>stricti juris</u> and will be accorded a technical and precise interpretation that will not be extended

12

by construction, analogy, or inference.  Itel Containers, 982 F.2d at 768 (citing

Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 12

(1920)).

     The type of lien at issue in this case is a maritime lien for necessaries is set

forth in the Commercial Instruments and Maritime Lien Act ("CIMLA").[6]  Under

the statutory scheme, a party claiming a maritime lien against a vessel must show

it (1) provided necessaries, (2) to any vessel, (3) upon the order of the owner of the

vessel or a person authorized by the owner.  46 U.S.C. § 31342(a).  "Necessaries"

include, among other things, supplies.  Itel Containers, 982 F.2d at 767.  CIMLA

also lists "persons … presumed to have authority to procure necessaries for a

vessel:"

     (1) the owner;

     (2) the master;

     (3) a person entrusted with the management of the vessel at the port of supply; or

     (4) an officer or agent appointed by--

          (A) the owner;

          (B) a charterer;

          (C) an owner pro hac vice; or

          (D) an agreed buyer in possession of the vessel.

46 U.S.C. § 31341(a).

---

[6] These statutory provisions were formerly part of the Federal Maritime Lien Act ("FMLA") until a 1988 recodification.  Because there were no substantive changes, it is generally accepted that cases interpreting the FMLA statutory scheme prior to 1988 remain instructive to questions regarding CIMLA today.  See, e.g., Integral Control Sys. Corp. v. Consolidated Edison Co. of NY, Inc., 990 F. Supp. 295, 298 (S.D.N.Y. 1998) (Haight, J.).

C.      Agency

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006). Agency can result from "actual" or "true" authority, which can be either express or implied, id. § 2.01, or "apparent" authority, which results "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Id. § 2.03. The burden of proving an agency relationship is on the party who asserts the existence of the relationship. See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 72 (2d Cir. 2012). "While the existence of an agency relationship often turns on questions of fact, the issue is properly resolved as a matter of law where, as here, the relevant facts are uncontroverted." Johnson v. Priceline.com, 711 F.3d 271, 275 (2d Cir. 2013).

D.      Unjust Enrichment

A claim for unjust enrichment is made out when a plaintiff shows (1) that the defendant was enriched; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution. Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000). "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." Beth Israel Medical Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006).

"The statutory requirement of inquiry as to the vessel's ability to be bound [for necessaries] cannot be circumvented by resorting to the doctrine of unjust enrichment." Diaz v. S.S. SEATHUNDER, 191 F. Supp. 807, 823 (D. Md. 1961).

IV.    ANALYSIS

When the music stopped, so to speak, the order for supply of bunkers to the Amazon had been passed along from Jasper/Dynacom to OW-Malta, OW-Malta to OW-USA, OW-USA to Bergen and finally Bergen to Aegean. Aegean is the only party among this group that actually supplied the physical goods. The remainder of the entities in the chain were essentially engaging in financial transactions in which they were able to make a relatively small amount of money on the arbitrage opportunity presented in the buy/sell difference in the price of the fuel oil.

It is unsurprising – indeed, entirely to be expected – that Aegean seeks payment. Its immediate counterparty is bankrupt – whether with or without future prospects is unclear. Aegean seeks to do what those who supply necessaries may sometimes do:  assert an in rem maritime lien against the Amazon. The series of motions before this Court raise directly whether it – Aegean – in fact possesses such a lien as a matter of law and fact. As previewed above, it does not. The law governing this dispute proceeds from longstanding admiralty law principles.

A.    The Maritime Lien

As set forth above, CIMLA (often referred to by its prior statutory incarnation, the FMLA), requires that in order for Aegean – as the person providing necessaries to the vessel to enforce a maritime lien, it must be acting "on the order

of the owner or a person authorized by the owner." 46 U.S.C. 31342(a). Aegean has failed to proffer sufficient evidence to raise a triable issue as to whether it was acting on the order of the owner or a person authorized by the owner. No facts support any direct communication or interaction between Aegean and Jasper, Dynacom, OW Malta, or OW USA.

All parties are in agreement that Aegean provided the bunkers – which all agree constitute necessaries under CIMLA – to the Amazon. On whose order was that done? The record evidence is clear: on the order of Bergen. It is undisputed that Bergen was not the direct agent of Jasper or Dynacom. How, then can Aegean obtain a position superior to that of the entity from which it received its order? To analyze this the Court looks to each step of the transaction chain and then also at the additional arguments that Aegean has raised regarding the impact of the chief mate's signature of the delivery receipt and provision L.4 of the OW Bunker Group Terms and Conditions.

To analyze Aegean's arguments in this regard the Court looks first to the relationship between the parties. Given the number of steps in the transaction chain, this necessarily requires resort to principles of agency.

The burden of proving an agency relationship is on the party who asserts the existence of the relationship. See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 72 (2d Cir. 2012). "Agency is never presumed; it must be shown affirmatively, and the party who asserts the existence of an agency relationship has the burden of proving it." Valero Marketing & Supply Co. v. M/V

16

ALMI SUN, No. 14-2712, 2015 WL 9459971, at *11 (quoting Karl Rove & Co. v. Thornburgh, 39 F.3d 1273, 1296 (5th Cir. 1994)).

Actual authority requires the manifestation of the principal (which here must be the Amazon's owner or charterer) that it has authorized the agent (here, OW Malta and/or other intervening bunker trading entities). Cactus Pipe & Supply Co., Inc. v. M/V MONTMARTRE, 756 F.2d 1103, 1111 (5th Cir. 1985); Themis Capital LLC v. Democratic Republic of Congo, 881 F. Supp. 2d 508, 520 (S.D.N.Y. 2012) ("[A]n agent has actual authority of the principal  has granted the agent the power to enter contracts on the principal's behalf.")

Apparent authority requires some overt act by the principal (again, the Amazon's owner or charterer) that suggests the existence of an agency relationship. Hawkspere Shipping Co., Ltd. v. Intamex, S.A., 330 F.3d 225, 235 (4th Cir. 2003). Apparent authority requires that the principal make some manifestation to the third party who insists he has relied on such a relationship. Cactus Pipe, 756 F.2d at 1111.

Aegean's inability to trace an agency relationship between Jasper / Dynacom and Bergen fails at both the top and bottom of the chain. At the bottom of the chain, the initial issue Aegean confronts is that previewed above: the documents evidencing and establishing Aegean's transaction with Bergen, as well as the equivalent materials exchanged between OW Malta, OW USA, and Bergen nowhere mention Dynacom. Moreover, there is no evidence to support an inference that Jasper or Dynacom had authorized or appeared to authorize OW Malta to bind

them.  Thus, any question of agency rightly ends at the first step.  See World Fuel Svcs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG, 12 F. Supp. 2d 792, 802 (D. Va. 2014), aff'd sub nom., 783 F.3d 507 (4th Cir. 2015); Hawkspere Shipping, 330 F.3d at 235 (4th Cir. 2003); Cactus Pipe, 756 F.2d at 1111.[7]

Finally, of course, the record is devoid of any facts which indicate that Jasper or Dynacom had conveyed any such authorization to OW Malta let alone authority that would have allowed OW Malta to transfer such authority further down the chain to OW USA, and then from OW USA to Bergen.  Indeed, that makes sense as otherwise Jasper would be subject to the Amazon's arrest based on transactions with third parties with whom it had no formal notice or direct relationship.  See Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV, 199 F.3d 220 (5th Cir. 1999), cert. denied, 529 U.S. 1130 (2000).  The representative of Jasper testified as follows:

> Q: Did you, on behalf of Jasper, ever authorize OW Malta to grant a right of lien on the M/T AMAZON to the physical supplier, or anyone else?
>
> A: No.

(Jasper Tr. 17:20-24.)  The OW Malta representative testified consistently:

> Q: Was O.W. Malta authorized to create or transfer any lien rights down the chain in favor of any other parties, including the physical supplier?
>
> A: No.

---

[7] The law is clear that a purported agent cannot confer authority on himself.  Cactus Pipe, 756 F.2d at 1111. Moreover, the subjective beliefs of the persons dealing with the agent cannot create an agency relationship that otherwise does not exist.  Hawkspere Shipping, 330 F.3d at 235.

18

(OW Malta Tr. 10:16-20.)  And,

> Q: In its role as a bunker trader, just to confirm, did O.W. Malta act at all times for its own account in dealing with the companies down the chain?
>
> A: Yes.

(Id. 8:2-6.)

Aegean has failed to proffer facts which support any actual or apparent agency relationship that would work its way up the chain.[8]

The natural and indisputably correct reading of the contract Aegean actually entered into is that it was a subcontract.  On whose order was the request to Aegean for the bunkers placed?  The documentation reflecting this step in the transaction confirms a two party transaction: Aegean received the nomination for the order from Bergen, and it confirmed the order to Bergen.  The documentation does not reference (in reverse order of transaction participants) OW USA, OW Malta, Dynacom, or Jasper. Nothing in the record indicates that either Aegean or Bergen mentioned or depended on the existence of any of the upstream entities.

As we trace the transaction each step, the same limitations apply and evidence a series of arms-length subcontract relationships: the OW USA / Bergen transaction does not reference the parties that precede them in the chain; the same is true for the OW Malta / OW USA transaction.

---

[8] It is also undisputed that Jasper had no communications with OW USA or Bergen.  (Jasper Tr. 14:15-21; Skoutelas Decl. para. 14.)  OW Malta was unaware that Bergen was even involved in the supply of the bunkers until after the transaction had taken place.  (OW-Malta Tr. 22:9-14.)

But let us imagine, counterfactually for the moment, that there was some connection between each of these parties in this chain between OW Malta and Aegean.  What then?  Aegean's claim for a maritime lien pursuant to CIMLA must nonetheless fail.  The only way in which OW Malta could have had the initial authority to bind the vessel, and to additionally allow others to bind the vessel (a broad set of authorizations to be sure), would be if Jasper had granted that authority to Dynacom and Dynacom had granted the same to OW Malta.  In the absence of such authorization, OW Malta itself is never in the position of one that may itself bind the vessel.  As we know, the record is silent as to any such authorization, it follows that no maritime lien can be held by an entity many steps further removed.[9]  It is notable that the documentation reflecting the transactions were all sent on each company's own letterhead with its own unique address and telephone numbers referenced.

What were the terms and conditions of the Aegean/ Bergen transaction? Aegean references the Hess Terms and Conditions.  This document, along with Aegean's Sales Order Confirmation with Bergen, makes it clear that the Buyer and Seller of the bunkers were Bergen and Aegean respectively.  Those documents established the essential terms of quantity and price; they established the terms governing sampling and insuring quality of the fuel. The invoice that Aegean

---

[9] As stated elsewhere herein, the power to bind a vessel is of course highly significant as the remedy for non-payment may be arrest of the vessel itself.  It stands to reason – and is certainly a core point of admiralty law – that such arrests which necessarily prevent the vessel from proceeding on its business, should occur only under very circumscribed circumstances.  See Cianbro Corp. v. George H. Dean, Inc., 596 F.3d 10, 14 (1st Cir. 2010). Allowing the "power to bind" to be passed down a long chain of subcontractors without the knowledge or approval of the owner or one directly authorized by the owner would fly in the face of this core point.

provided to Bergen further confirms that they were the parties to the transaction. The invoice indicates that the bunkers were sold and billed to Bergen; that is, not to OW Malta, OW USA, or Dynacom.  (Potter Decl. Exh. 10.)

      B.    <u>The Delivery Receipt</u>

To overcome the absence in the record of any direct agreement between Aegean and OW USA, OW Malta, or Dynacom, Aegean turns to the fact that the Amazon's chief engineer signed the delivery receipt after the bunkers were delivered.  This argument fails to raise the triable issue of material fact so as to defeat ING and Jasper's motions for summary judgment.

Aegean argues that the signature of the Amazon's chief engineer on the delivery receipt created or ratified a maritime lien.  In support of this argument, Aegean cites <u>Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky</u>, 869 F.2d 473 (9th Cir. 1988), in which the Ninth Circuit recognized a maritime lien in party because "Ken Lucky's chief engineer accepted the bunkers, acknowledged receipt, with approval of the master.  The ship's master also had presumed authority to incur a lien under the Act. The Vessel certainly benefited from the bunker supply." <u>Id.</u> at 478.  Thus, according to Aegean, a vessel's officer may authorize the provision of necessaries "as they are being provided" and thereby incur a maritime lien on the vessel.  <u>See, e.g.</u>, <u>Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty</u>, 608 F.2d 197, 202 (5th Cir. 1979) ("Authorization, actual and fairly presumed, given prior to or during the rendition of services, or ratified subsequent to rendition will suffice."); <u>Trico Marine Operators, Inc. v. Falcon Drilling Co.</u>, 1997 A.M.C. 267, 275 (E.D. La.

1996) (finding lien "in light of owners' and operators' acquiescence in the provision of such services necessary to the operation of the manned drilling vessel…").

On the facts in the record before this Court, the delivery receipt argument is a red herring. The argument amounts to nothing more than an attempt to create a maritime lien by contract – something that the law does not allow. Itel Containers, 982 F.2d at 768; Vestoil, Ltd. v. M/V M Pioneer, 148 F. App'x 898, 900 (11th Cir. 2005); Valero, 2015 WL 9459971, *5-6.

In addition, the receipt itself was signed by the chief engineer, not the master of the ship nor the owner. He is not among those specifically statutorily authorized to bind the ship. See 46 U.S.C. § 31341. Nothing in the factual record before this Court indicates that the chief engineer for the Amazon ordered the fuel or had any idea who was going to deliver it and on what price and payment terms; nor is there any indication that in signing the receipt the chief engineer was carrying out other instructions imbued with other meaning from the ships' master. Notably, the chief engineer's signed declaration on the Bunker Delivery Note also stated "I have no knowledge of the facts set forth herein." (Potter Decl. Exh. 9.) In addition, the receipt is an Aegean document that contains no references to ant particular terms and conditions of sale, but in the section of the document signed by the bunker barge employee, it refers to "applicable terms and conditions of sale" that were provided to the Buyer prior to delivery. (Id.; Aegean Tr. 56:9-11.) The "Buyer" under the Aegean contract was Bergen. There is no evidence that any Aegean terms were actually provided to Bergen; and it is undisputed that no Aegean terms

were ever provided to the Amazon's chief engineer, OW USA, OW Malta, Dynacom, or Jasper.  (See, e.g., OW Malta Tr. 28:24-25, 29:2-5; Jasper Tr. 43:9-13, 44:5-10.)

While it is no doubt true that there are certain circumstances in which a vessel's officers may bind a vessel (and indeed the CIMLA scheme reflects that reality), no facts here are supportive of such a determination.  Rather, here, all of the facts regarding the chief engineer are limited to finding his signature on a receipt – he otherwise plays no role in this dispute at all.  Such a limited role cannot amount to binding the vessel to a maritime lien.  Thus, the receipt itself amounts to nothing more than the expected acknowledgment by an individual present at delivery that the fuel came on board and that samples were taken.  This was precisely the role the Hess Terms and Conditions expected the individual who signed the receipt to play.  Those Terms and Conditions expected – in fact required – someone on board to sign a delivery receipt; and those same terms and conditions anticipated that the entity obligated to make payment was Bergen, not whomever signed the receipt. To the extent Aegean asserts the concept of ratification, that angle works no better.  To raise a triable issue as to ratification, Aegean must show that Jasper had full knowledge of Aegean's appointment as supplier and knowingly acquiesced in Bergen's authority to bind the vessel.  Chem. Bank v. Affiliated FM Ins. Co., 169 F.3d 121, 128 (2d Cir. 1999), vacated on other grounds 343 F.3d 120 (2d Cir. 2003) ("Ratification must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language."); see also

McAllister Towing & Transp. Co. v. United States, Civil Action No. 12-2208, 2013 WL 81391, at *3-4 (E.D. Pa. Jan. 8, 2013). There are no such facts.

In Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV, 199 F.3d 220 (5th Cir. 1999), the Fifth Circuit rejected an argument similar to that made by Aegean here. There, it held that the supplier's service and execution of the supplier's paperwork were insufficient to establish ratification and the requisite authority for a maritime lien. Id. at 232. The court in Valero reach the same conclusion when it concluded that "the mere signature of a receipt alleging the existence of a maritime lien does not create a maritime lien that never existed by operation of law." 2015 WL 9459971, at *12.

In opposition to this motion, ING correctly notes that while the receipt refers to a "maritime lien", it does so in the context of voiding "disclaimers" to an existing lien. It does not purport to create a lien. For this reason and the reasons listed above, the signed delivery notice does not create or evidence a maritime lien under these facts.

C.     Provision L.4 of the OW Bunker Group Terms and Conditions

Aegean points to provision L.4 of the OW Bunker Group Terms and Conditions as an alternative means of demonstrating a maritime lien. Aegean's argument is that through this portion of the contract between Dynacom and OW Malta its own terms (those of Aegean) are deemed to apply to Jasper. This argument is unavailing.

24

First, of course, it is worth remembering that maritime liens may not be created by contract.  Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd., 982 F.2d 765, 768 (2d Cir. 1992); Vestoil Ltd. v. M/V M Pioneer, 148 F. App'x 898, 900 (11th Cir. 2005) ("[I]t is settled law in the United States that a maritime lien can arise only by operation of law, regardless of any agreement by the parties."); Valero, 2015 WL 9459971, *5-6.  L.4 is, at most, a contract, and cannot itself create a maritime lien.  It is, however, conceivable that a contract could reflect the existence of an agency relationship and/or a maritime lien – thus not creating one, but evidencing one.  Cf. World Fuel Servs. Singapore Pte, Ltd. v. Bulk Juliana M/V, 822 F.3d 766, 774 (5th Cir. 2016).

The portion of the OW Bunker Terms and Conditions at issue is section L.4, which provides, under the heading "EXEMPTIONS AND FORCE MAJEURE," that "where the physical supply of the fuel is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions … the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party."  Aegean argues that this provision sweeps all of the Aegean / Hess Terms and Conditions into the contract between Dynacom and OW Malta and creates a direct contractual relationship between the vessel interests and Aegean giving rise to a maritime lien.

Aegean's reading of section L.4, while vigorously asserted, is fundamentally incorrect.  The interpretation Aegean advances is at odds with both a number of specific provisions in the OW Bunker Terms and Conditions and the overall

25

structure of that contract.  Moreover, even if one were to temporarily accept Aegean's interpretation of the contract for the purposes of argument, there is no evidence in the record which could support the other factual inferences necessary for Aegean to succeed on this theory.

The OW Bunker Terms and Conditions are quite clear that they set out a carefully specified contract between two parties, the Buyer (Dynacom) and the Seller (OW Malta).  It is not the kind of agreement that anticipates unforeseen future amendment; for instance, near the top of the document section A.3 provides that "[g]eneral trading conditions of another party will not apply, unless expressly accepted in writing by OWB."  The Terms and Conditions define "Agreement" as "the concluded terms for the sale/purchase of the Bunkers," and then go on to set out the specific steps the parties must complete in order to reach that conclusion. Nowhere in the sequence laid out in the Terms and Conditions is there a stage that anticipates that a third party may alter the agreement.

The OW Bunker Terms and Conditions also set forth payment terms in section I that are inconsistent with Aegean's interpretation of section L.4.  As with the rest of the agreement, the relevant identified parties are the Buyer and the Seller.  Importantly, per section I.2, the payment required of the Buyer "shall be made in full, without set-off, counterclaim, deduction and/or discount."  This specific provision, which in the contract at issue required Dynacom to pay OW Malta and no other entity, cannot be reconciled with Aegean's argument that a different portion of the Terms and Conditions allows Aegean to step into OW Malta's shoes and

substitute its own payment terms.  Such an arrangement would result in the kind of set-off of Dynacom's obligations to OW Malta that the Terms and Conditions specifically prohibit.

The language in section L.4 must be read against this overall structure and specific contrary provisions within the OW Bunker Terms and Conditions.  L.4 creates an exception "where the physical supply of the fuel is being undertaken by a third party" and where there are "terms and conditions imposed by the third party on the Seller."  The overall structure of the Terms and Conditions, and in particular the requirement in section A.3 that other parties' trading conditions apply only when "expressly accepted in writing," indicate that the condition that terms be "imposed" requires more than those terms simply being referenced as applicable.  Likewise, the requirement that the third party "insist[] that the Buyer is also bound by its own terms and conditions" indicates that, for L.4 to apply the supplier must have specifically referenced and obligated the Buyer, Dynacom.  As discussed above, Aegean's contracts and terms do not reference Copenship or any entity in its position.  Finally, section L.4 at most reaches conditions that result from an arrangement between the Seller, OW Malta, and a third party.  As discussed above, there is no arrangement directly between OW Malta, or even OW USA, and Aegean; all of Aegean's arrangements were with Bergen.

D.    Subcontractors

The transactions set forth above do allow for one characterization of the relationship of Aegean and Bergen to the parties up the chain: they are

27

subcontractors.  OW USA subcontracted for supply with OW Malta; Bergen subcontracted for supply with OW USA, and Aegean subcontracted with Bergen.  As several courts have now held, except in atypical circumstances not present here, subcontractors are not entitled to maritime liens.  <u>Lake Charles</u>, 199 F.3d at 228-29; <u>Galehead, Inc. v. M/V ANGLIA</u>, 183 F.3d 1242, 1246 (11th Cir. 1999) (bunker intermediary had no maritime lien against the vessel for non-payment of fuel); <u>Ceres Marine Terminals, Inc. v. M/V HARMEN OLDENDORFF</u>, 913 F. Supp. 919, 923 (D. Md. 1995) (a subcontractor generally cannot assert a maritime lien on its own behalf because the subcontractor generally provides its services on the order of the contractor, rather than on the order of a person with statutory or other authority to procure necessaries); <u>The Juniata</u>, 277 F. 438, 440 (D. Md. 1922) ("[T]he owner made its bargain with the contractor and looked to it, and no one else, to do the work.  The subcontractor extended credit to the contractor, and never thought of seeking to hold anyone else liable until bankruptcy intervened.  The finding that the subcontractor gave credit to the contractor, and looked to it, and not to the ship, doubtless renders it unnecessary to inquire whether under other circumstances a subcontractor can acquire a lien upon a ship.")  In <u>Port of Portland v. M/V PARALLA</u>, 892 F.2d 825 (9th Cir. 1989), the Ninth Circuit said that "[i]t is the general rule that a general contractor does not have the authority to bind a vessel." <u>Id.</u> at 828 (citing <u>Farwest Steel Corp. v. Barge Sea-Span 241</u>, 828 F.2d 522, 526 (9th Cir. 1987), <u>cert. denied</u>, 485 U.S. 1034 (1988)).

This Court is persuaded by the reasoning of <u>Lake Charles</u> and the case law recited above, that the Court must look to "the nature of the relationship between each pair of entities that are involved in the transaction at issue (<u>e.g.</u> agent vs. independent contractor)" to determine whether Aegean has a lien.  This outcome is consistent with the limited and disruptive nature of this remedy.  "Because a maritime lien is deemed to encumber commerce, it is disfavored in the law and its requisites are construed <u>stricti juris</u> by the courts."  <u>Cianbro Corp. v. George H. Dean, Inc.</u>, 596 F.3d 10, 14 (1st Cir. 2010) (internal quotation marks and citations omitted).  CEPSA, as a sub-subcontractor that Copenship played no role in selecting or supervising, cannot avail itself of a maritime lien against the vessel at the top of the contractual chain.  <u>See, e.g.</u>, <u>id.</u> at 16-17; <u>Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV</u>, 199 F.3d 220, 229 (5th Cir. 1999).

Aegean argues that this outcome ignores the fundamental supplier-protective purposes of CIMLA and maritime liens for the provision of necessaries.  Aegean did, after all, undisputedly supply necessaries to the Amazon, and it undisputedly has not been paid for that supply.  In support of this view, Aegean has invoked a decision by the Canadian Federal Court, <u>Canpotex Shipping Servs. Ltd. v. Marine Petrobulk Ltd.</u>, 2015 F.C. 1108 (Can.), which Aegean argues held "under nearly identical facts" that "a broker trader is never entitled to a maritime lien without having paid the physical supplier."  (ECF No. 117-1 at 1.)

However, <u>Canpotex</u> is a Canadian case, which is important not only because it renders the decision, however well-reasoned, non-binding on this and every other

U.S. court, but also because our two countries have distinct statutory schemes setting forth the requirements for maritime liens.  Most importantly, the relevant Canadian statute only imposes a requirement that an action be taken at the request of a vessel owner or his agent "with respect to stevedoring or lighterage;" no such requirement exists for the supply of necessaries.  Marine Liability Act, SC 2001, c 6 § 139(2.1).  In the United States, in contrast, this authorization is a necessary predicate to any maritime lien for necessaries.  46 U.S.C. § 31342(a).

This difference, and the absence of any orders from the Amazon's owner or its agents in this case, dictate a different result from <u>Canpotex</u>.  Instead, this matter is more like the one that faced Judge Charles S. Haight, an éminence grise of maritime law in this district, in <u>Integral Control Systems Corp. v. Consolidated Edison Co. of New York</u>, 990 F. Supp. 295 (S.D.N.Y. 1998).  In that case, a vessel owner contracted with a shipyard for conversion work on a barge and the shipyard in turn contracted with subcontractors.  <u>Id.</u> at 297.  When the shipyard failed to pay the subcontractors, they initiated an action against, among others, the vessel <u>in rem</u> on the basis of a maritime lien.  <u>Id.</u>

Judge Haight ruled that "the case turns upon whether these plaintiffs can show, as they must, that they rendered their services to the vessel 'on the order of the owner or person authorized by the owner.'"  <u>Id.</u> at 299 (quoting 46 U.S.C. § 31342).  He identified the plaintiffs' "difficulty" as "aris[ing] from the undisputed fact that they contracted to render these services not with [the vessel owner], but with [the shipyard]."  <u>Id.</u>  This, he ruled, was dispositive: given the "considerable

body of law supporting the proposition that a subcontractor cannot assert a maritime lien against a vessel," id., and "the Second Circuit's current commitment to a stricti juris approach to maritime liens," id. at 301, the subcontractors were not entitled to a maritime lien against the vessel on which they had performed work.

A subcontractor relationship without any indication that the vessel owner selected, supervised, or was even aware of the eventual physical supplier will not create a maritime lien against that vessel. To find otherwise would be to allow vessels to be arrested and encumbered based on the contractual disputes that arise between general contractors and subcontractors or even, as in this case, between subcontractors and sub-subcontractors. This is not in keeping with the CIMLA statutory scheme, and as a result there can be no dispute that Aegean does not have a maritime lien against the Amazon.

E.     Aegean's Equitable Arguments

As an alternative to its maritime lien claim, Aegean argues that it is entitled to recovery based on principles of equity. Certainly admiralty law has its basis in equity. The Ship Virgin v. Vyfhius, 33 U.S. 538, 550 (1834); see also The Kalfarli, 277 F. 391, 394-404 (2d Cir. 1921); Smith v. Seaport Marine, Inc., 981 F. Supp. 2d 1188, 1202 (S.D. Ala. 2013), aff'd sub nom 764 F.3d 1302 (11th Cir. 2014) ("Admiralty jurisdiction and maritime law are firmly grounded in principles of equity. In that regard, the Supreme Court has emphasized the judiciary's role in formulating flexible and fair remedies in [maritime law]." (internal citations and quotation marks omitted)). Aegean also points to Wardley International Bank, Inc.

31

v. Nasipit Bay Vessel, 841 F.2d 259 (9th Cir. 1988), in which, it argues, the Ninth Circuit "applied the principle of equitable subordination to re-rank the lien priorities of various claimants after finding that the purported maritime lien holder had engaged in a 'contrived financial scheme' in an attempt to 'destroy the liens of suppliers.'" However, principles of equity do not allow for the creation of a maritime lien for Aegean when the statute and facts here dictate otherwise.

As discussed now at length above, maritime liens are stricti juris and cannot be extended by construction, analogy, or inference conferred on a theory of unjust enrichment. See Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Inc., 982 F.2d 765, 768 (2d Cir. 1992); Integral Control Systems, 990 F. Supp. at 301; The YANKEE BLADE, 60 U.S. (19 How.) 82 (1856); Osaka Shoshen Kaisha v. Pac. Export Lumber Co., 260 U.S. 490; Diaz v. S.S. SEATHUNDER, 191 F. Supp. 807, 823 (D. Md. 1961) ("The statutory requirement of inquiry as to the vessel's ability to be bound for repairs made to her cannot be circumvented by resorting to the doctrine of unjust enrichment.."); see also Valero Mktg. & Supply Co. v. M/V ALMI SUN, Civ. Action No. 14-2712, 2016 WL 475905 at *5 & n. 73 (E.D. La. Feb. 8, 2016) ("Valero II").

Aegean argues for recovery specifically pursuant to a theory of unjust enrichment. It is axiomatic that a claim for unjust enrichment must be brought in personam – and Aegean has asserted only in rem claims in this action. Kane v. Motor Vessel Leda, 355 F. Supp. 796, 801 (E.D. La. 1972), aff'd 491 F.2d 899 (5th Cir. 1974).

Even if Aegean could at this juncture assert an unjust enrichment claim <u>in personam</u>, the claim must fail on the facts here.  The law is clear that a claim for unjust enrichment is a quasi-contractual claim.  <u>Beth Israel Medical Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.</u>, 448 F.3d 573, 586 (2d Cir. 2006).  Thus, a valid and enforceable contract governing a particular subject matter precludes recovery in quasi-contract for events arising out of the same subject matter.  <u>Clark-Fitzpatrick, Inc. v. Long-Island R.R. Co.</u>, 70 N.Y.2d 382, 388 (1987) ("A 'quasi contract' only applies in the absence of an express agreement."); <u>see also</u> <u>Katz v. Am. Mayflower Life Ins. Co. of N.Y.</u>, 788 N.Y.S.2d 15 (App. Div. 2004).  This rule applies to cases involving maritime liens.  <u>Integral Control Sys.</u>, 990 F. Supp. at 301 ("The case at bar falls within the established rule that the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter.") (internal quotation marks omitted).  Therefore, even if Aegean properly asserted an <u>in personam</u> claim, recovery under a theory of unjust enrichment would be beyond its reach.

V.      CONCLUSION

For the reasons set forth above, the ING and Jasper motions for summary judgment (ECF Nos. 114 & 119) are GRANTED and the Aegean motion (ECF No. 108) is DENIED.  Aegean's complaint is therefore dismissed.[10]


         SO ORDERED.

Dated:        New York, New York
              August 24, 2016



                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge

---

[10] Aegean did not oppose Jasper's arguments for dismissal of its conversion and trespass to title claims.  Those are dismissed as abandoned. Such claims would fail in all events by the same reasoning as that set forth in this Court's simultaneous decision in ING Bank N.V. v. M/V Temara, 16-cv-95.